UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
GETRONICSWANG CO., LLC,             )
                                    )
    Plaintiff,                      )
                                    )
v.                                  )    CIVIL ACTION NO. 04-12382(RCL)
                                    )
HYNIX SEMICONDUCTOR, INC.,          )
SAMSUNG ELECTRONICS CO.,            )
LTD.                                )
                                    )
    Defendants                      )
                                    )
_____ )

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff, GetronicsWang Co., LLC ("Getronics"), through its attorneys, Sheehan Phinney Bass + Green, P.A., pursuant to Fed. R. Civ. P. 56, submits the following memorandum of law in support of Plaintiff's motion for summary judgment. A separate motion for summary judgment and concise statement of material undisputed facts have been filed herewith.

### Introduction and Statement of Facts[1]

In 1992 and 1993, Wang Laboratories ("Wang"), the predecessor to Getronics, entered into separate license agreements with each Defendant. See Plaintiff's Concise Statement of Material Undisputed Facts In Support of Its Motion for Summary Judgment ¶¶ 1-2 ("Pl's. Concise State. Fact."). Under the license agreements, Defendants were to pay to Wang royalties for their use of Wang's patented memory modules. Id. ¶ 4.

---

[1] A separate concise statement of material undisputed facts has been filed herewith.

Royalty payments were to be made in U.S. Dollars, and all monetary values in the agreements were stated in dollars. Id. ¶ 5. Royalties accruing in currencies other than U.S. Dollars were to be converted into dollars at the rate in effect on the last day of the applicable accounting period in which the royalties accrued:

> All sums payable to Wang pursuant to this Agreement shall be paid in United States Dollars. In the event royalties accrue in a currency other than United States Dollars, those royalties shall be converted to United States Dollars at the rate for which United States Dollars were publicly traded in exchange for the other currency by the Korea Foreign Exchange Bank, on the last day of the Semi-Annual Period during which the royalties accrued.

Id. ¶ 6 (quoting the Samsung Agreement as an example).

From 1990 to 1997, the following aggregate royalties accrued under the license agreements as a result of each Defendant's use of the patented modules:

**Chart 1 (Full Value of Royalties):**

Samsung:   $6,206,482 (US)
Goldstar:   $5,382,784 (US)
Hyundai:    $803,987 (US)

See id. ¶¶ 15, 17.

Defendants did not pay the royalties in full, however. Defendants deducted 16.25% from each royalty payment, converted that percentage into Korean Won, and paid the Won to the Korean National Tax Service ("NTS"). Id. ¶ 22. Each Defendant withheld the following aggregate amounts from their royalty payments:

**Chart 2 (Amounts Deducted from Full Royalties):**

Samsung:   $1,000,792 (US)
Goldstar:   $723,578 (US)
Hyundai:    $129,643 (US)

See id. ¶ 23.

Defendants claimed they were compelled to withhold the monies to comply with Korean tax law.  However, just prior to Defendants' withholding, the Korean Supreme Court issued a written opinion in which the court determined that royalty payments by a Korean company for the use of another's patents registered in the United States were not Korean source income and, therefore, not taxable under the Korean Corporate Tax.  Id. ¶ 13.  Wang was forced to initiate a competent authority proceeding to rectify Defendants' withholding.  Id. ¶ 24.  The United States Treasury Department and Korean NTS determined in the competent authority proceeding that Defendants should not have withheld the funds because the royalties did not constitute Korean source income:

> **Determination and Disposition.**  We have reached mutual agreement with the Korean National Tax Service (NTS) regarding the treatment of royalties paid to Wang from 1992 to present.  The NTS has agreed that none of the royalties will be considered as Korean sourced.  Accordingly, the NTS will refund all of the withholding to the Korean withholding agents.  It will be the responsibility of Wang to determine and collect these refunds from the withholding agents.

Id. ¶ 26 (quoting the October 16, 2002 letter from IRS to Wang).  In accordance with the countries' determination, the NTS refunded to Defendants the funds Defendants withheld from the royalty payments.

After the NTS refunded the Won withheld by Defendants, Defendants purported to repay the 16.25% to Wang.  Id. ¶ 27.  The amounts Defendants repaid to Getronics[2] were not equal to the amounts they withheld when the royalties accrued, however.  Instead, by converting the Won refunded using current exchange rates, rather than the exchange rates called for by the license agreements, each Defendant paid to Getronics the following:

**Chart 3 (2002-2003 Repayment):**

    Samsung:    $808,360 (US)
    Goldstar:   $482,366 (US)
    Hyundai:     $93,724 (US)

See Pl's. Concise State. Fact ¶ 29.

Therefore, Defendant's purported repayments leave shortfalls in the following amounts:

**Chart 4 (Exchange Rate Claim, Chart 2-Chart 3):**

    Samsung:   $192,432 (US) ($1,000,792 - $808,360)
    Goldstar:  $241,212 (US) ($723,578 - $482,366)
    Hyundai:    $35,919 (US) ($129,643 - $93,724)

It is undisputed that Defendants made partial royalty payments when the royalties accrued by discounting 16.25% from each payment and deducting that amount from the amounts paid to Wang. It is also undisputed that after receiving the refund from the NTS, Defendants failed to repay the full amounts they withheld from their previous royalty payments. By failing pay the full royalties, Defendants have breached the license agreements in at least three ways: (1) by failing to pay royalties as they accrued; (2) by making payments in Won when the license agreements required all payments be made in U.S. Dollars; and (3) by applying their own currency conversion rate as opposed to the rate agreed to by the parties. Defendants' conduct, in addition to constituting breaches of the license agreements, also constitutes violations of Defendants' covenants of good faith and fair dealing. Under the license agreements, interest continues to accrue on Defendants' late payments. Id. ¶ 11. Getronics is also entitled to its costs and attorneys' fees incurred in enforcing the license agreements. Id. ¶ 12. The plain meaning of the

---

[2] In the interim, Getronics purchased Wang. Pl's. Concise State. Fact ¶ 25.

license agreements, when applied to the undisputed facts, warrants summary judgment in favor of Getronics.

**Argument**

**I. Standard for Summary Judgment.**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if it has the potential to affect the outcome of the suit under the applicable law, and a "genuine" issue is one supported by evidence such that a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party. Rossiter v. International Business Machines Corp., 2005 WL 2722929, *5-6 (D. Mass. October 24, 2005) (internal citations omitted).

To oppose a motion for summary judgment successfully, the non-moving party must present evidence with substance in the sense that it limits differing versions of the truth which a fact finder must resolve at an ensuing trial. Id. Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation. Id.

An examination of the undisputed facts before the Court in the context of the above summary judgment standards mandates the conclusion that Getronics has met its burden of proving that there are no genuine issues of material fact as to all counts of

Getronics' Complaint and therefore Getronics is entitled to judgment as a matter of law on all counts of its Complaint.

**II. Defendants Breached Their License Agreements.**

    A.  <u>Defendants breached the license agreements by making partial royalty payments.</u>

        1.  <u>Royalty Payment Claim.</u>

Defendants agreed to make royalty payments to Wang as the royalties accrued. <u>See</u> Samsung Agreement § 2.03; Goldstar Agreement § 3.03; Hyundai Agreement § 5.3.[3] When Defendants made their initial royalty payments, Defendants converted all royalties to U.S. Dollars according to the currency rate applicable when the royalties accrued. The calculation led to the determination of the full value of the royalties owed to Wang and is set forth in Chart 1, above. Defendants did not pay the full amounts due, however. Instead, they deducted the amounts set forth in Chart 2, above. <u>See id</u>. ¶ 23. In so doing, Defendants breached the plain terms of the license agreements calling for royalties to be paid when the royalties accrued (hereinafter referred to as the "Royalty Payment Claim"). <u>See</u> <u>Bank v. International Business Machines Corp.</u>, 145 F.3d 420, 424 (1st Cir. 1998) ("Should the court find the contract language unambiguous, we interpret it according to its plain terms.") (Massachusetts law); Samsung Agreement §§2.02 and 2.03 (requiring payment as royalties accrue); Goldstar Agreement §§8.02(iii) and 3.03; Hyundai Agreement §§1.5 and 5.3.[4]

        2.  <u>Exchange Rate Claim.</u>

---

[3] <u>See, e.g.</u>, Samsung Agreement § 2.03 ("During the term of this Agreement, LICENSEE shall pay to WANG a sunning royalty of three percent (3%) of the Net Sales Value of all LICENSED SIMMs made, used or sold by LICENSEE in the United States on or after January 1, 1992."). The license agreements are attached within Exhibits 1-2 of the Affidavit of James P. Harris, Esq.

[4] As explained more fully in section III, <u>infra</u>, interest has accrued on the late royalty payments from the time the royalties accrued until Defendants partially repaid the funds they withheld in 2002-2003.

In 2002-2003, Defendants purported to rectify their earlier partial payments. Chart 2 above sets forth the amounts withheld by Defendants when the royalties accrued. Instead of repaying the amounts they withheld, each Defendant paid to Getronics a portion of the amounts withheld (Chart 3, above). The reason for the difference is that Defendants converted the Won refunded by the NTS to dollars at the Won/Dollar exchange rate in effect of the time of the repayment, not the exchange rate called for by the parties' agreement. Regardless of the reason, however, Defendants have not paid Getronics the amounts withheld in dollars. As a result, each Defendant owes Getronics the difference between the amounts deducted in the 1990's and the amounts repaid in 2002-2003 (Chart 4, above). It is undisputed that despite Defendants' attempts to rectify their earlier breaches by making payments in 2002-2003, Defendants did not fully compensate Getronics for the amounts deducted from royalties that accrued in the 1990's. This conduct, referred to herein as the "Exchange Rate Claim," perpetuates Defendants' earlier breaches of the license agreements' requirements that royalties be paid as they accrued.[5] See Okmyanski v. Herbalife Intl. of Amer., Inc., 415 F.3d 154 (1st Cir. 2005) ("In construing [a contract], we adhere to the bedrock principle that, in the absence of linguistic ambiguity, the text of a contract dictates its meaning. In following that principle, 'words that are plain and free from ambiguity must be construed in their usual and ordinary sense.'") (internal citation omitted); Samsung Agreement §§2.02 and 2.03 (requiring payment as royalties accrue); Goldstar Agreement §§8.02(iii) and 3.03; Hyundai Agreement §§1.5 and 5.3.

   B. <u>Defendants have breached the payment terms of the license agreements.</u>

---

[5] As explained more fully in section III, infra, interest has accrued on the Exchange Rate claim from the time Defendants made their partial payments in 2002-2003 until the initiation of this litigation.

Defendants have also breached the license agreements' explicit requirement that all payments be made in U.S. Dollars. See Samsung Agreement §2.11; Goldstar Agreement §3.09; Hyundai Agreement §6.4. As royalties accrued, Defendants converted 16.25% of each royalty payment to Won (according to the currency rate applicable when the royalties accrued) and paid that amount of Won to the Korean National Tax Service. In 2002, the NTS refunded the same amount of Won to Defendants. Defendants subsequently converted the Won refunded back into U.S. Dollars according to the 2002-2003 currency rate. When Defendants paid that amount to Getronics, they effectively made late royalty payments in Won. Because all payments under the lease agreement were to be made in U.S. Dollars, Defendants have breached their respective license agreements by failing to convert the refunds into dollars at the exchange rate required by the license agreements. Teragram Corp. v. Marketwatch.com, Inc., 2004 WL 3086883, *4 (D. Mass. Dec. 29, 2004) ("If the contract language is unambiguous, the court must construe it according to its plain meaning. If that plain meaning clearly favors one party, and there is no material factual dispute, summary judgment is appropriate."). The damages suffered by Getronics for Defendants' breach of the payment terms are equal to the damages for the Exchange Rate Claim, (Chart 4) including any interest that has accrued.[6]

C. Defendants breached the license agreements' express currency rate formulas.

Defendants' failure to make full royalty payments also violates the currency rate formulas set forth in the license agreements. The parties contemplated that currency rates might fluctuate throughout their relationship, and they established a mechanism for determining the currency rate applicable to a particular payment. The parties agreed that

---

[6] See section III, infra, regarding interest that has accrued under the license agreements.

royalties accruing in currencies other than U.S. Dollars were to be converted into U.S. Dollars at the rate in effect on the last day of the applicable accounting period.  See Samsung Agreement §2.11; Goldstar Agreement §3.09; Hyundai Agreement §6.4.[7]  Therefore, effectuating the plain meaning of the license agreements requires applying the currency rate from 1990-1997, the period during which royalties accrued, to all payments made by Defendants.  Owens v. West, 182 F.Supp.2d 180, 195 (D. Mass. 2001) (Construction of contract terms begins with the plain and natural meaning of the words used by the parties.).  Getronics should not be required to accept less than full royalties simply because Defendants delayed in making payments.

The contractual conversion rate applies in two ways relevant to this case.  The value of the royalties is determined by applying the currency rate applicable when they accrued (Chart 1, above).  In fact, Defendants used this value in making their initial royalty payments (and deducting the amount of Won to pay to the NTS) and, therefore, set the standard by which Defendants' payments are measured.  Defendants' payment of less than full royalties results in the Royalty Payment Claim (Chart 2).  The contractual conversion rate also demonstrates that Defendants breached the license agreements when they made their 2002-2003 repayments of the NTS refund.  Defendants applied the 2002-2003 currency rate to their repayment, even though the royalties accrued in 1990-1997.  By applying a currency conversion rate different than the one agreed to by the parties,

---

[7] See, e.g, Samsung Agreement, § 2.11:

> All sums payable to Wang pursuant to this Agreement shall be paid in United States Dollars.  In the event royalties accrue in a currency other than United States Dollars, those royalties shall be converted to United States Dollars at the rate for which United States Dollars were publicly traded in exchange for the other currency by the Korea Foreign Exchange Bank, on the last day of the Semi-Annual Period during which the royalties accrued.

Defendants have breached their respective license agreements. This breach manifests itself in the Exchange Rate Claim (Chart 4).

    D.  <u>Courts routinely enforce similar contractual provisions.</u>

It is undisputed that Defendants have failed to pay the full value of the royalties that accrued. They argue they should be excused from full payment simply because the market fluctuated during their withholding. Other courts have given effect to contractual exchange rate methodologies, even where the market conditions have fluctuated. For example, in <u>Pape v. Home Ins. Co.</u>, 139 F.2d 231 (2d Cir. 1943), the Spanish government seized the insured's cotton during a civil war. An insurance policy defined loss in terms of the value of the cotton expressed in U.S. Dollars, and established the exchange rate to be the rate applicable at the time of loss. The premiums were also charged in U.S. Dollars. After the war, the insured negotiated with the government for reimbursement for the seized cotton. In the meantime, the value of the peseta decreased substantially. Under the settlement agreement, the government paid the insured in pesetas, which in terms of U.S. Dollars was only about 60% of the cotton's value. The exchange rate set in the contract was given effect and the insurer was ordered to indemnify the insured for the difference between the settlement price and the market value of the cotton (<u>i.e.</u> make up the difference in the exchange rate). <u>See</u> <u>also</u> <u>Bernina Distributors, Inc. v. Bernina Sewing Machine Co.</u>, 646 F.2d 434, 438 (10th Cir. 1981) (Applying the exchange rate set in the contracts despite fluctuations in the market where the contracts were silent as to risk allocation.).

In other circumstances, courts have applied the terms of the parties' agreements, because commercial contracts inherently contemplate risks that market conditions will

affect one party negatively. That is, sellers generally bear the risk that the market prices will increase over the course of the contract, and buyers bear the risk that market prices will decrease. Courts routinely recognize that parties anticipate these market forces when they enter such agreements. See Seaboard Lumber Co. v. United States, 308 F.3d 1283 (Fed. Cir. 2002) (The government's monetary control policy that lead to increase in interest rates and a slump in the timber market did not alleviate the parties' contractual obligations just because the contract became less profitable.); Siemens Credit Corp. v. Newlands, 905 F. Supp. 757 (N.D. Cal. 1994) (The lender assumed the usual risks that the defendant might default or that the interest rate might rise.); Meinrath v. The Singer Co., 87 F.R.D. 422, 428 (S.D.N.Y. 1980) (The fact that all monetary amounts in the contract were stated in terms of U.S. Dollars and the parties chose the law of New York to apply, bonus payments were to be made in U.S. Dollars, despite the fact that the U.S. Dollar declined vis-à-vis the Belgian franc.); Heat Exchangers, Inc. v. Map Constr. Corp., 368 A.2d 1088 (Md. Ct. App. 1977) (Businessmen are reasonably aware of the risk of inflation, and the seller tacitly assumes that risk absent some express provision in the contract.). In this case, the parties expressly determined that the exchange rate applicable when the royalties accrued applied.

Courts have also enforced contractual terms that impliedly allocate the risk that the exchange rate will fluctuate. In ITT Arctic Services, Inc. v. United States, 524 F.2d 680 (Ct. Cl. 1975), after the parties entered into an agreement, the Canadian government decided to float its currency on the open market, instead of fixing its value vis-à-vis the U.S. Dollar. The Canadian government's decision caused the plaintiff's costs to escalate. The Court's review of the contract and the negotiations revealed that the parties never

contemplated such an occurrence. Nevertheless, the plaintiff was held to have assumed the risk of currency fluctuations because it was inherent to its performance. See also Sternberg v. West Coast Life Ins. Co., 196 Cal. App. 2d 519, 523 (Cal. Ct. App. 1961) ("When parties name a specified currency for the payment of an obligation, they know that such a currency falls under the control of the government that issues it, and they realize, too, that the currency is therefore subject to fluctuation. . . . Implied in the terms of the parties' contract fixing designated media for payment lies a correlative recognition that they assume the risks of appreciation or depreciation in the value of the media."); see also Industrial Quimica del Nalon, S.A. v. United States, 15 C.I.T. 240 (Ct. Int'l Trade 1991) (A party to a long-term contract bears the risk of shifting exchange rates.); Toho Titanium Co., Ltd. v. United States, 743 F.Supp. 888 (Ct. Int'l Trade 1990) (A party to a three-year sales contract with fixed prices that did not take into account potential exchange rate fluctuations bore the risk that the yen would appreciate.).[8]  Defendants impliedly assumed the risk that the currency would fluctuate to their detriment during the period of their withholding. As such, Plaintiff is entitled to compensation in accordance with the parties' contractual terms.

According to established precedent, the parties' contractual choice should be effectuated, even where market conditions have changed. In this case, the parties contemplated that market conditions might affect the currency conversion. These

---

[8] See also International Sleeping Car Co. v. C.I.R., 14 B.T.A. 702 (1928). In International Sleeping Car, the plaintiff was a landlord of a building in New York. The building's owner was a resident of France. The agreement between the owner and landlord called for the landlord to make rent payments to the owner in francs each year. The landlord withheld U.S. taxes from the owner's rent payments. The landlord later paid the withheld amounts into the Internal Revenue Service. Between the time of the withholding and the time of payment to the I.R.S., the French franc devalued against the dollar. The I.R.S. imposed a deficiency on the landlord claiming that the landlord should have paid in the amount it withheld before the franc devalued. The court agreed with the I.R.S.. The court held that the amount to be paid to the I.R.S. was the amount withheld, regardless of the fluctuations in the rates of foreign exchange.

sophisticated parties expressly agreed that the currency rate applicable on the dates the royalties accrued should apply.  Defendants made only partial payments when the royalties accrued.  At the very least, the license agreements impliedly allocate the risk of downward currency fluctuation in the Won to Defendants, particularly when Defendants made late payments. In 2002, when Defendants purported to make full payment, they applied a currency rate other than the one set forth in the license agreements.  Defendants have therefore breached the license agreements to the detriment of Getronics.

    E.  <u>Defendants breached by withholding taxes.</u>

       Defendants also argue they should be excused from making full payment because they were justified in withholding taxes.  Although not necessary to Getronics' prevailing on the present motion, it is clear that Defendants breached their license agreements because Defendants improperly deducted from the royalty payments taxes that were not due or levied by the NTS.  The license agreements permitted Defendants to withhold taxes "<u>levied</u>."  The Hyundai Agreement, for example, provided that Hyundai should withhold only taxes levied consistent with the U.S.-Korean tax treaty: "LICENSEE shall withhold from payments to WANG under this Agreement the amount of any national taxes levied on LICENSEE's payments hereunder by the Korean government consistent with any Korea/United States double taxation treaty."  Hyundai Agreement §6.10.  The Samsung and Goldstar agreements contained similar language.  <u>See</u> Goldstar Agreement § 7.07; Samsung Agreement §6.07.  Defendants withheld funds from the royalties and paid them to the NTS without a seizure of the funds, which is the common meaning of the word "levy."  <u>See</u> <u>Interfirst Bank Dallas, N.A. v. United States</u>, 769 F.2d 299, 304-05 (5th Cir. 1985) (Distinguishing between "assess" and "levy" under 26 U.S.C. § 6331 (b)

where the former means to demand taxes and the latter means to forcibly extract taxes.); Sanders v. United States, 1996 WL 303412, *5 (D. Colo. Apr. 3, 1996) ("Levy" means to seize and "seize" means "the act of taking possession of property."); Commonwealth Land Title Ins. Co. v. United States, 759 F. Supp. 87, 91 (D. Conn. 1991) (A "lien" is an encumbrance on property whereas "levy" is a seizure of property.). Defendants' payment to the NTS without the Korean authorities levying the funds contravenes the plain meaning of the license agreements.

Even if Defendants construed "levied" to mean "imposed" or "assessed," the case of Hyundai Motor Co., Ltd. v. Chongro Tax Office, 91 Nu 6887 (May 12, 1992) ("Hyundai Motor Co. Case"), decided by the Korean Supreme Court just prior to Defendants' withholding, should have alerted Defendants that the Korean Corporate Tax was not imposed under the circumstances. In the Hyundai Motor Co. Case, the Korean Supreme Court determined that royalty payments by a Korean company for the use of another's patents registered in the United States were not Korean source income and therefore not taxable under the Korean Corporate Tax. Pl's. Concise State. Fact ¶ 13. Wang brought the holding of the Korean Supreme Court decision to the attention of Samsung and Goldstar, but they withheld taxes nevertheless. Id. ¶ 20.[9] Even under a relaxed definition of "levy," Defendants' withholding was improper.[10]

---

[9] The Hyundai Agreement, entered into fifteen months after the Samsung and Goldstar Agreements, expressly required Hyundai to comply with the U.S.-Korean tax treaty, making further notification of the Korean Supreme Court decision unnecessary. See Pl's. Concise State. Fact ¶ 8 ("LICENSEE shall withhold from payments to WANG under this Agreement the amount of any national taxes levied on LICENSEE's payments hereunder by the Korean government consistent with any Korea/United States double taxation treaty.").

[10] To the extent the license agreements afforded Defendants discretion to determine what taxes were due to the NTS, Defendants breached their obligations to act in good faith and deal fairly with Getronics, a duty implied into the license agreements. See Okmyansky v. Herbalife Intl. of Amer., Inc., 415 F.3d 154 (1st Cir. 2005). Defendants did so by, among other things, ignoring the plain meaning of the license

14

Despite the contract language, the Korean Supreme Court decision in the <u>Hyundai Motor Co.</u> Case, and Getronics' instructions, Defendants withheld taxes from their royalty payments. Getronics was forced to initiate a competent authority proceeding to rectify Defendants' wrongful withholding. <u>Id</u>. ¶ 24. The competent authority proceeding ultimately determined that the withholding was not consistent with the tax treaty, a determination that was consistent with the holding in the <u>Hyundai Motor Co.</u> Case. <u>Id</u>. ¶ 26 (quoting the October 16, 2002 letter from IRS to Wang). Therefore, Defendants' deducting 16.25% from their initial royalty payments was unjustified and does not excuse Defendants' breaches of the license agreements. <u>See</u> <u>Willits v. Peabody Coal Co.</u>, 1999 U.S. App. Lexis 21095 (6th Cir. 1999) (Breach of contract where royalty payments were calculated after deducting taxes, contrary to the terms of the contract.) (unpublished); <u>Beggs v. Dougherty Overseas, Inc.</u>, 287 F.2d 80, 83 (2d Cir. 1961) (Breach of contract where the contract set a procedure for processing of foreign tax and the defendant failed to adhere to the procedure to the detriment of the plaintiff.).

Even after the competent authority proceeding illuminated Defendants' improper withholding, Defendants failed to compensate Getronics for the amounts they withheld when the royalties accrued. The shortfall, set forth in Chart 4 above, results from Defendants' application of the 2002-2003 currency rate as opposed to the rate called for in the license agreements, the rate applicable when the royalties accrued. Defendants have therefore breached their respective license agreements.

F. <u>Defendants were not agents of Getronics</u>.

---

agreements, disregarding the <u>Hyundai Motor Co.</u> decision, and instructions from Wang not to withhold taxes.

Defendants cannot avoid liability by asserting themselves to be "withholding agents," a contention advanced by Defendants in discovery. Such an assertion ignores the express language of the license agreements. Each agreement stated expressly that the licensees were <u>not</u> the agents of Wang. Samsung Agreement § 6.02 ("WANG and LICENSEE agree and stipulate that LICENSEE shall not be construed as acting as an agent or representative of WANG in any dealings which LICENSEE may have with any other person, firm, or corporation and that LICENSEE has no power to act for or legally bind WANG in any transaction."); Goldstar Agreement § 7.02 (same); Hyundai Agreement § 10.2 (same, except reciprocal).

Even if Defendants were agents of Wang, Defendants Samsung and Goldstar disregarded instructions to <u>not</u> withhold taxes due and Hyundai contravened the express requirement that it withhold taxes only if consistent with the U.S-Korea tax treaty. Pl's. Concise State. Fact ¶ 20 and ¶ 8 (quoting the Hyundai Agreement). Defendants violated their duties to Wang by failing to implement the express directives of their principal, and Defendants are liable to Wang/Getronics for all damages suffered as a result. <u>Wilcox v. St. Croix Labor Union Mut. Homes, Inc.</u>, 567 F.Supp. 924, 935 (D.V.I. 1983) ("In accord with the Restatement Second of Agency, the agent must obey directives of his principal and act only as authorized by that principal."); <u>Cultum v. Heritage House Realtors, Inc.</u>, 694 P.2d 630 (Wash. 1985) (An agent has the duty to obey all reasonable instructions and directions given by the principal.); <u>Cutcliffe v. Chesnut</u>, 176 S.E.2d 607 (Ga. Ct. App. 1970) (An agent who has violated specific instructions is responsible for damages for any loss which results from the violation, regardless of the degree of care exercised.). In any event, their alleged status as withholding agents does not alter their contractual

obligations under the license agreements to pay the accrued royalties in U.S. dollars at the exchange rate set in the agreements.

**III. Damages From Defendants' Breaches.**

The purpose of awarding damages for a breach of contract is to put the non-breaching party in the position it would have been in had the withholding agents performed their obligations under the contract. See, e.g., Situation Mgt. Systems, Inc. v. Malouf, Inc., 430 Mass. 875, 881 (2000) ("The usual rule for damages in a breach of contract case is that the injured party should be put in the position they would have been in had the contract been performed."). Putting Getronics in the position it would have been in without Defendants' breach means paying Getronics the full royalties that accrued (Chart 1, above). Beggs v. Dougherty Overseas, Inc., 287 F.2d 80 (2d Cir. 1961).[11] Doing so requires Defendants to pay the shortfalls set forth in Chart 4, above.

The risk that currency would fluctuate during Defendants' withholding was reasonably foreseeable to the parties at the time they entered into the contract. See, e.g., Campbell Hardware, Inc. v. R.W. Granger & Sons, Inc., 401 Mass. 278, 280 (1987). The parties expressly agreed that the currency rate applicable when the royalties accrued would apply to all royalty payments. Placing Getronics in the position it would have been in had Defendants properly performed requires payment of royalties that accrued according to the exchange rate applicable when they accrued. Damages for the improper withholding of Korean taxes were also reasonably foreseeable to the parties at the time of

---

[11] Beggs signed an employment agreement in which he was to serve as a stenographer in Cambodia. The contract explicitly called for the reimbursement of Cambodian income tax payments and was drafted in a way to permit Beggs to take advantage of favorable U.S. tax provisions. The defendant wrongfully terminated Beggs, and Beggs sued for contract damages, which included reimbursement for Cambodian income tax payments. Because the contract explicitly set forth a procedure for the processing of the foreign tax, the court found that the parties contemplated the tax benefits to Beggs, and therefore Beggs was entitled to compensation for the tax benefit lost as a result of the defendant's breach. Id. at 83.

the royalty agreements. See Hyundai Agreement § 6.10 (withholding taxes consistent with U.S.-Korea tax treaty); Goldstar Agreement §7.07 and Samsung Agreement §6.07 (withholding only those taxes levied). The wrongful withholdings therefore comprise elements of damages that are fully compensable to Getronics.

Other aspects of Getronics' damages are set by the license agreements. The parties to the agreements agreed that interest would accrue on late payments. Interest accrues at 1% for the Samsung and Goldstar Agreements at 1%. See Samsung Agreement § 2.12;[12] Goldstar Agreement § 3.10. Interest on late payments accrues at 1.5% under the Hyundai Agreement. See Hyundai Agreement § 6.9. With respect to the Royalty Payment Claim, interest accrues from the time Defendants made partial royalty payments as they accrued from 1990-1997.[13] Agri-Mark, Inc. v. Niro, Inc., 233 F.Supp.2d 200 (D. Mass. 2002) (Under Massachusetts law, interpretation of a contract is ordinarily a question of law for the court; should the court find the contract language unambiguous, it must interpret it according to its plain terms.); cf. Michigan v. U.S., 141 F.3d 662 (6th Cir. 1998) (Interest accrues on overpayment to I.R.S. from date payments were made.); Mnopf Trustees, Ltd. v. U.S., 123 F.3d 1460 (Fed. Cir. 1997). Therefore, Getronics is entitled to interest that has accrued on Defendants' overdue royalty payments in the following amounts:

---

[12] Samsung Agreement § 2.12: "In the event that any payment to be made pursuant to this Article 2 is made after the date by which payment is due, such late payment shall be increased to further include a late payment charge at the rate of 1% of the payment amount for each calendar month or part of a calendar month during the period during which the amount due remains unpaid."
[13] Defendants cannot credibly claim that the 16.25% they withheld was not "due" to Wang, because they withheld the 16.25% from the accrued royalties and paid that amount to the NTS. The fact that Defendants

**Chart 5 (Interest on Royalty Payment Claim):**

    Samsung:   $1,209,684 (US)
    Goldstar:    $802,178 (US)
    Hyundai:   $219,562 (US)

See Pl's. Concise State. Fact ¶ 32.

Interest at the same rates also accrues on the Exchange Rate Claim because Defendants' payments in 2002-2003 were merely partial payments. The interest has accrued on the Exchange Rate Claim in the following amounts:

**Chart 6 (Interest on Exchange Rate Claim):**

    Samsung:   $69,276 (US)
    Goldstar:    $84,424 (US)
    Hyundai:   $22,164 (US)

See id. ¶ 31.

The license agreements also provided that should Wang commence legal action to collect amounts due under the agreements or enforce the agreements, Wang would be entitled to recover from the licensees the costs and attorneys' fees incurred. See Hyundai Agreement § 10.4; Goldstar Agreement § 7.05; Samsung Agreement § 6.05. In this case, Getronics was forced to commence a competent authority proceeding to determine that Defendants' withholding was improper. Getronics was also required to initiate this action because Defendants applied the incorrect exchange rate when paying to Getronics the refund from the NTS. Getronics is, therefore, entitled to recover its costs and attorneys' fees incurred.[14] See Pl's. Concise State. Fact ¶ 35 and ¶ 12 (The license

---

withheld and paid those funds to the NTS is evidence that they considered the 16.25% otherwise due to Wang at the time.
[14] In the event the Court grants Plaintiff's motion for summary judgment and finds that Plaintiff is entitled to its costs and attorneys' fees under the license agreements, Plaintiff will file an appropriate affidavit setting forth the costs and attorneys' fees incurred at that time.

agreements grant Getronics its costs and attorneys' fees incurred enforcing the agreements.).

## Conclusion

For the foregoing reasons, Plaintiff respectfully requests that his Honorable Court grant Plaintiff summary judgment and grant such other additional relief as the Court deems necessary.

Respectfully submitted,

GETRONICSWANG CO., LLC

By its attorneys,

SHEEHAN PHINNEY BASS + GREEN, PA

| | |
|---|---|
| Date: January 20, 2006 | /s/ Michael C. Harvell<br>Michael C. Harvell (Pro Hac Vice)<br>One Boston Place, 38th Floor<br>Boston, MA 02108<br>(617) 897-5600 |
| Date: January 20, 2006 | /s/ Maria Recalde<br>Maria Recalde, (BBO# 552831)<br>One Boston Place, 38th Floor<br>Boston, MA 02108<br>(617) 897-5600 |

## CERTIFICATE OF SERVICE

I, Maria E. Recalde, hereby certify that the foregoing memorandum of law in support of plaintiff's motion for summary judgment was served on Robert P. Sherman, Esq., DLA Piper Rudnick Gray Cary LLP, One International Place, Boston, Massachusetts 02110, robert.sherman@dlapiper.com through Electronic Case Filing, this 20th day of January, 2006.

/s/ Maria E. Recalde
Maria E. Recalde