UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GETRONICSWANG CO., LLC,<br><br>Plaintiff,<br><br>v.<br><br>HYNIX SEMICONDUCTOR, INC. and<br>SAMSUNG ELECTRONICS CO., LTD.<br><br>Defendants. | Civil Action No. 04-12382 (RCL) |

## DEFENDANT, HYNIX SEMICONDUCTOR, INC.'S RESPONSES TO PLAINTIFF, GETRONICSWANG CO., LLC'S REQUESTS FOR ADMISSIONS

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Hynix Semiconductor, Inc. ("Hynix") responds as follows to the Requests for Admission propounded by Getronicswang Co. LLC ("Wang") .

### GENERAL OBJECTIONS

Hynix incorporates the following General Objections into each and every objection and/or individualized response contained herein, as set forth below, and into each and every amendment, supplement or modification to these responses hereafter provided to the specific requests. These General Objections have been set forth herein to avoid duplication and repetition from restating them in response to each request. The Preliminary Statement and General Objections may be referred to in response to certain requests for the purpose of clarity only. Hynix does not waive any General Objections in response to any specific request propounded. Hynix sets forth the following general objections to Wang's Requests For Admissions:

1.     Hynix objects to each of the requests to the extent that it seeks to impose an obligation or burden beyond that required by the Federal Rules of Civil Procedure. Hynix will respond to the requests to the extent required by the applicable Rules.

2.     Hynix objects to each request to the extent that it seeks information that is protected from discovery by the Attorney-Client Privilege, the Work-Product Doctrine, or any other privilege or immunity from discovery.

3.     Hynix objects to each request to the extent that it seeks information that is already in the possession of Wang or information that is equally available to Wang.

4.     Hynix objects to each request to the extent that it is overly broad, unduly burdensome, and/or seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

5.     Hynix objects to each request to the extent that the requests are duplicative, unreasonably cumulative and/or oppressive.

6.     Hynix objects to each request to the extent that it seeks information that is subject to the protection afforded trade secrets or confidential research, development, commercial, or proprietary information.

7.     Hynix objects to each request to the extent that it is vague and/or ambiguous.

8.     Hynix objects to each request to the extent that it calls for information that is not in the possession, custody, or control of Hynix.

**RESPONSES**

**REQUEST NO. 1:**

A true and accurate copy of the Hyundai License Agreement is attached hereto as Exhibit A.

**RESPONSE NO. 1:**

Admitted.

## REQUEST NO. 2

A true and accurate copy of the Goldstar License Agreement is attached hereto as Exhibit B.

## RESPONSE NO. 2:

Admitted.

## REQUEST NO. 3:

A true and accurate copy of correspondence from WLI to Goldstar dated June 16, 1992 is attached hereto as Exhibit C and was received by Goldstar in response to Exhibit C.

## RESPONSE NO. 3:

Admitted.

## REQUEST NO. 4:

A true and accurate copy of correspondence dated July 27, 1992 from Goldstar to WLI is attached hereto as Exhibit D and was transmitted by Goldstar in response to Exhibit C.

## RESPONSE NO. 4:

Admitted.

## REQUEST NO. 5:

During 1992 or 1993, prior to beginning royalty payments to WLI pursuant to the Hyundai License Agreement, Hyundai became aware of the Hyundai Case.

## RESPONSE NO. 5:

Denied.

## REQUEST NO. 6:

Royalty payments made by Hyundai to WLI did not constitute "Korean source" income within the meaning of the Hyundai Case.

## RESPONSE NO. 6:

Hynix objects to this request as calling for a legal conclusion.  To the extent that the request may be deemed a request for an admission of fact, Hynix denies the request.

**REQUEST NO. 7**

The royalty payments made to WLI by Goldstar did not constitute "Korean source" income within the meaning of the Hyundai Case.

**RESPONSE NO. 7**

Hynix objects to this request as calling for a legal conclusion.  To the extent that the request may be deemed a request for an admission of fact, Hynix denies the request.

**REQUEST NO. 8**

The royalty payments paid by Hyundai to WLI were not taxable by the Korean tax authorities pursuant to the Hyundai Case.

**RESPONSE NO. 8:**

Hynix objects to this request as calling for a legal conclusion.  To the extent that the request may be deemed a request for an admission of fact, Hynix denies the request.

**REQUEST NO. 9:**

The royalty payments paid by Goldstar to WLI were not taxable by the Korean tax authorities pursuant to the Hyundai Case.

**RESPONSE NO. 9:**

Hynix objects to this request as calling for a legal conclusion.  To the extent that the request may be deemed a request for an admission of fact, Hynix denies the request.

**REQUEST NO. 10:**

Hyundai and/or Hynix has paid to WLI or its successors in interest all amounts due under the Hyundai Licensing Agreements, other than the Exchange Rate Claim referred to in the complaint in this matter, interest and attorneys' fees, the payment obligation of which are disputed.

**RESPONSE NO. 10:**

Hynix objects to this request as referring to Hyundai Agreements, because there was only one such agreement between Hyundai and Wang.  The request is otherwise admitted.

**REQUEST NO. 11:**

Goldstar and/or Hynix has paid to WLI or its successors in interest all amounts due under the Hyundai Licensing Agreements, other than the Exchange Rate Claim referred to in the complaint in this matter, interest and attorneys' fees, the payment obligation of which are disputed.

**RESPONSE NO. 11:**

Hynix objects to this request as referring to amounts paid by Goldstar under the Hyundai Licensing Agreements. Hynix admits that Goldstar and/or Hynix has paid to WLI or its successors in interest all amounts due under the Goldstar Licensing Agreement, other than the Exchange Rate Claim referred to in the complaint in this matter, interest and attorneys' fees, the payment obligation of which are disputed.

HYNIX SEMICONDUCTOR, INC.,

By its attorneys,

Robert P. Sherman (BBO #458540)
Gordon M. Jones, III (BBO #549016)
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110
(617) 345-1000

Dated: November ___, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail on November ___, 2005.

Gordon M. Jones III

**EXHIBIT A**

SIMM   TECHNOLOGY   PATENT   LICENSE   AGREEMENT

Agreement dated as of June __21__, 1993 (hereinafter "Date of this Agreement") by and between Wang Laboratories, Inc., a corporation under the laws of the Commonwealth of Massachusetts and having a principal place of business at One Industrial Avenue, Lowell, Massachusetts 01851 (hereinafter "WANG"), and Hyundai Electronics Industries Co., Ltd., a corporation under the laws of the Republic of Korea, and having a principal place of business at 66 Chuckseon-Dong, Chongro-Ku, Seoul, Korea, (hereinafter "LICENSEE").

WANG is the owner of, and has the right to license, certain United States patents and it desires to grant licenses and other rights with respect to such patents.

LICENSEE acknowledges that by letter dated as of July 25, 1990, WANG advised LICENSEE of its need for a license under such patents. LICENSEE desires to acquire a license and other rights under such patents.

NOW, THEREFORE, for and in consideration of the premises and covenants contained herein, WANG and LICENSEE agree as follows:

Section 1.  Definitions

1.1      "SIMM" shall mean a single in-line memory module.

1.2      "Licensed Products" shall mean SIMMs which have a Type Number and which are covered by one or more claims of either or both of the Licensed Patents.

1.3      "Licensed Patents" shall mean the United States Letters Patent owned by WANG and identified as Patent Numbers 4,656,605 issued April 7, 1987 and 4,727,513 issued February 23, 1988.

1.4      "Type Number" shall mean any combination of numbers, letters or words utilized by LICENSEE to identify a particular type or model of SIMM.

1.5      "Licensee's Selling Price" shall mean the bona fide gross selling price, after prompt payment discounts (not to exceed 2%) and quantity discounts actually allowed, at which LICENSEE or its sublicensed Subsidiaries sell a Licensed Product to other than its affiliate.  If said gross selling price includes the following items, they may be deducted only if separately stated:  packing, transportation and insurance charges;  import, export excise, sales and value added taxes;  custom duties;  and commissions.    If LICENSEE or its

2

GW0000001990

sublicensed Subsidiaries so sell Licensed Products at more than one such price, Licensee's Selling Price with respect to each such Licensed Product of that Type Number shall mean the total revenue at such bona fide gross selling prices, adjusted as aforesaid for such sales of said Licensed Product, in the relevant semi-annual accounting period divided by the number of said Licensed Products of that Type Number sold in said period.   If LICENSEE or its sublicensed Subsidiaries do not separately sell such Licensed Products, but incorporate them in apparatus which is not itself a Licensed Product, Licensee's Selling Price shall be deemed to be the Manufacturing Cost for each such Licensed Product of that Type Number in the relevant semi-annual accounting period multiplied by two (2).  Licensed Products which are not sold by LICENSEE or its sublicensed Subsidiaries during the relevant accounting period, but which are otherwise transferred shall be deemed to have been sold for purposes of the computation of royalties in accordance with Section 5 hereof.

1.6        "Manufacturing Cost" shall mean LICENSEE's or its sublicensed Subsidiaries' total cost of direct materials, direct and indirect factory labor and factory overhead determined by LICENSEE in accordance with sound accounting principles.

3

GW0000001991

1.7      "Subsidiary" shall mean any corporation, company or other entity more than fifty percent (50%) of whose outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) are, now or hereafter, owned or controlled, directly or indirectly, by LICENSEE, but such corporation, company or other entity shall be deemed to be a Subsidiary only so long as such ownership or control exists.

Section 2.  <u>License</u>

2.1      WANG  grants  to  LICENSEE  a  royalty  bearing, nonexclusive license under the Licensed Patents:

　　　　2.1.1      to  make,  use,  sell  and/or  otherwise transfer Licensed Products; and

　　　　2.1.2      to have made Licensed Products by another manufacturer for the use, sale or other transfer only by LICENSEE; provided, that prior written authorization to manufacture such Licensed Products under this Agreement has been given to said other manufacturer by LICENSEE.

2.2      No  license  or  immunity  is  granted  by  WANG  to LICENSEE  either  directly  or  by  implication,  estoppel  or otherwise:

　　　　2.2.1 other than under the Licensed Patents;

　　　　2.2.2 with respect to any other apparatus which is not a Licensed Product even though such Licensed Product

4

GW0000001992

is incorporated into such apparatus; or

2.2.3 to parties acquiring any items from LICENSEE for the combination of such acquired item with any other item, including other items provided by LICENSEE, or for the use of any such combination.

Section 3.    <u>Extension of License to Subsidiaries</u>

3.1    The license granted herein includes the right of LICENSEE to sublicense its Subsidiaries, direct or indirect. Each Subsidiary so sublicensed shall be bound by the terms and conditions of this Agreement as if it was named herein in the place of LICENSEE, provided that LICENSEE shall pay and account to WANG in respect of the exercise by any Subsidiary of any sublicense granted to it hereunder.  Any sublicense granted to a Subsidiary shall terminate on the date such Subsidiary ceases to be a Subsidiary.  Upon written request from WANG, LICENSEE shall promptly advise WANG in writing of those of its Subsidiaries which have been sublicensed under this Agreement.  At the time of the signing of this Agreement, Hyundai Electronics of American (hereinafter "HEA") is a Subsidiary of LICENSEE.

Section 4.    <u>Release</u>

4.1    Effective upon the receipt and acceptance by WANG of the payment provided for in Section 5.2 and the report required by Section 6.2, WANG irrevocably releases LICENSEE

5

GW0000001993

and its customers, mediate and immediate, from any and all claims of infringement of the Licensed Patents, which claims have been made or which might be made at any time, with respect to any item manufactured, used, sold or otherwise transferred by or for LICENSEE before the date of this Agreement, to the extent that such item would have been licensed hereunder had it been manufactured, used, sold or otherwise transferred after the date of this Agreement.

Section 5. Payments and Royalties

5.1        Within twelve (12) days of the Effective Date of this Agreement, LICENSEE shall pay to WANG, based on an invoice from Wang, a one time administrative licensing fee of fifty thousand dollars ($50,000), which payment shall be non-refundable and not creditable against royalties payable under any other provision of this Section 5.  The foregoing fee shall be paid by wire transfer pursuant to instructions from WANG to LICENSEE.

5.2.1        As consideration for the release granted to LICENSEE herein, LICENSEE shall pay to Wang seven hundred fifty thousand United States Dollars ($750,000).  The seven hundred fifty thousand ($750,000) shall be paid to WANG within twelve (12) days of the Effective Date of this Agreement.  The foregoing payments shall be made by wire transfer pursuant to WANG's instructions to LICENSEE.  LICENSEE shall provide to

6

WANG the report required by Section 6.2 of this Agreement within twelve (12) days of the Effective Date of this Agreement.

5.2.2    The payment provided for in Section 5.2 above includes:

an amount for LICENSEE's and its Subsidiaries' past infringement for direct and indirect sales (as defined in Section 5.3 of this Agreement) of memory modules in countries in which there was any Licensed Patent from July 25, 1990 through December 31, 1992, for memory modules which would have been Licensed Products upon which royalties would have accrued pursuant to Section 6.1 of this Agreement had such memory modules been made, used, sold or otherwise transferred subsequent to January 1, 1993 pursuant to the licenses and rights granted herein; and

a pre-paid running royalty for LICENSEE's and its Subsidiaries' direct and indirect manufacture, use, sale or other transfer of Licensed Products in a country where there is a Licensed Patent during the period from January 1, 1993 through December 31, 1994 under the licenses and rights granted herein and upon which royalties have accrued according to Section 6.3 of this Agreement.

7

GW0000001995

5.2.3    In the event that LICENSEE's and its Subsidiaries' cumulative direct and indirect sales in terms of LICENSEE's selling price of Licensed Product in countries in which there is any Licensed Patent during the period from January 1, 1993 through December 31, 1994 exceed twenty million two hundred thousand United Stated dollars ($20,200,000), LICENSEE shall pay Wang an additional royalty of three percent (3%) of the direct and indirect sales that exceed $20,200,000.    The foreign factor (defined in Section 5.3) applicable to LICENSEE's indirect sales shall be five percent (5%).    Wang shall provide LICENSEE an invoice for any such additional royalty upon receipt of LICENSEE's report for the semi-annual accounting period ending on December 31, 1994.    LICENSEE shall pay to Wang any such additional royalty within sixty days of December 31, 1994.

5.2.4    In the event that LICENSEE's direct and indirect sales of Licensed Product for the period from January 1, 1993 through December 31, 1994 are equal to or less than twenty million two hundred thousand United States dollars ($20,200,000), Wang shall not be required to refund any amount to LICENSEE nor shall LICENSEE be obligated to make any additional payment to Wang.

5.2.5    In the event that the United States Court of Appeals for the Federal Circuit, the United States Supreme

8

GW0000001996

Court or a United States District court hold that "3 pack" SIMMs infringe one or both of the Licensed Patents, then, after the foregoing holding becomes final without further right of appeal by any party (the "HOLDING") and within sixty days of the HOLDING, LICENSE shall recalculate the royalty on its direct and indirect (as defined in Section 5.3) sales of Licensed Products, including sales of both "classic" and 3 pack SIMMs,

(1) upon which royalties would have accrued pursuant to Section 6.1 of this Agreement, for the period from July 25, 1990 through December 31, 1992 at a rate of 4% and pay WANG within said sixty (60) days the royalty on such revenue that is in excess of the royalty payable on $4,800,000 at 4%; and

(2)(a) upon which royalties would have accrued pursuant to Section 6.3 of this Agreement for the period from January 1, 1993 through December 31, 1994, when the HOLDING date is on or after January 1, 1995, at a rate of 3% and pay WANG within sixty (60) days of January 1, 1995 the royalty on such revenue that is in excess of the royalty payable on $20,200,000 at 3%, or

(2)(b) upon which royalties would have accrued pursuant to Section 6.3 of this Agreement when the HOLDING date is between January 1, 1993 and January 1, 1995, at a rate of 3% and pay WANG, within sixty (60)

9

GW0000001997

days of the HOLDING date, the royalty on revenue accrued

from January 1, 1993 through the HOLDING DATE that is in

excess of the royalty payable on $20,200,000 times

0.04167 times the number of full months from January 1,

1993 to and including the month of the HOLDING;

plus,

(2)(c)    upon which royalties have accrued pursuant to

Section 6.3 of this Agreement during the period from the

HOLDING date through December 31,1994 at a rate of 3% and

pay WANG, within sixty (60) days of January 1, 1995, the

royalty on revenue accrued from the HOLDING date through

December 31, 1994 that is in excess of $20,200,000 times

0.04167 times the number of full months from the HOLDING

date  to January 1, 1995.

5.3    On or after January 1, 1995, LICENSEE shall pay to

WANG a running royalty of three percent (3%) of LICENSEE's

Selling Price, as hereinafter provided, in respect of each

Licensed Product manufactured, used, sold or otherwise

transferred directly or indirectly in a country where there is

a Licensed Patent by LICENSEE and its sublicensed Subsidiaries

(including HEA) under the licenses and rights granted herein

and upon which royalties have accrued according to Section 6.3

of this Agreement.  LICENSEE shall also pay the above three

percent (3%) royalty on a percent (calculated as of January 1,

1995) of all Licensed Products, except those Licensed Products

10

GW0000001998

upon which royalty is payable pursuant to the preceding sentence, which Licensed Products are made, used, sold or otherwise transferred in any country where there is not an issued Licensed Patent. (This percentage, which is hereinafter defined as the "Foreign Factor", is used for administrative convenience based on activity, including manufacture, use and sales, of LICENSEE and its Subsidiaries which result in Licensed Products being indirectly imported into a country where there is an issued Licensed Patent, the "indirect sales"). "Foreign Factor" means AxP + BxQ + CxR divided by the sum of A + B + C multiplied by 100. A, B and C are LICENSEE's revenue for a twelve month period in three regions of the world: A is Europe; B is Japan and Australia and the South East Asia countries between those two countries including, but not limited to, Korea, Hong Kong, Singapore and Malaysia; and C is all other regions of the World except the United States. P, Q and R are percentages of the total number of ISA and EISA personal computers exported from A, B, and C, respectively, to the United States over the twelve month period.

5.4   Notwithstanding the provisions of Section 5.3 of this Agreement, LICENSEE has the option, exercisable after it has paid to Wang the $50,000 set forth in Section 5.1 and the $750,000 set forth is Section 5.2.1 above within any semi-annual accounting period beginning with the accounting period

11

GW0000001999

that commences on April 1, 1994, of electing to convert the
royalty rate of three percent (3%) as set forth in such
Section 5.3 to a royalty rate of two and three quarters
percent (2¾%) by LICENSEE making a one time payment to Wang of
six hundred thousand United States dollars ($600,000). Such
option shall be deemed exercised by LICENSEE upon the making
of such one time payment. The royalty rate of two and three
quarters percent (2¾%) shall be effective for the remainder of
that accounting period and all subsequent accounting periods.

5.5    No royalties shall be paid by LICENSEE in respect of
a Licensed Product manufactured by LICENSEE or a sublicensed
Subsidiary for any other party that is licensed by WANG to
have such Licensed Product manufactured for it under the
Licensed Patents, provided said other party has given prior
authorization to LICENSEE or such Subsidiary to manufacture
such Licensed Product under said other party's name.

5.6    No royalties shall be payable under this Agreement
by LICENSEE for Licensed Products acquired by LICENSEE or a
sublicensed Subsidiary from a third party that is licensed by
WANG under the Licensed Patents pursuant to a license
agreement that provides for the payment of running royalties
and under which agreement such third party has paid such
royalties. No royalties shall be payable under this Agreement
for Licensed Products acquired by LICENSEE or a Sublicensed

12

GW0000002000

Subsidiary from the Hewlett Packard Corporation or from the International Business Machine Corporation.

Section 6. <u>Accruals, Records and Reports</u>

6.1      For all memory modules made, used, sold or otherwise transferred during the period from July 25, 1990 through December 31, 1992 which would have been Licensed Products had such activity occurred after December 31, 1992, the past infringement portion of the Section 5.2 payment shall be deemed to have accrued if such memory modules were first sold or otherwise transferred or first used, by or for LICENSEE, during such period.

6.2      Together with the payments required by Sections 5.1 and 5.2 and within twelve (12) days of the Effective Date, LICENSEE shall furnish a report certified by an officer of LICENSEE covering the period from July 25, 1990 through December 31, 1992 setting forth the same type of information as required by Section 6.6 for a regular semi-annual accounting period as defined in Section 6.5. Within thirty (30) days following receipt of such report and the payment required by Section 5.2, WANG will advise LICENSEE in writing if it accepts such reports and payment. If Wang accepts such report and payment the release of Section 3.1 shall be effective. If WANG does not accept such report and payment, the release of Section 3.1 shall be of no effect and WANG

13

shall specify its reasons for nonacceptance including the amount of any deficiency in the amount of the payment. If prompt payment is not made by LICENSEE of such deficiency, the report and payment will be, at WANG's option, subject to the audit provisions of Section 6.8 and the interest provision of Section 6.9.

6.3    Beginning on January 1, 1993, royalties shall accrue when Licensed Products with respect to which royalty payments are required by Section 5.2 or Section 5.3 of this Agreement, as the case may be, are first sold or otherwise transferred, or first used, by or for LICENSEE or its sublicensed Subsidiaries in a country where there is an issued Licensed Patent, unless such first sale, transfer or use first occurs in a country where there is not an issued Licensed Patent in which event royalties shall accrue on such Licensed Products when first made by LICENSEE or such sublicensed Subsidiaries. No royalties shall accrue with respect to Licensed Products for a second or subsequent use, sale or other transfer thereof.

6.4    LICENSEE shall pay all royalties and other payments due hereunder in United States dollars. All royalties for an accounting period or other payments computed in other currencies shall be converted into United States dollars at the exchange rate for bank transfers from such currency to

14

GW0000002002

United States dollars as quoted by the head office of the Korean Foreign Exchange Bank at the close of banking on the day preceding the Effective Date of the Agreement for the payments required by Section 5.1 and 5.2 and on the last day of such accounting period (or the first business day thereafter if such last day shall be a non-business day) for the royalty payments required by Section 5.3.

6.5    A semi-annual accounting period shall end on the last day of each June and December during the term of this Agreement.  The first accounting period will end on June 30, 1993 and cover the period from January 1, 1993 through June 30, 1993.  Within twelve (12) days after the end of each such period (including the first) LICENSEE shall furnish to WANG a written report containing the information specified in Section 6.6.  In response thereto, for the accounting period ending on June 30, 1995, WANG shall issue to LICENSEE an invoice for the amount specified in such report as the royalties due and payable by LICENSEE and upon receipt thereof, LICENSEE shall pay to WANG within such sixty (60) day period, all unpaid royalties accrued hereunder to the end of each such period.

6.6    LICENSEE's semi-annual report shall be certified by an officer of LICENSEE and shall contain the following information:

6.6.1 identification by Type Number, quantity and

15

GW0000002003

description of each Licensed Product upon which royalty has accrued pursuant to Section 6.3;

6.6.2 identification of Licensee's Selling Price for each Type Number of Licensed Product; the amount of royalties due for each Type Number of Licensed Product; and the aggregate amount of all royalties due;

6.6.3 identification by Type Number, quantity and description of each Licensed Product which LICENSEE has delivered during such semi-annual accounting period to a third party and which are exempt from royalty in accordance with Section 5.5 and the name of such third party, or which are exempt from royalty in accordance with Section 5.6 and the name of such third party; and

6.6.4 in the event that any of the Sections 6.6.1 through 6.6.3 do not apply, LICENSEE shall so state as to each such Section.

In the event no royalties are due, LICENSEE's report shall so state and the reason therefor.

6.7     Upon written request by WANG and in any event at least once each year during the term of this Agreement with the report provided by LICENSEE for the semi-annual accounting period ending in June, LICENSEE will promptly provide to WANG a copy of each publicly available sales manual or brochure relevant to each Licensed Product identified by WANG or sold or distributed by LICENSEE or its Subsidiaries. Upon written

16

GW0000002004

request by WANG, LICENSEE will sell under its standard terms
and conditions and promptly deliver to WANG any Licensed
Product which is offered for sale by LICENSEE identified by
WANG in its request.

6.8        LICENSEE, for itself and its sublicensed
Subsidiaries, shall keep records in sufficient detail to
permit the determination of royalties payable hereunder and at
the request and expense of WANG (except as provided in the
last sentence of this Section 6.8) will permit an independent
auditor selected by WANG or a WANG internal auditor, or any
other person acceptable to WANG and LICENSEE, to examine,
during ordinary business hours once in each calendar year,
such records and other materials as may be required by the
auditor to verify or determine royalties paid or payable under
this Agreement.   Such auditor or other person shall be
instructed to report to WANG only the amount of royalties due
and payable.  If no request for examination of such records
and materials for a particular semi-annual accounting period
has been made by WANG within six (6) years after the end of
said period, the right to examine such records and materials
for said period, and the obligation to keep such records and
materials for said period, shall terminate.  If royalties are
found by such independent auditor or other person to have been
understated, LICENSEE shall pay the understated amount
together with interest in accordance with Section 6.9 and

17

GW0000002005

shall reimburse WANG for its costs and expenses associated with the performance of the audit; provided, however, LICENSEE shall not be obligated to pay such costs and expenses if the amount of such understatement is less than three percent (3%) of the amount reported by LICENSEE and subject to such audit. If the amount subject to such audit is overstated by more than three percent (3%) WANG shall repay to LICENSEE the amount in excess of three percent (3%) of the amount subject to such audit.

6.9    In the event that any payment to be made pursuant to Section 5 is made in whole or in part after the date by which payment is due, such late payment shall be increased to include a late payment charge at the rate of one and one-half percent 1 1/2%) of the payment amount for each calendar month or part thereof (or, if such rate exceeds the maximum legal rate in the jurisdiction where a claim is asserted, the interest rate shall be reduced to the highest rate permitted by applicable law) during the period the amount due remains unpaid.

6.10    All taxes imposed as a result of the existence or performance of this Agreement shall be borne and paid by the party required to do so by applicable law.  LICENSEE shall withhold from payments to WANG under this Agreement the amount of any national taxes levied on LICENSEE's payments hereunder

18

GW0000002006

by the Korean government consistent with any Korea/United
States double taxation treaty. LICENSEE shall effect payment
to the appropriate tax authorities of said government of the
taxes so withheld, and shall transmit to WANG official
receipts issued by said tax authorities or such other evidence
as is reasonably available to support a claim for income tax
credit by WANG in respect of any taxes so withheld and paid.

Section 7. <u>Warranties and Liability</u>

7.1      WANG represents and warrants that it has the full
right and power to grant the licenses and release granted to
LICENSEE pursuant to this Agreement. LICENSEE represents and
warrants that it, its Subsidiaries and their directors and
officers, are not and have not directly or indirectly made,
used or sold SIMMs in the United States under any other name
without being licensed by WANG.

7.2      Nothing contained in this Agreement shall be
construed as:

        7.2.1 a warranty or representation by WANG as to the
    validity or scope of the Licensed Patents;  or

        7.2.2 a warranty or representation by WANG that any
    manufacture, use, sale or other transfer of any product
    does not or will not infringe patents, copyrights,
    industrial design rights or other proprietary rights

19

GW0000002007

owned or controlled by third parties. WANG shall not be liable to LICENSEE or its sublicensed Subsidiaries either directly or as an indemnitor of LICENSEE, such Subsidiaries or their customers as a consequence of any alleged infringement of any such patents, copyrights, industrial design rights or other proprietary rights owned or controlled by third parties. For WANG's information purposes, LICENSEE shall endeavor to advise WANG in writing of any pending or future claims with respect to any such property rights asserted against it or its Subsidiaries by any third party which relates to Licensed Products.

7.3     WANG makes no other warranty or representation, express or implied, including any warranty or representation as to the results obtained or to be obtained by Licensed Products or the use thereof, and including but not limited to, any WARRANTY OF MERCHANTABILITY or any warranty of fitness for a particular purpose with respect to any Licensed Product or the use thereof.

7.4     In no event shall WANG have any responsibility in contract, tort or otherwise, arising out of or in any way connected with this Agreement, to pay or return to LICENSEE royalties paid hereunder by LICENSEE to WANG, except as specifically set forth herein.

20

GW0000002008

Section 8. <u>Term and Termination</u>

8.1      Unless terminated earlier under a provision of this Section 8, the license granted to LICENSEE under this Agreement shall extend from January 1, 1993 to the date of expiration of the last to expire of the Licensed Patents. Unless terminated earlier under a provision of this Section 8, the term of this Agreement shall extend from the Effective Date of this Agreement to the date of termination or completion of performance of all licenses, rights and obligations hereunder.

8.2      LICENSEE may terminate the licenses granted herein with respect to either or both Licensed Patents at any time upon ninety (90) days written notice to WANG.

8.3      Upon breach or default by Licensee of any provision in this Agreement, including but not limited to, failure to make any report, make any payment or pay any royalties or interest due, or permit the inspection of its or a sublicensed Subsidiary's books and records, as hereinabove required, WANG may terminate the licenses granted to LICENSEE under this Agreement and/or this Agreement at any time upon thirty (30) days written notice to LICENSEE identifying such breach or

21

GW0000002009

default; provided, however, that if LICENSEE satisfactorily remedies such breach or default within the thirty (30) days notice period, then the licenses granted herein by WANG to LICENSEE shall not terminate.

8.4     In the event this Agreement or the license granted hereunder shall be terminated pursuant to this Section 8, the corresponding sublicense granted to Subsidiaries of LICENSEE pursuant to Section 3 shall likewise terminate, but no notice need be given by WANG to such sublicensed Subsidiaries.

8.5     No termination pursuant to this Section 8, or Sections 3.1 or 10.10 shall relieve LICENSEE of any obligations or liability accrued hereunder prior to such termination, or rescind or give rise to any right to rescind anything done by LICENSEE or any payments made or other consideration given to WANG prior to the time such termination becomes effective, and such termination shall not affect in any manner any rights of either party arising under this Agreement prior to such termination.

Section 9. Notices and Communications

9.1     Notices, reports and communications hereunder shall be deemed to have been sufficiently given if in writing and sent by facsimile transmission and confirmed in writing by

22

courier to the other party at the address given below within ten (10) days following such facsimile transmission.   Until further notice, all notices shall be addressed as follows:

    9.1.1  If from WANG to LICENSEE;

        D. S. Chung
        Senior Manager of the
        Patent Department
        Hyundai Electronics Co., Ltd.
        66 Chuckseon-Dong, Chongro-Ku
        Seoul, Korea

    9.1.2  If from LICENSEE to WANG;

        General Counsel
        Wang Laboratories, Inc.
        One Industrial Avenue
        Lowell, Massachusetts  01851

Either party may change such address by written notice to the other party.

Section 10. Miscellaneous Provisions

10.1    Assignment.

LICENSEE shall not assign this Agreement or the license and rights granted hereunder, in whole or in part, without the prior written consent of WANG.  WANG may assign this Agreement without the written consent of LICENSEE, provided that the assignee expressly assumes all of WANG's obligations under this Agreement by a writing delivered to LICENSEE.

10.2    Agency.

WANG and LICENSEE stipulate that neither party shall be

23

construed as acting as an agent or representative of the other party in any dealings which the first party may have with any other person, firm or corporation and that neither party has power to act for or legally bind the other party in any transaction.

10.3    Applicable Law.

This Agreement shall be interpreted and the rights and liabilities of the parties determined in accordance with the laws of the Commonwealth of Massachusetts.

10.4    Costs and Attorney's Fee.

In the event it is necessary for WANG to commence legal proceedings to enforce this Agreement, or to collect amounts due hereunder, WANG will be entitled to recover from LICENSEE its costs of suit and collection, including attorney's fees, unless such proceedings involve the representation or warranty made by WANG in Section 8.1 of this Agreement, in which event LICENSEE shall be entitled to recover from WANG its attorney's fees.

10.5    Other Property.

Nothing contained in this Agreement shall be construed as conferring any rights by implication, estoppel or otherwise, to or under know-how, copyrights or mask work or similar rights, or with respect to computer programs under any form of

24

GW0000002012

statutory protection now existing or hereafter enacted,
wherein the copying of a program is a requisite for
infringement under such form.

10.6    Enforcement.

WANG shall not have any obligation hereunder to institute
any action or suit against third parties for infringement of
any Licensed Patents or to defend any action or suit brought
by a third party which challenges or concerns the validity of
any Licensed Patents.  In addition, LICENSEE shall not have
any right to institute any action or suit against third
parties for infringement of any Licensed Patents.

10.7    Entire Agreement.

This Agreement constitutes the complete and exclusive
statement of the agreement between WANG and LICENSEE with
respect to the subject matter indicated above, and supersedes
all prior proposals and understandings, oral or written,
relating to the subject matter of this Agreement.  There are
no understandings, representations or warranties of any kind,
oral or written, express or implied, with respect to the
subject matter indicated above, except as expressly set forth
herein.  Failure by either party to enforce any provision of
this Agreement shall not be deemed a waiver of that provision
or of any other provision of this Agreement.  Any claim of
waiver of any right, obligation, term or condition of this

25

GW0000002013

Agreement and any claim that any provision of this Agreement has been modified or amended shall be null and void unless such waiver, modification or amendment is made in writing and signed by authorized representatives of both LICENSEE and WANG.

10.8    This Agreement shall be effective (herein the "Effective Date of this Agreement") as of the later to occur of:

      10.8.1    The Date of this Agreement; or

      10.8.2    The date on which all necessary Korean government approvals are obtained.

If the approvals referred to in Section 10.8.2 are required in order for LICENSEE to perform its obligations under this Agreement, and all such approvals are not obtained within sixty (60) days of the signing of this Agreement by WANG, this Agreement shall be void, <u>ab initio</u>.

10.9    <u>Headings</u>.

    The headings of the several Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

10.10    <u>Severability</u>.

    If any Section of this Agreement is found by competent

GW0000002014

authority to be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such Section in every other respect and the remainder of this Agreement shall continue in effect so long as the Agreement still expresses the intent of the parties. If the intent of the parties cannot be preserved, this Agreement shall be either renegotiated or terminated.

10.11    FACSIMILE SIGNATURES

The parties agree that this Agreement may be executed by one party signing and dating two originals of the Agreement in the place provided at the end and transmitting by facsimile one signed Agreement to the other party and by the other party signing and dating the facsimile copy in the place provided at the end and transmitting by facsimile the facsimile copy back to the first party. The first party, upon receipt of the signed facsimile copy, shall deliver by courier the two original Agreements to the second party for signing and dating to conform to the facsimile copy and shall deliver by courier one of the signed and dated originals of the Agreement to the first party. The Agreement shall be deemed to be made as of the date that the first party receives from the second party its signed and dated copy of the facsimile copy of the Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this

27

GW0000002015

Agreement to be duly signed as of the date first above written.

For Hyundai Electronics        For Wang Laboratories, Inc.
   Industries Co., Ltd.

_Munba Chip_ 6/21/93          _R L Buckingham_       6/21/93
Signature        Date          Signature               Date

MUN-BAE CHUNG                  Richard L. Buckingham
Typed Name                    Typed Name

VICE PRESIDENT                Vice President and
Title                         Treasurer
                              Title

28

GW0000002016

Agreement to be duly signed as of the date first above written.

For Hyundai Electronics          For Wang Laboratories, Inc.
     Industries Co., Ltd.

_____ 6/21/93         _____ 6/21/93
Signature       Date             Signature       Date

MUN-BAC CHUNG                    Richard L. Buckingham
Typed Name                      Typed Name

VICE PRESIDENT                   Vice President and
                                Treasurer
Title                           Title

Commonwealth of Massachusetts
Middlesex, SS.

     Before me on June 21, 1993, the above-named Richard L. Buckingham,
Vice President and Treasurer, being personally known to me did appear
and subscribe his name to the foregoing and affirmed that the same was
his free act and deed.

                              _____
                              Notary Public
                              My Commission Expires: 9/14/95



SEEN at the Consulate General of the
Republic of Korea Boston on  JUL 0 8 1993

                Wha Hyon JUNG
                Consul

NO 93-0446

28

GW0000002017

**EXHIBIT B**

## SIMM TECHNOLOGY PATENT LICENSE AGREEMENT

This Agreement is made this __th day of March, 1992 by and between

Wang Laboratories, Inc., a corporation organized and existing under the laws of the Commonwealth of Massachusetts, United States of America, and having a principal place of business at One Industrial Avenue, Lowell, Massachusetts 01851 (hereinafter "WANG"), and;

Goldstar Electron Co., Ltd., a corporation organized and existing under the laws of Korea and having a principal place of business at 50 Hyang Jeong-Dong, Cheong Ju, Korea 360-480 (hereinafter "LICENSEE").

RECITALS

WANG is the owner of the following United States patents (hereinafter **"WANG SIMM PATENTS"**) relating to single in-line memory modules (hereinafter "SIMMs"):

United States Patent No. 4,656,605 for "Single In-Line Memory Module";

and

United States Patent No. 4,727,513 for "Signal In-Line Memory Module."

Wang is also the owner of the following United States patents (hereafter **"WANG PURCHASE PATENTS"**):

GW0000001266

- 2 -

(1)  4,146,898 for "Toner Transfer System"

(2)  4,297,042 for "Helical Print Head Mechanism"

(3)  4,410,896 for "Apparatus for Preventing Removal of Toner from Transferred Images"

(4)  4,508,463 for "High Density Dot Matrix Printer"

(5)  4,574,318 for "Light Arrangement for Scanner - Digitizer"

(6)  4,628,431 for 'Power Supply On/Off Switching with Inrush Limiting"

(7)  4,688,031 for "Monochromatic Representation of Color Images"

(8)  4,703,318 for "Character-Based Monochromatic Representation of Color Images"

(9)  4,708,313 for "Tilt Apparatus for a Display Monitor"

(10) 4,749,364 for "Display attachment Apparatus"

LICENSEE wants to acquire a nonexclusive license under the **WANG SIMM PATENTS** and the assignment of the **WANG PURCHASE PATENTS**. Wang has the right to grant a nonexclusive license to LICENSEE under the **WANG SIMM PATENTS** and to assign the **WANG PURCHASE PATENTS** and is willing to do so on the terms and conditions recited in this Agreement.

NOW, THEREFORE, WANG and LICENSEE agree as follows.

In addition to the terms appearing in bold type above, other terms appearing in bold type are defined in Article 8 of this Agreement.

GW0000001267

- 3 -

### ARTICLE 1.   LICENSE GRANT

1.01  WANG hereby grants to LICENSEE during the term of this Agreement a nontransferable, nonexclusive world-wide license under the **WANG SIMM PATENTS** to make, have made, to use and to sell **LICENSED SIMMs**.   LICENSEE shall have no right to grant sublicenses under the **WANG SIMM PATENTS** except to its **SUBSIDIARIES**.  This License provides license or release for any **LICENSED SIMM** sold either directly or indirectly into the United States either before or after the **Effective Date** of this Agreement.   WANG agrees that it will make no other claim for use of any other patent owned by WANG for any **LICENSED SIMM** covered by this Agreement.

### Article 2:   ASSIGNMENT

2.01  On the **Effective Date** of this Agreement, WANG assigns by the assignment document attached hereto as Exhibit A to LICENSEE all WANG'S right, title and interest in the **WANG PURCHASE PATENTS**.   WANG retains a non-exclusive royalty-free fully paid-up license to practice the inventions disclosed and/or claimed in the **WANG PURCHASE PATENTS**.

### ARTICLE 3.   ROYALTY PAYMENTS AND ACCOUNTING

3.01  Within three (3) days of the **Effective Date** of this Agreement, LICENSEE shall pay by wire transfer to WANG a one-time administrative licensing fee of Fifty Thousand ($50,000) United States Dollars which is nonrefundable and not creditable

against royalties payable under other provisions of this Article 3.

3.02  Within three (3) days of the **Effective Date** of this Agreement, LICENSEE shall pay to WANG by wire transfer for use of the **WANG SIMM PATENTS** prior to April 1, 1992 and for the assignment of the **WANG PURCHASE PATENTS** the sum of One Million Two Hundred Thousand ($1,200,000) United States Dollars. LICENSEE represents that Two Hundred Thousand ($200,000) United States Dollars of the sum above is sufficient to provide payment of a 3% running royalty on the **Net Sales Value** of LICENSEE'S or its **SUBSIDIARIES** manufacture, sale or use of **LICENSED SIMMs** in the United States and on 5% of the **Net Sales Value** of all **LICENSED SIMMs** sold by LICENSEE or its **SUBSIDIARIES** outside the United States in the period from January 1, 1992 to March 31, 1992.  As this Agreement is only effective after approval by the Korean Government, LICENSEE warrants that it will make its best efforts to obtain such approval in the month of April 1992.

3.03  During the term of this Agreement, LICENSEE shall pay to WANG a running royalty of three percent (3%) of the **Net Sales Value** of all **LICENSED SIMMs** made, used or sold by LICENSEE and **SUBSIDIARIES** in the United States on or after April 1, 1992. However, at the option of the LICENSEE, on or after October 1, 1992, the LICENSEE may pay WANG the sum of Six Hundred Thousand (600,000) United States Dollars to convert the running royalty thereafter to two and three-quarter percent (2.75%) from three percent (3%).  For purposes of administration of this license,

GW0000001269

LICENSEE shall also pay a royalty of 3% or 2.75%, whichever is then effective on five percent (5%) of LICENSED SIMMs sold by LICENSEE and its SUBSIDIARIES outside the United States. This percent is applied to sales outside the United States for administrative convenience based on the overall sales activity of LICENSEE and its SUBSIDIARIES which would result in LICENSED SIMMs being indirectly imported into the United States. This percent will be reviewed on or before January 1, 1995 to be effective thereafter based on sales activity of LICENSEE and its SUBSIDIARIES at that time.

3.04  Within sixty days after the end of each Semi-Annual Period during the term of this Agreement (and within sixty days after the expiration or termination of this Agreement), LICENSEE shall render a written report to WANG showing the amount of royalties payable under paragraph 3.03 for such Semi-Annual Period and the basis upon which it was determined, or, if such is the case, that no fee is payable and the basis upon which that was determined. LICENSEE shall be responsible for reporting and paying any royalty owed as a result of any sale by its SUBSIDIARIES. Upon receipt of such written report, Wang will present an invoice for the royalties so that a wire transfer payment can be made within said period.

3.05  Upon written request to WANG by LICENSEE for the purpose of filing a report pursuant to this Article 3, Wang shall inform LICENSEE of the Net Sales Value applicable under paragraph

GW0000001270

8.02(b) below to a specified **LICENSED SIMM** for the immediately preceding or other specified **Semi-Annual Period**.

3.06  No royalty shall be payable by LICENSEE under this Agreement for any **LICENSED SIMM** for which a royalty already was paid to WANG by a third party pursuant to an Agreement licensing such third party under the **WANG SIMM PATENTS**.  In that event, however, LICENSEE shall nevertheless (a) include such **LICENSED SIMMs** in the appropriate **Semi-Annual Period** written report provided to WANG by LICENSEE pursuant to this Article 3, and (b) provide in such report the basis on which LICENSEE asserts that such royalty was paid to WANG for such **LICENSED SIMMs**, including the identity of such third party.  LICENSEE shall pay the royalty for such **LICENSED SIMMs** within thirty days of receipt of written notice from WANG that such third party did not, in fact, pay such royalty to WANG.  WANG will confirm the non-payment on the request of LICENSEE.  In the event multiple royalty payments are actually made to WANG for any item pursuant to this Agreement and another agreement licensing the **WANG SIMM PATENTS**, WANG shall reimburse either LICENSEE or the third party in accordance with reasonable written instructions submitted jointly to WANG by LICENSEE and the third party within six months of such multiple royalty payments.  No royalty shall be payable by LICENSEE for any **LICENSED SIMMs** sold to IBM, Hewlett-Packard and any other licensee who is licensed to acquire **LICENSED SIMMs** sold by LICENSEE without any other additional royalty payment thereon to WANG.  WANG shall inform LICENSEE on a periodic basis

of any licensee of WANG licensed to make, use or sell LICENSED SIMMs.

3.07  No royalty shall be payable under this Agreement by LICENSEE for LICENSED SIMMs sold by it to WANG.

3.08  LICENSEE and its SUBSIDIARIES shall keep such records as will be adequate to establish the accuracy of the reports and the computation of royalties due under this Agreement, including the prepayment of royalties under Section 3.02.  LICENSEE agrees to maintain adequate accounting records as to LICENSED SIMMs to determine the correctness of such reports and computations for a period of three years from the end of any Semi-Annual Period.  WANG may conduct inspections of such records during reasonable business hours and on reasonable notice to LICENSEE not more than once annually.  Such inspections shall be at WANG's expense and be conducted by an auditor designated by WANG and acceptable to LICENSEE.  LICENSEE agrees to assist and cooperate with the audit of its sublicensed SUBSIDIARIES.  Such assistance shall extend to the auditor and such SUBSIDIARY and shall include, but will not be limited to, the prompt response to requests for information from LICENSEE concerning its records, reports, computation of royalties and payment of royalties. LICENSEE's acceptance of such auditor designated by WANG shall not be unreasonably withheld.  The auditor shall report to WANG only the amount of fees due and payable to WANG and the basis upon which it was determined.  If royalties are found to have been understated by five (5%) percent or more, LICENSEE shall

reimburse WANG for its costs and expenses incurred in having the inspection conducted.

3.09  All sums payable to WANG pursuant to this Agreement shall be paid in United States Dollars.  In the event royalties accrue in a currency other than United States Dollars, those royalties shall be converted to United States Dollars at the rate for which United States Dollars were publicly traded in exchange for the other currency by Korea Foreign Exchange Bank, on the last day of the **Semi-Annual Period** during which the royalties accrued.  LICENSEE's reports, as required by Section 3.04 of this Article 3, shall set forth the computation of the number of United States Dollars remitted.

3.10  In the event that any payment to be made pursuant to this Article 3 is made after the date by which payment is due, such late payment shall be increased to further include a late payment charge at the rate of 1% of the payment amount for each calendar month or part of a calendar month during the period during which the amount due remains unpaid.

3.11  If, during the term of this Agreement, WANG grants to another licensee a license under the **WANG SIMM PATENTS** of substantially similar type and scope as the license granted in Article 1 hereof at a royalty rate or rates more favorable than that provided in Article 3 hereof, then Wang shall promptly notify LICENSEE and shall grant to LICENSEE such more favorable rate(s) subject to the same terms and conditions applicable to the other licensee.

GW0000001273

3.12 If, during the term of this Agreement, a court with proper authority or any official or official body of an administrative agency with proper authority determines any claim of the WANG PATENTS to be invalid, LICENSEE may decline to continue the royalty payments required under paragraph 3.03 for products covered by that claim and place such payments in escrow until a final disposition of such invalidity determination. If such invalidity determination is reversed or vacated, LICENSEE shall pay the escrowed payment when such reversal or vacation order is final. If such invalidity determination becomes final before a court of last resort, any escrowed amount may be released and be returned to LICENSEE.

## ARTICLE 4.  WARRANTIES AND LIABILITY

4.01  WANG represents and warrants that it has the right to grant the license and assignment granted to LICENSEE pursuant to this Agreement.

4.02  Subject to the provisions of paragraph 3.12, nothing in this Agreement shall be construed as:

(a)  a warranty or representation by WANG as to the validity or scope of any patent; or

(b)  a warranty or representation by WANG that any manufacture, use, lease, or sale of any product does not or will not infringe patents, copyrights, industrial design rights or other proprietary rights owned or controlled by third parties. WANG shall not be liable to LICENSEE directly or as an indemnitor

of LICENSEE or LICENSEE's customers as a consequence of any alleged infringement of any such patents, copyrights, industrial design rights or other proprietary rights.

4.03  WANG makes no warranty or representation, express or implied, including any representation or warranty as to the results obtainable by **LICENSED SIMMs** or the use thereof and further including, but not being limited to, any WARRANTY OF MERCHANTABILITY or any warranty of fitness for a particular purpose with respect to any **LICENSED SIMMs** or with respect to use thereof.

4.04  LICENSEE agrees that WANG will not be responsible for any loss or damage as a direct or indirect result of any use, manufacture or sale of any **LICENSED SIMM** by LICENSEE or its customers.

4.05  In no event shall Wang have any liability, in contract, tort or otherwise, arising out of or in any way connected with this Agreement to pay or return to LICENSEE royalties paid hereunder by LICENSEE to WANG except as set forth in Section 3.06, 3.12 or 4.01.

## ARTICLE 5.  TERM AND TERMINATION

5.01  Unless terminated earlier under a provision of this Article 5, the license granted to LICENSEE under this Agreement shall extend from the **Effective Date** to the date of expiration of the last to expire of the **WANG SIMM PATENTS**. Unless terminated earlier under a provision of this Article 5,

GW0000001275

- 11 -

the term of this Agreement shall extend from the **Effective Date** to the date of termination or completion of performance of all licenses, rights and obligations hereunder.

5.02 LICENSEE may terminate this Agreement, either in its entirety, or with respect to any type or model of **LICENSED SIMMs**, at any time, upon forty-five (45) days written notice to WANG.

5.03 WANG may terminate the licenses granted to LICENSEE under this Agreement for breach or default by LICENSEE at any time upon thirty days written notice to LICENSEE identifying such breach or default; provided, however, that if LICENSEE satisfactorily remedies such breach or default within the thirty days notice period, then the licenses granted herein by WANG to LICENSEE shall not terminate.

ARTICLE 6. NOTICES

6.01 Notices, reports and communications hereunder shall be deemed to have been sufficiently given if in writing and sent by registered mail, postage prepaid to the other party at the address given below. Until further notice, all notices shall be addressed as follows:

If from WANG to LICENSEE:

Dongwoo Chun
Senior Managing Director
Goldstar Electron Co., Ltd.
50 Hyang Jeong-Dong
Cheong Ju, Korea 360-480

- 12 -

If from LICENSEE to WANG:

>Michael H. Shanahan
>Chief Patent Counsel
>Wang Laboratories, Inc.
>One Industrial Avenue
>Lowell, Massachusetts  01851

Either party may change such address by written notice to the other party.

## ARTICLE 7.  MISCELLANEOUS PROVISIONS

7.01  Assignment.  LICENSEE may assign this Agreement in whole or in part only with the prior written consent of WANG, which shall not be unreasonably withheld.  WANG may assign this Agreement without the written consent of LICENSEE, provided that the assignee expressly assumes all of WANG's obligations under this Agreement by a writing delivered to LICENSEE.

7.02  Agency.  WANG and LICENSEE agree and stipulate that LICENSEE shall not be construed as acting as an agent or representative of WANG in any dealings which LICENSEE may have with any other person, firm or corporation and that LICENSEE has no power to act for or legally bind WANG in any transaction.

7.03  Applicable Law.  This Agreement shall be interpreted and the rights and liabilities of the parties determined in accordance with the laws of the Commonwealth of Massachusetts.

7.04  Severability.  The terms and conditions of this Agreement are severable.  If any condition of this Agreement is

- 13 -

found to be illegal or unenforceable under any rule of law, all other terms shall remain in force. Further, the term or condition which is held to be illegal or unenforceable shall remain in effect as far as possible in accordance with the intention of the parties.

7.05 <u>Costs and Attorneys' Fees</u>. Except in the case of WANG's petition in ITC, in the event it is necessary for either party to commence legal proceedings to enforce this Agreement, or to collect amounts due hereunder, the winning party will be entitled to recover from the losing party its costs of suit and collection, including attorneys' fees.

7.06 <u>Entire Agreement</u>. This Agreement and Attachment A constitutes the complete and exclusive statement of the agreement between WANG and LICENSEE with respect to the subject matter indicated, oral or written, relating to the subject matter of this Agreement. There are no understandings, representations or warranties of any kind, oral or written, express or implied, with respect to the subject matter indicated above, except as expressly set forth herein. Failure by either party to enforce any provision of this Agreement shall not be deemed a waiver of that provision or of any other provision of this Agreement. Any claim of waiver of any right, obligation, term or condition of this Agreement and any claim that any provision of this Agreement has been modified or amended shall be null and void unless such waiver, modification or amendment is

GW0000001278

- 14 -

made in writing and signed by authorized representatives of both LICENSEE and WANG.

7.07 <u>Tax</u>.  All taxes imposed as a result of the existence of this agreement or the performance hereunder shall be paid by WANG if so required by applicable law.  LICENSEE shall withhold the amount of such taxes levied by the Government of Korea on the payment to be made by LICENSEE to WANG.  LICENSEE shall transmit to Wang official tax receipts or other evidence issued by said appropriate tax authorities.

7.08 <u>Confidentiality</u>.  Other than revealing the existence of this Agreement, neither party shall divulge the terms and conditions of this Agreement to any third party except as required by law or upon the written consent of the other party.  This consent will not be unreasonably withheld.

### Article 8.  DEFINITIONS

8.01  "LICENSED SIMM" means any 9-bit organization, 30 pin memory module using an epoxy glass printed circuit board and wherein one of the 9-bits is a parity bit or any other module which the parties agree to be subject of this agreement.

8.02  "Net Sales Value" is defined as follows:

(a)  In the case of a LICENSED SIMM which either (i) is sold separately as such by LICENSEE for full value to a Bona-Fide Purchaser or (ii) is sold by LICENSEE incorporated in an assembly, but which was purchased separately from a Bona-Fide Supplier, Net Sales Value

means the gross billing price for such **LICENSED SIMM**
charged or paid, respectively, by LICENSEE minus:

    (i)  container or packaging costs and actual
freight charges included in such price;

    (ii) trade, quantity, or cash discounts, if any,
actually allowed, but included in such price;

    (iii)  sales taxes and other governmental charges
on the sale, transportation or delivery of such
product included in such price;

    (iv) subsequent allowances for actual returns of
such **LICENSED SIMM**;

    (v)  premiums on insurance against loss or damage
in transit included in such price; AND

    (vi) sales commission.

(b)  In all other cases (including, without limitation,
**LICENSED SIMM**s (a) assembled from parts provided in
whole or in part on consignment by third parties,
(b) purchased by LICENSEE from other than a **Bona-Fide
Supplier**, (c) sold as functioning devices to other than
a **Bona-Fide Purchaser**, or (d) sold incorporated in an
assembly made by LICENSEE), **Average Net Sales Price**
derived from in subparagraph 8.02(a) for the same or
generally comparable product during the same **Semi-
Annual Period** shall be used.

8.03  "Bona-Fide Purchaser" and "Bona-Fide Supplier"
means a purchaser or a supplier, respectively:

(a)  over which LICENSEE, its officers and directors exercise no control; and

(b)  which exercises no control over LICENSEE and the officers and directors of which exercise no control over LICENSEE, and

(c)  which is not owned or controlled by any third party which also owns or controls LICENSEE.

8.04  "SUBSIDIARY" means a corporation or other entity which LICENSEE now or hereafter owns or controls, directly or indirectly, more than fifty percent (50%) of the voting stocks or rights of such corporation or such other entity, provided, however, that such corporations and other entities shall be regarded as subsidiaries only so long as such ownership or control exists.

8.05  "Semi-Annual Period" means any period of six consecutive calendar months commencing on the first day of January or July.  "Semi-Annual Period" also means the portion of such a six-month period which commences on the Effective Date.

8.06  "Effective Date"  means the date of approval of this Agreement by the Korean Government.

- 17 -

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year written below.

WANG LABORATORIES, INC.                    GOLDSTAR ELECTRON CO., LTD.

_____                    _____
Edward D. Grayson                          Dongwoo Chun

Senior Vice President                      Senior Managing Director
  and General Counsel


Date: _____3/25/92_____                     Date: _____April 9, 1992_____

Commonwealth of Massachusetts
Middlesex, ss.

    Before me on March 25, 1992, the above-named
Edward D. Grayson, Senior Vice President and General
Counsel, being personally known to me did appear and
subscribe his name to the foregoing and affirmed that
the same was his free act and deed.

_____
Notary Public
My Commission Expires:  10/10/97

- 2 -

Korea 360-480 (hereinafter "Assignee"), is desirous of acquiring the entire interest in said Letters Patent.

NOW, **THEREFORE**, in consideration of the sum of one dollar and other valuable consideration, the receipt of which is acknowledged, WANG hereby sells, assigns and transfers to Assignee the entire right, title and interest in and to said Letters Patent, to be held and enjoyed by Assignee, for its own use and for its legal representatives and assigns, to the full end of the term for which said Letters Patents are granted, as fully and entirely as the same would have been held by WANG had this assignment and sale not been made except that Wang retains a non-exclusive, royalty-free fully paid-up license to make, use or sell any invention disclosed and/or claimed in said Letters Patent.

Executed on _March 25_, 1992 at Lowell, Massachusetts.

Edward D. Grayson
Senior Vice President
Wang Laboratories, Inc.
One Industrial Avenue
Lowell, Massachusetts  01851

Commonwealth of Massachusetts
Middlesex, ss.

Before me, on March 25, 1992, the above-names Edward D. Grayson, Senior Vice President and General Counsel, being personally known to me did appear and subscribe his name to the foregoing and affirmed that the same was his free act and deed.

Notary Public
My Commission Expires: 10/10/97

Wha Hyon JUNG
Consul

GW0000001283

Exhibit A

<u>ASSIGNMENT</u>

**WHEREAS**, Wang Laboratories, Inc., a corporation organized and existing under the laws of the Commonwealth of Massachusetts, United States of America and having a principal place of business at One Industrial Avenue, Lowell, Massachusetts 01851 (hereinafter "WANG"), is now the sole owner of the following United States Letters Patent:

(1) 4,146,898 for "Toner Transfer System"

(2) 4,297,042 for "Helical Print Head Mechanism"

(3) 4,410,896 for "Apparatus for Preventing Removal of Toner from Transferred Images"

(4) 4,508,463 for "High Density Dot Matrix Printer"

(5) 4,574,318 for "Tight Arrangement for Scanner - Digitizer"

(6) 4,628,431 for "Power Supply On/Off Switching with Inrush Limiting"

(7) 4,688,031 for "Monochromatic Representation of Color Images"

(8) 4,703,318 for "Character-Based Monochromatic Representation of Color Images"

(9) 4,708,313 for "Tilt Apparatus for a Display Monitor"

(10) 4,749,364 for "Display attachment Apparatus"

**WHEREAS**, Goldstar Electron Co., Ltd., a corporation organized and existing under the laws of Korea and having a principal place of business at 50 Hyang Jeong-Dong, Cheong Ju,

GW0000001284

- 2 -

Korea 360-480 (hereinafter "Assignee"), is desirous of acquiring the entire interest in said Letters Patent.

NOW, **THEREFORE**, in consideration of the sum of one dollar and other valuable consideration, the receipt of which is acknowledged, WANG hereby sells, assigns and transfers to Assignee the entire right, title and interest in and to said Letters Patent, to be held and enjoyed by Assignee, for its own use and for its legal representatives and assigns, to the full end of the term for which said Letters Patents are granted, as fully and entirely as the same would have been held by WANG had this assignment and sale not been made except that Wang retains a non-exclusive, royalty-free fully paid-up license to make, use or sell any invention disclosed and/or claimed in said Letters Patent.

Executed on _MARCH 25_, 1992 at Lowell, Massachusetts.

3/25/92

Edward D. Grayson
Senior Vice President
Wang Laboratories, Inc.
One Industrial Avenue
Lowell, Massachusetts   01851



Commonwealth of Massachusetts
Middlesex ss.

Before me, on March 25, 1992, the above-names Edward D. Grayson, Senior Vice President and General Counsel, being personally known to me did appear and subscribe his name to the foregoing and affirmed that the same was his free act and deed.

At the Consulate General of the
Republic of Korea Boston on    APR 1 4 1992   19

서 명 _____

이 름 Wha Hyon JUNG
         Consul

_Rebecca M. Skoulla_
Notary Public
My Commission Expires: 10/10/97

GW0000001285

**EXHIBIT C**

WANG LABORATORIES, INC., ONE INDUSTRIAL AVENUE, LOWELL, MA 01851 • TEL: 508/459-5000, TELEX 172108

MICHAEL H. SHANAHAN
CHIEF PATENT COUNSEL

June 16, 1992                                    **WANG**

VIA FACSIMILE
011-82-2-575-4555

JeongHwan Lee, Esq.
General Manager of Patent Department
Goldstar Electron Co., Ltd.
16 Woomyeon-Dong
Seocho-Gu
Seoul 137-140, Korea

Re:  SIMM Technology Patent License Agreement Remittances

Dear Mr. Lee:

       Our attorneys in Korea have advised us of a decision of the Korean
Supreme Court in favor of a licensor who licensed patents which were registered
and used outside of Korea.  The decision concluded that the Korean licensee
erroneously withheld corporation income tax and inhabitant surtax on royalties
paid in connection with the license.

       The Supreme Court case is <u>Hyundai Motor Co., Ltd. v. Chongo Tax Office</u>,
Supreme Court 91 Nu 6887, 12 May 1992.

       We feel that our facts are substantially similar and that the royalties paid
and to be paid under our SIMM Technology Patent License Agreement for use
outside of Korea should not be subject to withholding for corporation income tax
and inhabitant surtax.

       We ask that you apply the results of this decision and forward to us the
corporation income tax and inhabitant surtax that has been withheld from any
royalties paid to date and that no withholdings be deducted from future royalty
remittances.

       If you have any questions, do not hesitate to contact me.

       Thank you for your help in this matter.

                              Yours truly,

                              Michael H. Shanahan

CC:    Dr. Dongwoo Chun
       Roger S. Borovoy, Esq.
MHS/cab

GW0000002404

**<u>EXHIBIT D</u>**

# GoldStar
**GOLDSTAR ELECTRON CO., LTD.**
16, Woomyeon-Dong, Seocho-Gu, Seoul 137-140, Korea
PHONE:(02)576 5811 FAX:(02)576 4666 TLX:GSCRL K22799

Mr. Michael Shanahan                                          July 27, 1992
Chief Patent Counsel
WANG LABORATORIES, INC.
One Industrial Avenue,
Lowell, 01851 USA.

Subject : Remittances

Dear Mr. Shanahan :

I am very sorry for late response to your letter of June 16 asking about the
withholding tax from royalty remittance in the light of recent Korean Supreme
Court case.

I have asked to Korean Tax office whether that case can be applied to our
agreement.

One of the main difference ,they replied, is that Hyundai case is concerning
the remittance from a mother campany to it's subsidiary not to a third.  The
decision, they added, is only applicable to such a specific case, and is not
for any other case because such a sole specific decision can't rule over the
administrative agency.

The royalty remittance ,in their conclusion, is still subject to withholding for
income tax and surtax, and whithout the confirmation of Tax office, any royalty
remittance would be impossible.

I hope this makes you understand well.

If you have any further question, please let me know.

Yours Truly,

Jeonghan Lee
General Manager, Patent Dept.

C.C : Roger S. Borovoy, Esq.

TOTAL P.01

GW0000002114