UNITED STATE DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GETRONICSWANG CO., LLC,<br>    Plaintiff,<br><br>v.<br><br>HYNIX SEMICONDUCTOR, INC., and<br>SAMSUNG ELECTRONICS CO., LTD.,<br>    Defendants. | Civil Action No. 04-12382 (RCL) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Seven years after defendants Hynix Semiconductor, Inc. ("Hynix") and Samsung Electronics Co., Ltd. ("Samsung") made their last royalty payments to plaintiff Getronicswang Co., LLC ("Wang") under licensing agreements, and almost two years after Hynix and Samsung promptly turned over to Wang every penny they received from the Korean National Tax Service ("NTS") in a refund of corporate income and inhabitant tax they had withheld from the payments, Wang brought this breach of contract action claiming defendants owe still more. Hynix and Samsung performed exactly as required by the licensing agreements. Notwithstanding that, Wang claims that the defendants must make up the difference in Dollar-value of the amount withheld versus the amount refunded that resulted from the deterioration of the Korean Won against the U.S. Dollar between the time of withholding and the time of the refund -- a circumstance wholly beyond the control of Hynix and Samsung. Claiming the difference in Dollar value constitutes unpaid royalties, Wang seeks not only the so-called "shortfall" caused by the exchange rate fluctuation but also contractual interest and costs of recovery. Hynix's and

Samsung's motions for summary judgment should be granted and the plaintiff's claims dismissed because: Wang cannot prove, as it must, that the withholding was not required by NTS; even if it could, the claims are time-barred; and, in any event, it is unfair and unreasonable to make the defendants bear the exchange-rate risk and pay to Wang more than they received on Wang's behalf from the Korean government when that risk was not contemplated by the parties and the allocation of the risk of exchange-rate fluctuation was not addressed by the licensing agreements.

## SUMMARY OF UNDISPUTED FACTS

As set forth in more detail in the defendants' accompanying Local Rule 56.1 Statement of Undisputed Facts ("Undisputed Facts"), the relevant undisputed facts are as follows.[1]

Single, In-Line Memory Module ("SIMMs") technology was developed by Wang in the early 1980s and became widely used in computer products in the U.S. and elsewhere. (Undisputed Facts ¶ 1.) Samsung, Hynix -- Korean manufacturing companies that make semiconductor products -- and Goldstar Electron Co., Ltd. ("Goldstar") each entered into a licensing agreement with Wang to use the SIMMs technology.[2] The agreements are referred to herein as the "Samsung Agreement," the "Hynix Agreement" and the "Goldstar Agreement" or,

---

[1] The defendants present the following facts as undisputed for purposes of the instant motion. In the event that the Court denies this motion, the defendants reserve the right to dispute certain of these facts at trial.

[2] The Samsung Agreement was entered on February 17, 1992. The Goldstar Agreement was entered on April 9, 1992. The Hynix Agreement was entered on June 21, 1993. (Undisputed Facts ¶¶ 5-7). Each Agreement required approval of the Korean government in order to become effective. The Samsung and Goldstar Agreements were approved on May 12, 1992. The Hynix Agreement was approved sometime prior to August 11, 1993. (Undisputed Facts ¶ 30)

collectively as the "License Agreements" or the "Agreements." (Undisputed Facts ¶ 2.)[3] The SIMMs patents covered by the Agreements were registered in the United States but not in Korea.

**The License Agreements**

Each of the agreements provides for an initial lump sum payment to cover past infringement and administrative fees and then semi-annual "running royalty" payments for royalties accrued in the prior six months. (Undisputed Facts ¶ 8.) All payments by the Korean companies to Wang are to be made in U.S. Dollars. (Undisputed Facts ¶¶ 9-11.)

The agreements require the Korean companies to withhold taxes imposed by the Korean government on the royalty payments. (Undisputed Facts ¶¶ 12-14). The Samsung and Goldstar Agreements provide that "LICENSEE shall withhold the amount of such taxes levied by the Government of Korea on the payment to be made by LICENSEE to WANG." (Id.) The Hynix agreement, in immaterially different words, provides "LICENSEE shall withhold from payments to Wang under this Agreement the amount of any national taxes levied on LICENSEE's payments hereunder by the Korean government consistent with any Korea/United States double taxation treaty." (Id.)

Under the License Agreements, the Korean companies are subject to a "late payment charge" (i.e., required to pay interest on a monthly basis) if a royalty payment is made after the date it is due. These provisions are referred to herein as the "Late Payment Provisions." (Undisputed Facts ¶¶ 16-18.)

---

[3] Hynix is the current name of Hyundai Electronics Industries Co., Ltd., the named party under the Hynix Agreement. Hynix is also the successor in interest to Goldstar, which changed its name to LG Semicon and then sold to Hynix the assets relevant to the Goldstar Agreement. For simplicity, Hyundai is referred to herein as "Hynix" and Goldstar and LG Semicon are both referred to herein as "Goldstar". (Undisputed Facts ¶ 3.)

**The Korean Tax System**

Under Korean law, royalty payments for rights such as those licensed in the Agreements are considered Korean source income and thus taxed by the Korean National Tax Service ("NTS")[4] if the rights are "used" in Korea. (Undisputed Facts ¶ 21.) This is consistent with the Korean-US income tax treaty, which provides that royalty payments are sourced in the country where the underlying right is used. (Undisputed Facts ¶ 22.) The corporate income tax and inhabitant surtax rate for royalty payments under the License Agreements was 16.125% through 1995 and 16.5% thereafter. (Undisputed Facts ¶ 29.)

Korean law requires a Korean resident making royalty payments to a foreign company to withhold relevant taxes. (Undisputed Facts ¶ 23.) One who fails to properly withhold must pay the taxes plus a late-payment penalty. Also, if there is no justifiable reason for the failure, the person making the payment faces possible criminal sanctions in the form of imprisonment or a fine under the Punishment of Tax Evaders Act. (Undisputed Facts ¶ 24.)

In fact, it is practically impossible to make royalty payments to a foreign company without withholding taxes from them. Relevant guidelines issued by the Korean Federation of Banks under authority from the Korean government provide that a Korean resident making a royalty payment to a non-resident should submit to the foreign exchange bank a copy of the Certification of Taxes Paid or Due on Korean Source Income of Non-residents (the "Taxes Paid Certificate"). (Undisputed Facts ¶ 25.) The Taxes Paid Certificate shows that the proper taxes have been duly withheld and paid, as required by the Korean tax laws, and without it, the foreign

---

[4] In documents and testimony in this case, the Korean taxing authority is referred to sometimes as the National Tax Service (NTS) and sometimes as the National Tax Administration (NTA). Here, it is always referred to as the NTS.

exchange bank simply would not remit the payment to a non-resident recipient. (Undisputed Facts ¶ 26.)

**Performance Under The Licensing Agreements**

Goldstar, Samsung, and Hynix made royalty payments to Wang under the License Agreements from June 5, 1992 to January 20, 1997. (Undisputed Facts ¶¶ 32, 35, 38.) No royalty payment was made under the Agreements after January 20, 1997. (Undisputed Facts ¶ 42.)

In making royalty payments under the Agreements, the Korean companies computed the gross amount of the royalties owed in U.S. Dollars and then multiplied the payment by the applicable tax rate for corporation tax and inhabitant surtax to determine the amount to be withheld for taxes. The Korean companies subtracted that withholding amount from the gross royalty payment and sent the net payment to Wang in U.S. Dollars, as required, and then converted the amount withheld to Korean Won at the prevailing exchange rate and sent that amount of Won to the Korean government in payment of taxes on behalf of Wang. (Undisputed Facts ¶¶ 33, 36, 39.). <u>Each Korean company paid to NTS (in Won) every Dollar it withheld from the royalty payments</u>. (Undisputed Facts ¶¶ 34, 37, 40.)[5]

In May 1992, the Korean Supreme Court decided the <u>Hyundai Motor Co</u>. case. (Undisputed Facts ¶ 43.) After learning of this decision the following month, Wang wrote to Samsung and Goldstar asking that they apply the <u>Hyundai Motor</u> decision to the License

---

[5] The amount of the gross royalties, the taxes withheld, and the net royalties paid to Wang are not relevant to Defendant's motion for summary judgment. They are also not disputed.

Agreements[6] by forwarding to Wang any taxes previously withheld from royalty payments and by not withholding any taxes in the future. (Undisputed Facts ¶ 44.)

In response, on June 20, 1992, Samsung wrote to Wang stating that the Hyundai Motor decision would not apply to the License Agreements until NTS formally said so.  Samsung stated that if it was told by the Korean government that no withholding was necessary before the date that its first withholding to NTS was due, it would remit the withheld amounts to Wang. Otherwise, Samsung stated, it would pay the taxes to NTS.  ((Undisputed Facts ¶ 45.)

In the following weeks, each of Wang, Samsung, and Goldstar sought clarification from NTS as to whether the Hyundai Motor decision would apply to payments under the License Agreements, but none received word that taxes need not be withheld under the Agreements:

- Between July 9, 1992 and July 28, 1992, Wang's Korean law firm (Kim & Chang) contacted NTS to informally seek a ruling that the Hyundai Motor case applied to the Samsung and Goldstar agreements and no withholding was required.  NTS declined to issue the ruling.  (Undisputed Facts ¶ 46.)

- On July 6, 1992, Samsung asked NTS to rule whether the Hyundai Motor case applied to its royalty payments to Wang.  When it finally received a response in January 2003, NTS said that where, as here, the payments are for the use in Korea of the rights and the patents are not registered in Korea, the payments are Korean source income, subject to withholding. (Undisputed Facts ¶ 47.)

- Prior to July 27, 1992, Goldstar asked the NTS if the Hyundai Motor decision was applicable to the Goldstar Agreement and was told that it was still required to withhold taxes from its royalty payments to Wang.[7]  (Undisputed Facts ¶ 51.)

**The Competent Authority Proceeding**

A Competent Authority Proceeding (also known as a "mutual agreement procedure") is a negotiation between the tax authorities of two countries concerning taxes levied on a taxpayer's

---

[6] The Hynix Agreement had not yet been executed.

[7] Goldstar informed Wang of its inquiry with NTS and NTS's response on July 27, 1992.  (Undisputed Facts ¶ 52.)

income or property.  ((Undisputed Facts ¶ 27.)  The outcome of a Competent Authority Proceeding is not a binding judicial or administrative finding as to whether or not one country was correct in imposing taxes on the residents of the other country.  It is instead a political and diplomatic resolution reached in response to a request by a single affected taxpayer, which has no effect or significance beyond the particular issue that is resolved by the particular proceeding.  (Undisputed Facts ¶ 28, 54.)

Wang initiated a Competent Authority Proceeding in 1996 with the aim of recovering from NTS the taxes withheld by Samsung, Hynix and Goldstar. (Undisputed Facts ¶ 53.)  The intergovernmental negotiations continued for over six years, but in October 2002 the IRS and NTS had reached an agreement under which NTS agreed to refund 100% of the taxes previously withheld by Samsung, Hynix and Goldstar.  The money was to be returned to the three Korean companies in their capacity as withholding agents for Wang, and Wang was required to make arrangements to have each one remit the proper amount to Wang.  The competent authority agreement was applicable to the tax years 1992-2002, but was not binding on subsequent years.  (Undisputed Facts ¶ 55.)

In a contemporaneous memorandum, Carol Dunahoo, the IRS International Director, noted that, "[s]ince the Korean tax authorities considered all royalties as 100% sourced in Korea, all payments were subject to withholding taxes."  (Undisputed Facts ¶ 57.)

**The NTS Refund**

Wang wrote separately to Samsung, Hynix and Goldstar/LG Semicon[8] in December 2002 to inform them of the results of the Competent Authority Proceeding and asked them to refund to Wang in Dollars the amounts that had been withheld in Dollars, which amounts were specified in the letters. (Undisputed Facts ¶ 58.) Later that month, Hynix wrote to Wang to inform it that the actual amounts refunded, when converted to Dollars, would be less than the amount stated in Wang's letter because of differences in exchange rates for the Dollar and the Won at the time the taxes were paid and the time the refund was received. (Undisputed Facts ¶ 59.)

Indeed, Hynix and Samsung received from the Korean government the exact amount in Won that they or their predecessors in interest had withheld and paid in taxes to NTS from 1992 to 1997.[9] Each company then converted all of that amount to Dollars at the then-current exchange rate and paid it to Wang. Because of the deterioration of the Won against the Dollar from the time the taxes were withheld and paid (1992-1997) and the time the refund was received (2002), the amount that Wang received in Dollars was less than the Dollar value of the amounts withheld and paid from 1992 to 1997. (Undisputed Facts ¶ 60.)

Neither Hynix nor Samsung profited in any way from serving as the withholding agent for taxes due in connection with the royalty payments to Wang. They converted to Won and paid to the NTS every Dollar they withheld from the royalty payments, and they converted to Dollars and paid to Wang every Won they received from the NTS in the refund. (Undisputed Facts ¶ 61.)

---

[8] In December 2002, Wang was unaware that Goldstar/LG Semicon had sold to Hynix the assets related to the Goldstar Agreement. As a result of that sale, Hynix handled the refund of the amounts withheld by both itself and Goldstar/LG Semicon.

[9] NTS did not pay interest on the amounts refunded. (Undisputed Facts ¶ 60.)

**SUMMARY JUDGMENT STANDARD**

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996).  Section (e) of Rule 56 provides the standard for judging the sufficiency of an opposition to summary judgment: "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

**ARGUMENT**

I.  **Wang's Claims Fail Because It Cannot Prove That The Tax Withheld By The Defendants Was Not Imposed By The Korean Government.**

It is essential to all of Wang's claims that the taxes withheld by the defendants were not taxes levied by the Government of Korea.  Indeed, in its Complaint, Wang concedes that it must prove that the taxes were not imposed by the Korean government by alleging as the basis of its claim that the tax amounts were "improperly withheld," Compl. ¶ 15, and that "no Korean tax was due," Compl. ¶ 10.  If the taxes were levied by the Korean government and the defendants were required to withhold them on Wang's behalf, then Hynix and Samsung performed exactly as required by the Agreements and cannot be said to have breached the contract or to have

breached the implied covenant of good faith and fair dealing.  Wang has no admissible evidence from which a rational fact finder could conclude that the taxes were not required to be withheld, and so the defendants' motions for summary judgment must be granted.[10]

The Agreements contemplated withholding by Hynix and Samsung of tax payments owed by Wang to the Korean government:

> All taxes imposed as a result of the existence of this agreement or the performance hereunder shall be paid by WANG if so required by applicable law. LICENSEE shall withhold the amount of such taxes levied by the Government of Korea on the payment to be made by LICENSEE to WANG.  LICENSEE shall transmit to Wang official tax receipts or other evidence issued by said appropriate tax authorities.

Samsung Agreement §6.07; Goldstar Agreement § 7.07 (the "Taxes Provision").[11]  As the language reflects, and as Wang concedes (see Undisputed Facts ¶¶ 34, 37, 40), Hynix and Samsung acted as withholding agents for the payment of taxes owed by Wang.  They remitted to NTS all of the funds they withheld, which was the only obligation imposed on them by the Agreements.  Then, years later, after a negotiated agreement between the governments of Korea and the United States led to a refund of the taxes paid to the NTS by Samsung and Hynix on

---

[10] As shown in Parts II and III, even if the Court finds a dispute of fact as to whether the taxes were governmentally imposed, the defendants' motions should nevertheless be granted for separate, independent reasons.

[11] The slightly different wording of § 6.10 the Hyundai Agreement presents no material difference for purposes of this litigation:

> All taxes imposed as a result of the existence or performance of this Agreement shall be borne and paid by the party required to do so by applicable law.  LICENSEE shall withhold from payments to WANG under this Agreement the amount of any national taxes levied on LICENSEE's payments hereunder by the Korean government consistent with any Korea/United States double taxation treaty.  LICENSEE shall effect payment to the appropriate tax authorities of said government of the taxes so withheld, and shall transmit to WANG official receipts issued by said tax authorities or such other evidence as is reasonably available to support a claim for income tax credit by WANG in respect of any taxes so withheld and paid.

Wang's behalf, the defendants of course promptly paid to Wang all of the funds they received from NTS.

As noted, Wang's claim depends on the taxes not being imposed by the Korean government and on the Korean companies not being required to withhold from the royalty payments, issues which are only to be determined by examining Korean law. Defendants' have retained Dong Soo Kim, a Korean law expert. His explanation of the Korean tax system, relevant case law, and administrative rulings is undisputed.

- The Korean Corporate Income Tax Act requires a Korean resident (such as the defendants) who is making royalty payments to a foreign company to withhold taxes due from the recipient and remit them to NTS. Undisputed Facts ¶ 21. Taxes are due if the royalties are Korean source income.

- A Korean resident who fails to withhold when required faces not only a late-payment penalty, but also possible imprisonment and a criminal fine if there is no justifiable reason for the failure. Undisputed Facts ¶ 24.

- In mid-2002, the Supreme Court of Korea decided the case of <u>Hyundai Motor Co., Ltd. v. Chongro Tax Office</u>, 91 Nu 6887 (May 12, 1992). In administrative rulings, the Korean tax authorities have consistently held -- both before and after the <u>Hyundai Motor</u> case -- that royalty payments are sourced in Korea (and thus taxable) if they are for products made in Korea using the licensed rights, even if the patents are not registered in Korea. Kim Report at 5. (The Kim Report is Barnett Aff. Ex. F.)

- Without withholding the taxes and obtaining certification that it had done so, the defendants would not have been able to get the foreign exchange bank to remit the royalty payments to Wang. (Undisputed Facts ¶ 25)

Based on his review of Korean law and the License Agreements, among other things, Mr. Kim concludes that Samsung and Hynix were compelled to withhold taxes from the royalty payments made to Wang and that failure to do so would have subjected them to penalties and sanctions. Kim Report § V(b).

His conclusion mirrors the parties' undisputed experience in this case. After the <u>Hyundai Motor</u> case was handed down, and after Wang had taken the position in correspondence that the case applied to the License Agreements, each of the parties contacted the NTS:

- Wang sought a ruling from NTS that tax should not be withheld from the defendants' royalty payments, but NTS declined to give it.

- When Goldstar inquired whether the <u>Hyundai Motor</u> decision was applicable to the Agreements, NTS informed it that the withholding was required.

- Samsung requested a ruling from NTS as to whether its payments to Wang were Korean source and thus taxable. The Ministry of Finance (of which NTS is a part) stated that where, as here, the payments are for the use in Korea of the rights and the patents are not registered in Korea, the payments are Korean source income, subject to withholding.

The plaintiff offers nothing to dispute that, in this case, Samsung and Hynix were required to withhold tax on the royalty payments, just as they did. Plaintiff's expert, Chang Nam Ahn, does not raise a genuine issue with respect to these facts. At no point does Ahn state that the royalty payments were not Korean source income or that the Korean companies were not

required to withhold taxes. Moreover, he affirms that the <u>Hyundai Motor</u> case is only applicable to the parties involved. Ahn Report at 8. (The Ahn Report is Barnett Affidavit Exhibit DD.)

In sum, Wang has no competent evidence to support the essential element of its case that Korean law and the NTS did not impose the corporate income tax and require the defendants to withhold the tax on Wang's behalf. Accordingly, Hynix and Samsung must be granted judgment on Wang's claims.[12]

## II. Wang's Claims Are Barred By The Statute Of Limitations.

As noted above, Wang's claim is based on wrongful withholding by the Korean companies. Wang asserts that the taxes withheld were, in fact, royalties that should have been paid on the original due dates with the balance of the royalty payments. Assuming <u>arguendo</u> that Wang had sufficient evidence to prove the withholding was wrongful, its claims are nevertheless barred by the applicable six-year statute of limitations for contract claims. This is so because if the taxes were not <u>governmentally</u> imposed and the withholding was not required, the defendants necessarily would have breached the contract -- <u>and Wang's claim would have accrued</u> -- at the time the payments were made, which was between 1992 and 1997. This is Wang's stated position: "The royalty payments called for by each agreement were due as provided in the royalty agreement; otherwise no withholding tax would have been asserted to have been due. <u>The full amount of the royalty payments that were due were not paid by either Hynix or Goldstar.</u>" (See Wang's Answers to Samsung Interrogatory No. 14, Hynix Interrogatory No. 21 (Barnett Aff. Ex. U).)

---

[12] Even if Wang's evidence supports the possibility that a taxpayer could attempt to use the <u>Hyundai Motor</u> decision as a defense to NTS's imposition of the tax, that does not mean that NTS has not imposed the tax. Indeed, it concedes it, too. Moreover, while Korean law requires the Hynix and Samsung to withhold on behalf of Wang, nothing in the Agreements or any other obligation requires them to challenge the taxation on behalf of Wang.

The last payment made by any of the defendants was on January 21, 1997, and Wang commenced this action more than six years later, on November 10, 2004. Massachusetts law[13] imposes a six-year statute of limitations on claims for breach of contract and breach of the implied duty of good faith and fair dealing. See M.G.L. c. 260, § 2. As this Court recognized last year:

> "The general rule is that a contract action accrues at the time the contract is breached." Berkshire Mutual Ins. Co. v. Burbank, 422 Mass. 659, 661 (1996). The statute of limitations is an affirmative defense on which defendants bear the initial burden of proof. Coastal Oil New England, Inc. v. Citizens Fuels Corp., 38 Mass. App. Ct. 26, 29 n.3 (1995). However, "[w]here summary judgment is sought on the basis of a statute of limitations, once the defendant establishes that the time period between the plaintiff's injury and the plaintiff's complaint exceeds the limitations period set forth in the applicable statute, the plaintiff bears the burden of alleging facts which would take his or her claim outside the statute." McGuinness v. Cotter, 412 Mass. 617, 620 (1992).

Fay v. Aetna Life Ins. & Annuity Co., 307 F. Supp. 2d 284, 290 (D. Mass. 2004) (Stearns, J.). While the statute of limitations is tolled when a party has suffered an "inherently unknowable" injury or until it knew or should have known of the injury, see id. at 291 (citing Flynn v. Associated Press, 401 Mass. 776, 781 (1988); Szymanski v. Boston Mut. Life Ins. Co., 56 Mass. App. Ct. 367, 371 (2002)), it is undisputed that Wang was fully aware that the defendants were withholding taxes from the royalty payments, as reflected by its receipt of the Taxes Paid Certificates and other contemporaneous correspondence. See Undisputed Facts ¶¶ 33, 36, 39.

---

[13] Each of the Agreements provides that it is governed by Massachusetts law. Undisputed Facts ¶ 19.

**III.    Hynix And Samsung Do Not Bear The Risk Of Exchange Rate Fluctuations Affecting The Dollar Value Of The Amount Of Tax Withheld And Then Refunded.**

Because the statute of limitations bars any claim premised on a breach of the Agreements at the time of withholding, any viable claim that Wang may have must be based on a theory that the Licensing Agreements were breached at some other time.  The only other possible event that could constitute a breach is the manner in which Hynix and Samsung remitted the tax refunds to Wang.  Moreover, any such theory must presume that the taxes were imposed by the Korean government and required to be withheld (because if they were not, the contracts were breached at the time of the original payments).  Thus, its theory must be that, after the Korean companies properly withheld taxes imposed by NTS and then years later paid over to Wang all of the refund NTS made as a result of the negotiated Competent Authority Proceeding, Hynix and Samsung were nevertheless required to make up the difference between the amount of U.S. Dollars originally withheld and the amount paid at the time of the refund and they breached the Licensing Agreements when they failed to do so.

To see why no such alternative claim is sustainable and why defendants motions for summary judgment must therefore be granted in their entirety, it is helpful to break Wang's claim into its three component parts:

- First, contractual interest on the entire amount withheld from the time the original royalty payments were made to the time of the tax refund payment (the "Pre-Refund Interest");
- Second, the difference between the Dollar value of the amount withheld in Won and the Dollar value of the amount of Won refunded by NTS (the "Exchange Rate Shortfall").

- Third, contractual interest on the Exchange Rate Shortfall from the time of the refund to the filing of the action (the "Post-Refund Interest").

Where the claim is that the contract was breached at the time the refund was remitted, the terms of the Licensing Agreements (as well as common sense) prohibit Wang from recovering for Pre-Refund Interest. With respect to the latter two components of the claim, neither the Agreements nor governing law provide Wang any basis for claiming the defendants breached by remitting all that they received from NTS but not more.

### A. Wang has no alternative claim for Pre-Refund Interest

Any claim for Pre-Refund Interest is barred by the statute of limitations because it has as its necessary predicate that the amounts withheld were royalties "due" at the time the royalty payments were made.

Wang's claims for contractual interest are based on the late-payment provisions of the License Agreements, Compl. ¶ 17, which state:

> In the event that any payment to be made pursuant to this Article [] is made after the date by which payment is due, such late payment shall be increased to further include a late payment charge at the rate of 1% of the payment amount for each calendar month or part of a calendar month during the period during which the amount due remains unpaid.

Samsung Agreement §2.12; Goldstar Agreement § 3.10.[14]

---

[14] The slightly different wording of § 6.9 the Hyundai Agreement presents no material difference for purposes of this litigation:

> In the event that any payment to be made pursuant to Section 5 is made in whole or in part after the date by which payment is due, such late payment shall be increased to include a late payment charge at the rate of one and one-half percent (1 1/2%) of the payment amount for each calendar month or part thereof (or, if such rate exceeds the maximum legal rate in the jurisdiction where a claim is asserted, the interest rate shall be reduced to the highest rate permitted by applicable law) during the period the amount due remains unpaid.

By its terms, that provision only applies to payments not made when due. For Wang to start the clock on contractual interest on the date the original royalty payments were made, it necessarily must contend that the withholding amount was "due" at the time of the original payments. If the amount was due, then Hynix and Samsung breached when they withheld it from the payments to Wang, and, as seen in the preceding Part II, all claims based on a breach of the contract at time of the original payment are time-barred.

### B. Hynix and Samsung fully performed under the agreements, which are silent on the issue of exchange rate risk.

Wang concedes that, if the taxes were due and withholding was required, Hynix and Samsung properly applied the Taxes Provision and correctly withheld the proper amounts. After calculating the Dollar value of the royalty payments to be made to Wang, Hynix and Samsung withheld taxes from the payments at the appropriate rate for corporate income and inhabitant tax. Every Dollar withheld was converted to Won and paid to the NTS, and Hynix and Samsung obtained the proof of tax withholding required to send the net royalty payments out of the country.

When NTS agreed, through the negotiated Competent Authority Proceeding, to refund the taxes withheld from past royalty payments, Hynix and Samsung converted to U.S. Dollars every Won they received from NTS and promptly paid the full amount to Wang.

While the Agreements provide for withholding of required taxes at the time royalty payments are due, they (perhaps not surprisingly) fail to address the possibility that, years later and as a result of an intergovernmental negotiation begun at Wang's request, NTS would agree to refund the taxes. Its even less surprising that the Agreements do not assign the risk that the

exchange rate would fluctuate between the time of withholding and the time of the refund such that the refund converts to fewer Dollars than were withheld.

The one provision Wang identifies as making that allocation of risk does no such thing. Each of the Agreements required Hynix and Samsung to make all payments in U.S. Dollars (and it is undisputed that they did so):

> All sums payable to WANG pursuant to this Agreement shall be paid in United States Dollars. In the event royalties accrue in a currency other than United States Dollars, those royalties shall be converted to United States Dollars at the rate for which United States Dollars were publicly traded in exchange for the other currency by Korea Foreign Exchange Bank, on the last day of the Semi-Annual Period during which the royalties accrued. LICENSEE's reports, as required by Section 2.04 and 2.05 of this Article 2, shall set forth the computation of the number of United States Dollars remitted.

See Samsung Agreement § 2.11, Goldstar Agreement § 3.09; see also Hyundai Agreement § 6.4[15] (the "U.S. Dollar Payment Provision"). While the U.S. Dollar Payment Provision mentions an exchange rate, it merely identifies the date and source for establishing the rate in the event royalties accrue in a currency other than U.S. Dollars. The provision applies to the running royalties due under the Agreements, which accrue over a six-month period and then are computed and paid. See Undisputed Facts ¶ 8.

---

[15] The slightly different wording of § 6.4 of the Hyundai Agreement presents no material difference for purposes of this litigation::

> LICENSEE shall pay all royalties and other payments due hereunder in United States Dollars. All royalties for an accounting period or other payments computed in other currencies shall be converted to United States Dollars at the exchange rate for bank transfers from such currency to United States Dollars as quoted by the head office of the Korean Foreign Exchange Bank at the close of banking on the day preceding the Effective Date of the Agreement for the payments required by Section 5.1 and 5.2 and on the last day of such accounting period (or the first business day thereafter if such last day shall be a non-business day) for the royalty payments required by Section 5.3.

>    C.   **The reasonable term for the court to imply is that Wang bears the risk of exchange rate fluctuation and/or the obligation to retrieve the Exchange Rate Shortfall from the Korean government.**

In light of the contractual silence as to who bears exchange-rate risk, it falls to the Court to imply a reasonable term to resolve the dispute. "'When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.'" President and Fellows of Harvard College v. PECO Energy Co., 57 Mass. App. Ct. 888, 896 (2003) (quoting Restatement (Second) of Contracts § 204); see also Cofman v. Acton Corp., 958 F.2d 494, 497-98 (1st Cir. 1992) (applying Massachusetts law and employing Restatement (Second) of Contracts § 204 where the parties had given no thought to an essential matter).

The Court's touchstones in discerning the appropriate result are "community standards of fairness and policy." The Court is not to engage in some recreation of the actual negotiating history or an analysis of "a hypothetical model of the bargaining process." PECO Energy, 57 Mass. App. Ct. at 896 (quoting Restatement (Second) of Contracts § 204 cmt. d). The Court should consider whatever evidence bears on reasonableness. Id. (quoting Restatement of (Second) Contracts § 204 cmt. e).

Thus guided, the Court cannot reasonably impose the cost of the exchange rate shift on Hynix and Samsung. They were mere withholding agents who passed the withheld taxes to NTS and then passed the refund payment on to Wang. It is undisputed that neither Hynix nor Samsung obtained any gain as a result of their involvement with these tax payments. Forcing them to make up the Exchange Rate Shortfall, which was caused by changes in exchange rates that were clearly beyond their control, does not comport with fairness.

Accordingly, the Court should not allocate to Hynix and Samsung the risk of exchange rate fluctuation in connection with the NTS refund.

## CONCLUSION

For all of the foregoing reasons, Hynix and Samsung ask that the Court grant their motion for summary judgment and dismiss all the counts of the complaint.

HYNIX SEMICONDUCTOR, INC. and
SAMSUNG ELECTRONICS CO., LTD.,

By their attorneys,

/s/ Robert P. Sherman
Robert P. Sherman (BBO #458540)
Bruce S. Barnett (BBO#647666)
DLA Piper Rudnick Gray Cary US LLP
One International Place
Boston, MA 02110
617-406-6000