UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GETRONICSWANG CO., LLC,<br><br>            Plaintiff,<br><br>v.<br><br>HYNIX SEMICONDUCTOR, INC. and<br>SAMSUNG ELECTRONICS CO., LTD.<br><br>            Defendants. | Civil Action No. 04-12382 (RCL) |

**HYNIX SEMICONDUCTOR, INC. and SAMSUNG ELECTRONICS CO., LTD'S**
<u>**LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS**</u>

In support of their Motion for Summary Judgment on all counts of the Complaint by plaintiff GetronicsWang Co., Ltd. ("Wang"), defendants Hynix Semiconductor, Inc. ("Hynix") and Samsung Electronics Co., Ltd. ("Samsung") submit this concise statement of material facts which they contend are not in genuine dispute and they will treat as undisputed for purposes of their motion. In doing so, Hynix and Samsung do not concede them all to be true for purposes of trial. Not every fact included in this statement is material to each alternative legal theory pursuant to which the Court may grant summary judgment in this case. Further, some facts are included solely to provide the Court with useful background information and context.

**INTRODUCTION**

1.     Single, In-Line Memory Module ("SIMMs") technology was developed by Wang in the early 1980s and became widely used in computer products in the U.S. and elsewhere. (Letter from M. Shanahan to K.H. Kim, Dec. 22, 1989 (Attached as Exhibit A to the Affidavit of Bruce S. Barnett ("Barnett Aff.")).  Toward the end of the 1980s, Wang began to enforce its

- 2 -

patent rights in the SIMMs technology.  (Deposition Testimony of Anthony P. Paolillo ("Paolillo Dep.") (Barnett Aff. Ex. B) at 33-34)[1].

2. Samsung and Hynix are Korean manufacturing companies that make semiconductor products, as was Goldstar Electron Co., Ltd. ("Goldstar"). Affidavit of K.H. Min ("Min Aff.") ¶ 4; Affidavit of Sungrak Son ("Son Aff.") ¶ 2.  Each of the three companies entered a licensing agreement with Wang for SIMMs technology that will be referred to as the "Samsung Agreement," the "Hynix Agreement" and the "Goldstar Agreement," respectively. The agreements will sometimes be referred to collectively as the "License Agreements" or the "Agreements."

3. Hynix is the current name of Hyundai Electronics Industries Co., Ltd., the named party under the Hynix Agreement.  Hynix is also the successor in interest to Goldstar, which changed its name to LG Semicon Co., Ltd.  In 1999, Hynix acquired LG Semicon from LG Electronics.  (Min Aff. ¶¶ 2, 3).  For simplicity, Hyundai is referred to herein as "Hynix" and Goldstar and LG Semicon are both referred to herein as "Goldstar".

4. The SIMMs patents were registered in the United States but not in Korea, where Samsung, Goldstar and Hynix manufactured semiconductor products using the SIMMs technology.  The Samsung, Goldstar and Hynix products were sold throughout the world including in the United States.

### THE LICENSING AGREEMENTS

5. Wang and Samsung entered into the Samsung Agreement on February 17, 1992. (SIMM Technology Patent License Agreement between Wang and Samsung, Feb. 17, 1992 ("Samsung Agreement") (Barnett Aff. Ex. C).)

---

[1] Mr. Paolillo was deposed in his individual capacity and as a Rule 30(b)(6) witness of Wang.

6.     Wang and Goldstar entered into the Goldstar Agreement on April 9, 1992. (SIMM Technology Patent License Agreement between Wang and Goldstar, executed by Goldstar on April 9, 1992 ("Goldstar Agreement") (Barnett Aff. Ex. D).)

7.     Wang and Hynix entered into the Hynix Agreement on June 21, 1993. (SIMM Technology Patent License Agreement between Wang and Hyundai, June 21, 1993 ("Hynix Agreement") (Barnett Aff. Ex. E).)

**Royalty Payments**

8.     Each of the Agreements calls for an initial lump sum payment to cover past infringement and administrative fees and then semi-annual "running royalty" payments for royalties accrued in the prior six months. (Samsung Agreement Article 2; Goldstar Agreement Article 3; Hynix Agreement Section 5.)

9.     Each of the Agreements requires the Korean company to make all payments to Wang in U.S. Dollars and specifies the date and source (Korea Foreign Exchange Bank) of the exchange rate for use where accrued royalties were computed in some other currency. These provisions are referred to as the "U.S. Dollar Payment Provisions."

10.    The Samsung Agreement (§ 2.11) and the Goldstar Agreement (§3.09) have the following U.S. Dollar Payment Provision:

> All sums payable to WANG pursuant to this Agreement shall be paid in United States Dollars. In the event royalties accrue in a currency other than United States Dollars, those royalties shall be converted to United States Dollars at the rate for which United States Dollars were publicly traded in exchange for the other currency by Korea Foreign Exchange Bank on the last day of the Semi-Annual Period during which the royalties accrued. LICENSEE'S reports . . shall set forth the computation of the number of United States Dollars remitted.

11.    The Hynix Agreement (§ 6.4) has the following U.S. Dollar Payment Provisions:

> LICENSEE shall pay all royalties and other payments due hereunder in United States Dollars. All royalties for an accounting period or other payments computed in other currencies shall be converted into United States Dollars at the

- 3 -

exchange rate for bank transfers from such currency to United States Dollars as quoted by the head office of the Korean Foreign Exchange Bank at the close of banking on the day preceding the Effective Date of the Agreement for the payments required by Section 5.1 and 5.2 and on the last day of such accounting period (or the first business day thereafter if such last day shall be a non-business day) for the royalty payments required by Section 5.3.

**Payment of Taxes**

12. Each of the Agreements contains a provision addressing taxes and requiring the Korean company to withhold on behalf of Wang taxes imposed by the Korean government on the payments. These provisions are referred to as the "Taxes Provisions."

13. The Samsung Agreement (§ 6.07) and the Goldstar Agreement (§ 7.07) have the following Taxes Provision:

> All taxes imposed as a result of the existence of this agreement or the performance hereunder shall be paid by WANG if so required by applicable law. LICENSEE shall withhold the amount of such taxes levied by the Government of Korea on the payment to be made by LICENSEE to WANG. LICENSEE shall transmit to Wang official tax receipts or other evidence issued by said appropriate tax authorities.

14. The Hynix Agreement (§ 6.10) has the following Taxes Provision:

> All taxes imposed as a result of the existence or performance of this Agreement shall be borne and paid by the party required to do so by applicable law. LICENSEE shall withhold from payments to WANG under this Agreement the amount of any national taxes levied on LICENSEE's payments hereunder by the Korean government consistent with any Korea/United States double taxation treaty. LICENSEE shall effect payment to the appropriate tax authorities of said government of the taxes so withheld, and shall transmit to WANG official receipts issued by said tax authorities or such other evidence as is reasonably available to support a claim for income tax credit by WANG in respect of any taxes so withheld and paid.

15. Despite the slight differences in the wording of the U.S. Dollar Payment and Taxes Provisions between the Samsung and Goldstar Agreements, on the one hand, and the Hynix Agreement, on the other, the meaning of those sections is the same in all three Agreements. (Paolillo Dep. at 102-104.)

- 4 -

~BOST1:403271.v3

**Late Payment Provision**

16.     Each of the Agreements requires the Korean company to make a "late payment charge" (i.e., pay interest on a monthly basis) if a royalty payment is made after the date it is due. The provisions are referred to as the "Late Payment Provisions."

17.     The Samsung Agreement (§ 2.12) and the Goldstar Agreement (§ 3.10) have the following Late-Payment Provision:

> In the event that any payment to be made pursuant to this Article [] is made after the date by which payment is due, such late payment shall be increased to further include a late payment charge at the rate of 1% of the payment amount for each calendar month or part of a calendar month during which the amount due remains unpaid.

18.     The Hynix Agreement (§ 6.9) has the following Late Payment Provision:

> In the event that any payment to be made pursuant to Section 5 is made in whole or in part after the date by which payment is due, such late payment shall be increased to include a late payment charge at the rate of one and one-half percent (1½%) of the payment amount for each calendar month or part thereof (or, if such rate exceeds the maximum legal rate in the jurisdiction where a claim is asserted, the interest rate shall be reduced to the highest rate permitted by applicable law) during the period where the amount due remains unpaid.

**Massachusetts law applies**

19.     Each Agreement states that it "shall be interpreted and the rights and liabilities of the parties determined in accordance with the laws of the Commonwealth of Massachusetts." (Samsung Agreement § 6.03, Goldstar Agreement § 7.03 and Hynix Agreement § 10.03.)

**Loser Pays under Samsung and Goldstar Agreements**

20.     The Samsung Agreement (§ 6.05) and the Goldstar Agreement (§ 7.05) have the following provision with respect to costs and attorneys' fees:

> Except in the case of WANG's petition in ITC, in the event it is necessary for either party to commence legal proceedings to enforce this Agreement, or to collect amounts due hereunder, the winning party will be entitled to recover from the losing party its costs of suit and collection, including attorneys' fees.

## THE KOREAN TAX SYSTEM

21. Under Korean law, royalty payments for rights such as those licensed in the Agreements are considered Korean source income and thus taxed by the Korean National Tax Service ("NTS")[2] if the rights are "used" in Korea.  (Expert Report of Dong Soo Kim, October 28, 2005 ("Kim Report") (Barnett Aff. Ex. F) § V(a).)

22. This is consistent with the Korean-US income tax treaty, which provides that royalty payments are sourced in the country where the underlying right is used.  (Kim Report § V(a).)

23. Korean law requires a Korean resident making royalty payments to a foreign company to withhold relevant taxes and pay them to the appropriate tax office by the 10th day of the month immediately following the month in which the payment is made.  (Kim Report § V(d).)

24. A Korean resident who fails to properly withhold must pay the taxes plus a late-payment penalty.  Also, if there is no justifiable reason for the failure, the person making the payment faces possible criminal sanctions in the form of imprisonment or a fine under the Punishment of Tax Evaders Act.  (Kim Report § V(d).)

25. It is practically impossible to make royalty payments to a foreign company without withholding taxes from them.  Relevant guidelines issued by the Korean Federation of Banks under authority from the Korean government provide that a Korean resident making a royalty payment to a non-resident should submit to the foreign exchange bank a copy of the

---

[2] In documents and testimony in this case, the Korean taxing authority is referred to sometimes as the National Tax Service (NTS) and sometimes as the National Tax Administration (NTA).  Here, it is always referred to as the NTS.

~BOST1:403271.v3

Certification of Taxes Paid or Due on Korean Source Income of Non-residents (the "Taxes Paid Certificate"). (Kim Report § V(c).)

26. The Taxes Paid Certificate shows that the proper taxes have been duly withheld and paid, as required by the Korean tax laws. Without the Taxes Paid Certificate, the foreign exchange bank simply would not remit the payment to a non-resident recipient. (Kim Report § V(c).)

27. A Competent Authority Proceeding (also known as a "mutual agreement procedure") is a negotiation between the tax authorities of two countries concerning taxes levied on a taxpayer's income or property. (Kim Report § V(e).)

28. The outcome of a Competent Authority Proceeding is not a binding judicial or administrative finding as to whether or not one country was correct in imposing taxes on the residents of the other country. It is instead a political and diplomatic resolution reached in response to a request by a single affected taxpayer, which has no effect or significance beyond the particular issue that is resolved by the particular proceeding. (Kim Report § V(e). )

29. The corporate income tax and inhabitant surtax rate for royalty payments under the License Agreements was 16.125% through 1995 and 16.5% thereafter. (Min Aff. ¶ 5.)

## PERFORMANCE UNDER THE LICENSING AGREEMENTS

30. The Samsung, Goldstar and Hynix Agreements all required approval by the Korean government in order to become effective. (Paolillo Dep. at 65.) The Samsung and Goldstar Agreements were approved on May 12, 1992. (Facsimile letter from JeongHwan Lee to M. Shanahan, May 15, 1992 (Barnett Aff. Ex. G); Letter from Gwangho Kim to Thomas J. Scott, Jr., May 15, 1992 (Barnett Aff. Ex. H).) The Hynix Agreement was approved on August 6,

1993.  (Paolillo Dep. at 105; Letter from Maggie Mellonakos to D.S. Chung, Aug. 11, 1993 (Barnett Aff. Ex. I).)

31.     In making royalty payments under the Agreements, the Korean companies computed the gross amount of the royalties owed in U.S. Dollars and then multiplied the payment by the applicable tax rate for corporation tax and inhabitant surtax (16.125% through 1995; 16.5% thereafter) to determine the amount to be withheld for taxes.  The Korean companies subtracted that withholding amount from the gross royalty payment and sent the net payment to Wang in U.S. Dollars, as required.  The Korean companies then converted the amount withheld to Korean Won at the prevailing exchange rate and sent that amount of Won to the Korean government in payment of taxes on behalf of Wang.

32.     Goldstar made its first royalty payment to Wang on or about June 5, 1992 and its last on or about January 20, 1997.  (Summary Charts of Goldstar/LG Semicon Payments, May 14, 1996 & May 30, 1997 (Barnett Aff. Ex. J).)

33.     Goldstar withheld taxes from each of the payments it made at the rate of 16.125% (for payments through 1995) or 16.5% (for payments after 1995).  At the time of each payment, Goldstar reported to Wang the fact and amount of its withholding, providing Wang with governmental certifications of the withholding.  The certifications showed the amounts withheld and the taxes paid in Dollars. (E.g., Certified Application for Certification of Tax Paid (or Due) on Korean Source Income of Nonresidents, Sept. 23, 1992 (Barnett Aff Ex. K) (a pre-1995 payment); Certified Application for Certification of Tax Paid (or Due) on Korean Source Income of Nonresidents, Dec. 1996 (Barnett Aff Ex. L) (a post-1995 payment).)

34. Goldstar paid to NTS (in Won) every Dollar it withheld from the royalty payments. (Complaint and Demand for Jury Trial ("Compl.") (Barnett Aff. Ex. M) ¶¶ 10-11; Paolillo Dep. at 98-99.)

35. Samsung made its first royalty payment to Wang on June 26, 1992, and its last on August 29, 1995. (Summary Chart of Samsung Payments, Oct. 18, 1995 (Barnett Aff. Ex. N).)

36. Samsung withheld taxes at the rate of 16.125% from each of the payments it made. At the time of each payment, Samsung reported to Wang the fact and amount of its withholding, providing Wang with governmental certifications of the withholding. The certifications showed the amounts withheld and the taxes paid in Dollars. (E.g., Certified Application for Certification of Tax Paid (or Due) on Korean Source Income of Nonresidents, April 1994 (Barnett Aff. Ex. O).)

37. Samsung paid to NTS (in Won) every Dollar it withheld from the royalty payments. (Compl. ¶¶ 10-11; Paolillo Dep. at 97-98.)

38. Hynix made its first royalty payment to Wang on August 25, 1993, and its last on March 7, 1995. (Summary Chart of Hynix/Hyundai Payments, March 5, 1996 (Barnett Aff. Ex. P).)

39. Hynix withheld taxes at the rate of 16.125% from each of the Payments it made. At the time of each payment, Hynix reported to Wang the fact and amount of its withholding, providing Wang with governmental certifications of the withholding. The certifications showed the amounts withheld and the taxes paid in Dollars. (E.g., Certified Application for Certification of Tax Paid (or Due) On Korean Source Income of Nonresidents (Barnett Aff. Ex. Q).)

40. Hynix paid to NTS (in Won) every Dollar it withheld from the royalty payments. (Compl. ¶¶ 10-11; Paolillo Dep. p. 153.)

~BOST1:403271.v3

41.     The amount of the gross royalties, the taxes withheld, and the net royalties paid to Wang are not relevant to Defendant's motion for summary judgment.  They are also not disputed.

42.     No royalty payment was made under the Agreements after January 20, 1997. (Barnett Aff. Exs. J, N, P.)

## INAPPLICABILITY OF THE <u>HYUNDAI MOTOR CO.</u> DECISION

43.     On June 15, 1992, Wang was informed by Korean counsel of the Korean Supreme Court's decision the prior month in the <u>Hyundai Motor</u> case.  (Facsimile Transmission from Kim & Chang to Jim Boudreau, June 15, 1992 (Barnett Aff. Ex. R).)

44.     The next day, Wang wrote to Samsung and Goldstar that it felt that the facts of the <u>Hyundai Motor</u> case were substantially similar to those of the recently entered Samsung and Hynix Agreements.[3]  Wang asked that Samsung and Goldstar apply the <u>Hyundai Motor</u> decision by forwarding to Wang any taxes previously withheld from royalty payments and by not withholding any taxes in the future. (Letters from M. Shanahan to Gwangho Kim, JeongHwan Lee, June 16, 1992 (Barnett Aff. Ex. S).)

45.     On June 20, 1992, Samsung wrote to Wang and stated that the <u>Hyundai Motor</u> decision did not apply to the License Agreements until NTS formally said so.  Samsung stated that if it was told by the Korean government that no withholding was necessary before the date that its first withholding to NTS was due, it would remit the withheld amounts to Wang. Otherwise, Samsung stated, it would pay the taxes to NTS.  (Letter from Gwangho Kim to M. Shanahan, June 20, 1992 (Barnett Aff. Ex. T).)

---

[3] The Hynix Agreement had not yet been executed.

46.     Between July 9, 1992 and July 28, 1992, Wang's Korean law firm (Kim and Chang) contacted NTS to informally seek a ruling that the Hyundai Motor case applied to the Samsung and Goldstar agreements and no withholding was required.  NTS declined to issue the ruling.  (Wang's Answer to Samsung's Interrogatory No. 3 (Barnett Aff. Ex. U); Paolillo Dep. 91-93; Letter from Kim & Chang to James Boudreau, July 28, 1992 (Barnett Aff. Ex. V).)

47.     On July 6, 1992, Samsung asked NTS to rule whether the Hyundai Motor case applied to its royalty payments to Wang.  (Memorandum from Kwang Ho Kim to Office of National Tax Administration, July 6, 1992 (Son Aff. Ex. A).)  NTS referred the request to the Korean Ministry of Finance, which responded on January 20, 1993.  The Ministry of Finance stated that "any consideration paid to use or right to use the industrial knowledge or technology owned by a US corporation by a Korea corporation in Korea is a royalty income with its source being in Korea . . . if the patent, etc, are not registered in Korea."  (Memorandum from Office of National Tax Administration to Kwang Ho Kim (Son. Aff. Ex. B).)

48.     The patents licensed under the Samsung Agreement (and the other agreements) are U.S. patents and are not registered in Korea.

49.     On July 10, 1992, Samsung paid to the Korean government the taxes it had withheld from its first royalty payment because it had not heard from either Wang or the Korean tax authorities that the taxes were not due.  (Letter from Gwangho-Kim to Michael Shanahan, July 11, 1992 (Barnett Aff. Ex. W).)

50.     The next day, Samsung reported to Wang that it had remitted the taxes to NTS.  (Id.)

51.     Prior to July 27, 1992, Goldstar asked the NTS if the Hyundai Motor decision was applicable to the Goldstar Agreement and was told that it was still required to withhold taxes

- 11 -

from its royalty payments to Wang. (Letter from JeongHwan Lee to Michael Shanahan, July 27, 1992 (Barnett Aff. Ex. X).)

52.     Goldstar informed Wang of its inquiry with NTS and NTS's response on July 27, 1992. (Id.)

## THE COMPETENT AUTHORITY PROCEEDING

53.     On July 24, 1996, Wang's outside U.S. counsel requested that the Internal Revenue Service provide so-called competent authority assistance to help Wang recover from NTS the taxes withheld by Samsung, Hynix and Goldstar. (Letter from Robert D. Simon to IRS Tax Treaty Division, July 24, 1996 (Barnett Aff. Ex. Y).)

54.     A Competent Authority Proceeding is not a formal judicial or administrative proceeding. It is instead a diplomatic negotiation between representatives of two countries' taxing authorities concerning the proper application of a tax treaty between the two countries. (Paolillo Dep. at 115-116; Kim Report § V(e).)

55.     By October 16, 2002, the IRS and NTS had reached an agreement under which NTS agreed to refund 100% of the taxes previously withheld by Samsung, Hynix and Goldstar. The money was to be returned to the three Korean companies in their capacity as withholding agents for Wang, and Wang was required to make arrangements to have each one remit the proper amount to Wang. The competent authority agreement was applicable to the tax years 1992-2002, but was not binding on subsequent years. (Letter from Carol A. Dunahoo to Robert D. Simon, October 16, 2002 (Barnett Aff. Ex. Z).)

56.     Carol Dunahoo, Director, International of the IRS, informed Wang's outside counsel of these matters on October 16, 2002. (Id.)

57.     On the same day, Ms. Dunahoo sent a memorandum to the Industry Director, Communications, Technology and Media within the IRS summarizing the results of the Competent Authority Proceeding. Dunahoo stated in the background section of her memorandum that prior to the resolution of the proceeding, "[s]ince the Korean tax authorities considered all royalties as 100% sourced in Korea, all payments were subject to withholding taxes." (Memorandum Carol A. Dunahoo to Communications, Technology and Media Industry Director, Oct. 16, 2002 (Barnett Aff. Ex. AA).)

## THE NTS REFUND

58.     On December 16, 2002, Anthony Paolillo of Wang wrote separately to Samsung, Hynix and Goldstar/LG Semicon.[4] Paolillo informed the Korean companies of the results of the competent authority proceeding and asked them to refund to Wang the amounts he specified in the letters. Paolillo stated the Korean companies would be receiving those amounts from the Korean government. The amounts specified in the letter were $1,000,792 for Samsung, $723,457 for LG Semicon and $129,643 for Hynix. Paolillo also asked that no amounts be withheld for taxes from future royalty payments. (Letters from Anthony Paolillo to Hynix/Hyung-ryang Chung, LG Electronics/John Koo, and Samsung/Doh-Seok Choi, Dec. 16, 2002 (Barnett Aff. Ex. BB).)

59.     On December 30, 2002, D.S. Chung of Hynix wrote to Paolillo to inform him that the actual amount that would be refunded would be less than the amount stated in Paolillo's letter of December 16, 2002 because of differences in exchange rates for the Dollar and the Won at the time the taxes were paid and the time the refund was received. Samsung took a similar position

---

[4] In December 2002, Wang was unaware that LG Electronics had sold LG Semicon to Hynix. As a result of that sale, Hynix handled the refund of the amounts withheld by both itself and Goldstar/LG Semicon.

~BOST1:403271.v3

with regard to the amount of the refund to be paid to Wang.  (Letter from D.S. Chung to Anthony Paolillo, Dec. 30, 2002 (Barnett Aff. Ex. CC).)

60. As a result of the resolution of the competent authority proceeding, Hynix and Samsung received from the Korean government the exact amount in Won that they or their predecessors in interest had withheld and paid in taxes to NTS from 1992 to 1997.  (The Korean government did not include any interest with the amounts refunded.)  Each company then converted all of that amount to Dollars at the then-current exchange rate and paid it to Wang.  (Compl. ¶ 14.)  Because of the deterioration of the Won against the Dollar from the time the taxes were withheld and paid (1992-1997) to the time the refund was received (2003), the amount that Wang received in Dollars was less than the Dollar-value of the amounts withheld and paid from 1992 to 1997.  (Min Aff. ¶¶ 6-10; Son Aff. ¶¶ 6-9.)

61. Neither Hynix nor Samsung profited in any way from serving as the withholding agent for taxes due in connection with the royalty payments to Wang.  They converted to Won and paid to the NTS every Dollar they withheld from the royalty payments, and they converted to Dollars and paid to Wang every Won they received from the NTS in the refund.  (Min Aff. ¶ 11; Son Aff. ¶ 10.)

HYNIX SEMICONDUCTOR, INC. and
SAMSUNG ELECTRONICS CO., LTD.,

By their attorneys,

　/s/ Robert P. Sherman
Robert P. Sherman (BBO #458540)
Bruce S. Barnett (BBO#647666)
DLA Piper Rudnick Gray Cary US LLP
One International Place
Boston, MA 02110
617-406-6000

~BOST1:403271.v3