# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CA NO. 04-12382 (RCL)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
GETRONICS WANG CO., LLC,                    \*
    Plaintiff,                              \*
                                             \*
v.                                           \*
                                             \*
HYNIX SEMICONDUCTOR, INC., and               \*
SAMSUNG ELECTRONICS CO., LTD.,               \*
    Defendants.                              \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

      DEPOSITION OF ANTHONY P. PAOLILLO, taken pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, before Susan L. Prokopik, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Nixon Peabody LLP, 100 Summer Street, Boston, Massachusetts, on Wednesday, September 28, 2005, at 9:19 a.m.

KACZYNSKI REPORTING
72 CHANDLER STREET, SUITE 3
BOSTON, MASSACHUSETTS 02116
(617) 426-6060

Page 2

1  APPEARANCES:
2
    ON BEHALF OF THE PLAINTIFF:
3
    MICHAEL C. HARVELL, ESQ.
4   Sheehan Phinney Bass + Green
    1000 Elm Street
5   P.O. Box 3701
    Manchester, NH 03105-3701
6   (603) 627-8133
7
8   ON BEHALF OF THE DEFENDANTS:
9   ROBERT P. SHERMAN, ESQ.
    GORDON M. JONES, III, ESQ.
10  Nixon Peabody LLP
    100 Summer Street
11  Boston, MA 02110-2131
    (617) 345-1000
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

EXHIBITS
No.  Description                         Page No.
23   8/11/93 letter                      105
24   8/20/93 letter                      105
25   8/26/93 letter and attachment       110
26   SIMM Withholding Tax                113
27   10/24/95 handwritten note           116
28   12/19/95 E-mail                     117
29   7/24/96 letter and attachments      119
30   8/23 letter and attachments         125
31   1/28/98 letter                      127
32   10/2/98 letter and attachments      129
33   10/16/02 letter                     132
34   11/26/02 letter                     136
35   12/16/02 letter                     140
36   12/16/02 letter                     140
37   12/16/02 letter                     140
38   12/30/02 letter and attachment      147
39   1/3/02 letter                       150
40   1/14/02 letter                      152
41   1/14/03 letter                      162
42   1/18/02 letter and attachment       163
43   1/29/03 letter                      166
44   1/29/03 letter                      166
45   2/5/03 letter                       168
46   2/6/03 letter                       169
47   2/13/03 letter and attachment       173
48   3/21/03 letter and attachments      175
49   6/25/03 letter                      178
50   9/1/04 letter                       179
51   6/22/92 letter and attachments      184
52   10/16/02 letter and attachments     186

Page 3

1   INDEX
2
    EXAMINATION BY MR. SHERMAN............Page 5, 186
3
    EXAMINATION BY MR. HARVELL.............Page 183
4
5
6
7
    EXHIBITS
8
    No.  Description                     Page No.
9
10  1   Notice of Deposition and
        attachments                      7
11  2   12/22/89 letter and attachments  31
    3   11/11/91 letter and attachments  34
12  4   3/18/92 letter and attachments   40
    5   SIMM Technology Patent License
13      Agreement                        59
    6   SIMM Technology Patent License
14      Agreement                        61
    7   5/15/92 letter and attachment    63
15  8   5/15/92 letter and attachment    65
    9   6/26/92 letter                   65
16  10  6/25/92 memorandum               68
    11  5/15/92 facsimile message        74
17  12  6/5/92 facsimile message
        and attachment                   74
18  13  6/16/92 letter                   78
    14  6/16/92 letter                   78
19  15  6/20/92 letter and attachments   81
    16  7/27/92 letter                   86
20  17  Plaintiff Getronics Wang Co., LLC
        Answers to Defendant Samsung
21      Electronics Co., Ltd.'s First Set
        of Interrogatories               90
22  18  7/11/92 letter                   94
    19  SIMM Withholding Tax             95
23  20  GoldStar document                96
    21  9/18/00 letter                   99
24  22  SIMM Technology Patent License
        Agreement                       101

Page 5

1           PROCEEDINGS
2           - - - - -
3       MR. SHERMAN: The stipulations are that
4   all objections except as to the form of the
5   question and motions to strike will be reserved
6   until the time of trial. The witness will read
7   and sign the deposition within 30 days of the
8   receipt of the transcript by Mr. Harvell. That
9   takes care of it.
10      MR. HARVELL: Mm-hmm.
11      MR. SHERMAN: Can you just swear the
12  witness in, if you would.
13          ANTHONY P. PAOLILLO
14  having been satisfactorily identified and duly
15  sworn by the Notary Public, was examined and
16  testified as follows:
17      EXAMINATION BY MR. SHERMAN:
18  Q. Is it Mr. Paolillo?
19  A. You said it very well.
20  Q. Paolillo?
21  A. Yes.
22  Q. Okay. I want to make sure I got it right.
23  A. Yeah. That's fine.
24  Q. My name is Rob Sherman. With me is Gordon Jones.

Page 30

1  MR. HARVELL: Did you say '89?
2  THE WITNESS: Yeah.
3  Q. Was there any --
4  THE WITNESS: I believe so.
5  Q. -- particular area of emphasis in your MBA degree
6  program? Just --
7  A. Business management. That's it.
8  Q. Do you have any particularized training in
9  taxation or --
10 A. I've been in the business for going on 25 years
11 at least. And I worked for the Department of
12 Revenue, Massachusetts for five years when I
13 first got out, first started out of college.
14 From there, I worked at Compugraphic. I was a
15 tax manager at Compugraphic for four years. And
16 I've been involved with Getronics since then.
17 Like I said, I also worked at KPMG. So if that's
18 considered training, that's part of --
19 Q. Sure. You're not a CPA?
20 A. I'm not, no.
21 Q. What years did you work for the DOR?
22 A. Oh, God.
23 Q. You graduated from college in 1977?
24 A. I got to think a little bit here. Let me see.

Page 31

1  So -- I think it was '78 through -- '82.
2  Q. Fine.
3  A. '83.
4  Q. Something like that. Then you went to
5  Compugraphic from '82 to '86?
6  A. Yes.
7  Q. You were a four-year kind of guy?
8  A. That's right. Other than Getronics.
9  Q. Okay.
10 (12/22/89 letter and attachments marked
11 Exhibit No. 2.)
12 Q. Mr. Paolillo, I've provided you with an Exhibit
13 2, which is a document, a letter dated December
14 22, 1989 from Michael Shanahan to KH Kim, chief
15 executive officer of Samsung Semiconductor. And
16 let me -- with several attached pages. Let me
17 ask you whether or not you have ever seen this
18 document before, if you recall.
19 A. I have not seen this document, no.
20 Q. Did you review this document in connection with
21 today's deposition?
22 A. I have not seen this. I did not get to this
23 document, no.
24 Q. Okay. Let me just represent to you that this is

Page 32

1  the earliest in time of the documents that we
2  received in production from the plaintiff.
3  A. Okay.
4  Q. And I want to know whether or not you're aware of
5  any earlier correspondence or communication with
6  any of the three entities; that is to say,
7  Samsung, GoldStar or Hyundai, earlier than this
8  dated December of 1989.
9  A. No, I'm not.
10 Q. By reviewing this document, are you aware as to
11 whether or not in 1989 there was a patent suit
12 outstanding against any parties in relation to
13 the SIMMs patents?
14 A. My direct knowledge, I can't recall that there
15 was an outstanding patent suit.
16 Q. Okay. You understand this just from reading it,
17 however, to be a letter from Mr. Shanahan who was
18 then the patent counsel at Wang informing Samsung
19 that Wang held a patent for SIMMs technology and
20 was requesting that Samsung consider a license?
21 A. Right.
22 Q. Right?
23 A. I understand, yes.
24 Q. Okay. We're going to fly through some of these.

Page 33

1  You were at Wang at the time in the -- broadly,
2  were you in the tax department? Is that what it
3  would be?
4  A. Yes.
5  MR. HARVELL: When you say "at that
6  time," you're referring to the date of Exhibit 2?
7  MR. SHERMAN: Sorry. Exhibit 2.
8  Q. Were you aware of any discussions about a
9  strategy by Wang to secure licenses from various
10 manufacturers of SIMM -- semiconductors for the
11 SIMM technology?
12 A. Of course I was in the tax department but I was
13 aware that the legal department or the company as
14 a whole had made statements even publicly that
15 they were actually looking towards people
16 utilizing some of the patents that they had
17 already set up. SIMMs patents and other patents
18 I believe, too. But SIMMs was the biggest one.
19 I was aware. I mean, it was a constant
20 public -- it was a constant public knowledge that
21 that was going on.
22 Q. Was it seen as a revenue strategy?
23 A. In my opinion, it was not at first. Then I think
24 I believe it became but at first, I believe they

Page 34

1  really felt that they were -- their technology
2  was being stolen.
3  Q. Okay. But at some point it became a program to
4  try to generate revenue through licensing?
5  A. Yes. With the company on the down side of
6  things, it became a source of income.
7  Q. Okay. Want some water?
8  A. Yes.
9  Q. Let me just look at this for one second.
10        Okay. Let's do this.
11        (11/11/91 letter and attachments marked
12    Exhibit No. 3.)
13  Q. I'm going to show you a document which is marked
14  as Exhibit No. 3. And it's a multi-page
15  document.
16  A. Mm-hmm.
17  Q. Let me identify it by Bates number because I
18  think it will help the reporting. It bears a
19  prefix of GW, which indicates that it was
20  produced by the plaintiff, GetronicsWang, and the
21  last four digits begin with 3823 and end at 3835.
22  And let me ask you if you can identify this.
23  A. This is just the standard patent agreement that
24  Wang Laboratories I believe had with Samsung.

Page 35

1  Q. You mean standard license agreement?
2  A. License agreement. I apologize.
3  Q. Okay. Now, this is dated November 11, 1991,
4  right?
5  A. The letter is, yes.
6  Q. Exactly. And do you see if you look on, again,
7  at the letter, this refers to the trial of the
8  patent case involving NEC and Toshiba. Do you
9  see that in the second paragraph?
10 A. Yes, I do.
11 Q. You were aware, were you not, that Wang brought a
12 patent infringement action against NEC and
13 Toshiba which was tried somewhere in Virginia and
14 it resolved at least in part on Wang's favor?
15 A. Correct. Yes.
16 Q. Okay. This is now following up with Samsung
17 about a potential license and informing Samsung
18 of the resolution of that patent infringement
19 action. Was the patent infringement action
20 against NEC and Toshiba part of the strategy of
21 trying to kind of promote license agreements with
22 various manufacturers of SIMMs?
23 A. In my opinion what had happened is that they had
24 uncovered an infringement of this particular

Page 36

1  patent. And then as they investigated more about
2  it, they found that there were more and more
3  companies that in fact were infringing upon this
4  patent. And we felt that -- at the time Wang
5  felt that we needed to stop them and we needed to
6  get some royalty payments for that infringement.
7  Q. Okay.
8  A. And they just kept adding to the list as they
9  went through it. And --
10 Q. Now, the time of this is November 11, 1991.
11 Exhibit 2 that we looked at just before is
12 December 22, '89. We're talking about an almost
13 two-year period --
14 A. Mm-hmm.
15 Q. -- between correspondence between Wang on the one
16 hand and Samsung on the other. Are you familiar
17 with -- do you have any understanding as to what,
18 if anything, happened between the companies
19 during this two-year period? Were there any
20 other discussions, for example, that you're aware
21 of?
22 A. As far as I -- based on my research, not on my
23 knowledge, that I haven't seen anything that
24 showed any correspondence between '89 and '91

Page 37

1  that I can remember.
2  Q. Mr. Paolillo, I appreciate your attempting to
3  answer these as completely as you can. Some of
4  the areas, questions you don't have personal
5  knowledge on. Some you've had to try to research
6  or look at documents. But you do understand, do
7  you not, that your testimony as a 30(b)(6)
8  designee binds GetronicsWang in this case? That
9  is, you're testifying as the company in this
10 case?
11 A. I understand.
12 Q. Fine. Okay. Now, attached to the letter of
13 November 11th is a -- looks to be a draft license
14 agreement, right?
15 A. Yes.
16 Q. And is it your -- I think you referred to this as
17 a standard Wang license. Is it your
18 understanding then that the drafting of this was
19 done by Wang? Somebody at Wang.
20 A. Either somebody at Wang or an outside attorney.
21 Q. Or somebody for Wang?
22 A. Hired by Wang, yes.
23 Q. But I'm asking you, by contrast to Samsung. In
24 other words, it was Wang's draft to the best of

Page 62

1  the prefix GW beginning at 226 and ending at 244
2  and ask you if you can identify this as the
3  license agreement between Wang Laboratories and
4  GoldStar Electronic Company.
5  A. Yes.
6  Q. And if you'll look on the last page and note, I
7  take it, that it's executed?
8  A. Yes.
9  Q. The date of this agreement is -- doesn't actually
10  have a date at the top but the month is March of
11  1992. Do you see that?
12  A. Yes.
13  Q. And so this was negotiated and executed in the
14  same time frame as the Samsung agreement?
15  A. Correct.
16  Q. And we're going to distinguish this from the
17  Hyundai agreement, which you'll see later was
18  sometime later. Over a year later.
19  A. Mm-hmm.
20  Q. Now, have you reviewed this agreement --
21  A. Yes.
22  Q. -- in connection with both the Competent
23  Authority proceeding as well as in connection
24  with preparation for today?

Page 63

1  A. Yes. Sorry. Yes.
2  Q. Okay. And do you have an understanding -- we'll
3  try to short circuit this -- that the provisions
4  that I was referring to in the Samsung agreement
5  -- and here it would be so-called late payment,
6  attorneys' fees, losers pay, taxes to be withheld
7  and payment in US dollars -- in the GoldStar
8  agreement are identical to those in the Samsung
9  agreement?
10  A. Yes.
11  Q. Good. That makes it really easy. So I take it
12  that your answers at least with respect to your
13  understanding of those provisions with respect to
14  the Samsung agreement would apply to the GoldStar
15  agreement as well?
16  A. Yes.
17  Q. Okay. Good job. Excellent. So we're now
18  through sometime in March of 1992, correct?
19  A. Mm-hmm. Mm-hmm.
20  Q. We're into March of 1992.
21      (5/15/92 letter and attachment marked
22  Exhibit No. 7.)
23  Q. I'm showing you what's been marked Exhibit No. 7,
24  which is a letter from Gwangho, G W A N G H O,

Page 64

1  Kim, at Samsung to Thomas J. Scott at Howrey,
2  H O W R E Y, and Simon dated May 15, 1992 with an
3  attached fax cover sheet, Bates stamp number 1654
4  and 1655. Can you identify it as such?
5  A. Yes.
6  Q. Okay. Now, first of all, who is Thomas Scott?
7  A. I don't know.
8  Q. How about who is Howrey and Simon?
9  A. I believe they were the attorneys we were using
10  in reference to this -- these cases.
11  Q. When you say "in reference to these cases," what
12  do you mean?
13  A. I mean assisting us with the patent infringement
14  cases.
15  Q. You understand Howrey and Simon litigated the
16  patent infringement cases?
17  A. I believe they assisted. I'm not sure they were
18  sole attorneys.
19  Q. Okay. And this is with respect to the Samsung
20  agreement and you'll note that it says that the
21  government did approve the Samsung/Wang license
22  agreement on May 12th, which under the terms of
23  the agreement would make that the effective date,
24  correct?

Page 65

1  A. Correct.
2  Q. And then in turn on the fax cover sheet is a
3  transmittal of this letter purportedly from
4  Howrey and Simon to Mr. Shanahan, right?
5  A. Yes.
6  Q. Who was the chief patent counsel inhouse at Wang?
7  A. Yes.
8  Q. So it was clear, though, to Wang that in order
9  for this license agreement to be effective the
10  government of Korea had to formally approve it?
11  A. I believe so, yes.
12  Q. Okay.
13      (Off the record.)
14      (5/15/92 letter and attachment marked
15  Exhibit No. 8.)
16      (6/26/92 letter marked Exhibit No. 9.)
17  Q. Okay. I'm going to show you what's been marked
18  Exhibits 8 and 9. First is dated May 15, 1992, a
19  letter from Michael Shanahan to Gwangho Kim at
20  Samsung. And it's 1651. And let's do this. Why
21  don't we take -- just take the last page off
22  because I think we've already marked that as an
23  exhibit.
24      MR. HARVELL: That's fine.

Page 90

1   (Plaintiff GetronicsWang Co., LLC
2   Answers to Defendant Samsung Electronics Co.,
3   Limited First Set of Interrogatories marked
4   Exhibit No. 17.)
5   Q. This is Exhibit 17. And these are
6   GetronicsWang's answers to --
7   A. Yeah.
8   Q. -- Samsung's answers to interrogatories, correct?
9   A. Right. Yes.
10  Q. Okay. And let me just go to the next to the last
11     page.
12  A. What number?
13  Q. It actually doesn't have a number. Look for the
14     page that you signed it.
15  A. Yes.
16  Q. And you signed these on behalf of GetronicsWang
17     indicating that the answers were true to the best
18     of your knowledge, information and belief,
19     correct?
20  A. Yes.
21  Q. That's your signature?
22  A. Yes.
23  Q. Okay. Now, what I was referring to is in
24     interrogatory number three.

Page 91

1   A. Yes.
2   Q. And the answer to interrogatory number three was
3      "Between 7/9/92 and 7/28/92" -- so in July of
4      1992. At around the same time as this Getronics
5      -- as this GoldStar letter that we just looked
6      at, correct?
7   A. Yes.
8   Q. "That representatives of the Korean law firm Kim
9      & Chang" -- this is the firm that was
10     representing Wang in Korea, correct?
11  A. Yes.
12  Q. Okay. "Contacted the National Tax Administration
13     in Korea to informally seek a ruling supporting
14     the Hyundai case," right?
15  A. Correct.
16  Q. And when you mean "supporting the Hyundai case"
17     in this answer, you mean trying to get a ruling
18     that the Hyundai case applied to the license
19     agreements between Wang and Samsung on the one
20     hand and GoldStar on the other, correct?
21  A. Correct.
22  Q. And it goes on to say that "The NTA, National Tax
23     Administration, declined to issue a ruling
24     confirming the Hyundai Supreme Court case,"

Page 92

1      right?
2   A. Correct.
3   Q. So at that point, Wang was aware that the Korean
4      National Tax Administration said that the Hyundai
5      case could not be applied beyond its specific
6      case?
7   A. My understanding, based on what my understanding
8      was based on our correspondence with our outside
9      attorneys, is that the reason why they -- the
10     reason why they would not give the ruling is they
11     felt it would jeopardize their existing Competent
12     Authority cases on the outside. So it wasn't an
13     issue of whether or not the Hyundai case was
14     applicable to these cases. It was more in the
15     line with they were afraid they were going to
16     jeopardize whatever agreements they had going
17     with -- on the outside with the IRS involving
18     foreign source income with the IRS.
19  Q. Right. But for whatever reason they said, at
20     that point in time they informed your -- Wang's
21     counsel in Korea that you could not apply the
22     Hyundai case to the --
23  A. That's not what they said. They said they would
24     not give us a ruling on it.

Page 93

1   Q. And they certainly -- National Tax Administration
2      certainly didn't say that taxes shouldn't be
3      withheld under those agreements at that point in
4      time, correct?
5   A. They did not give us a ruling on it.
6   Q. Okay. They wouldn't give you a formal or an
7      informal ruling?
8   A. They said they would not give a ruling based on
9      the fact they felt it would compromise their
10     existing cases.
11  Q. Okay. And do you know whether or not your
12     counsel made inquiry at this time about whether
13     the Korean companies were required to withhold
14     taxes under the license agreements between Wang
15     and Samsung on the one hand and Wang and GoldStar
16     on the other?
17  A. Inquiries to who?
18  Q. I'm distinguishing now from the applicability of
19     the Hyundai case and asking you whether or not
20     you were aware or are aware based on knowledge or
21     investigation about whether Kim & Chang on Wang's
22     behalf inquired of the National Tax
23     Administration as to whether or not the Korean
24     companies were required to withhold taxes in

Page 94

1  connection with the Wang-Samsung and
2  Wang-GoldStar agreements?
3  A. I don't remember seeing anything, Bob, that
4     showed that, that in fact they asked specifically
5     whether or not withholding tax should be applied.
6  Q. Okay.
7         (7/11/92 letter marked Exhibit No. 18.)
8  Q. Exhibit 18 is a letter of July 11, 1992 from
9     Gwangho Kim at Samsung to Michael Shanahan. Can
10    you identify it as such?
11 A. Yes.
12 Q. Is this a document that you have reviewed in the
13    last period of time?
14 A. Yes. I believe I've gone through this.
15 Q. Okay. And have you discussed it with counsel?
16    Yes or no.
17 A. Yes.
18 Q. Okay. With anyone else?
19 A. No.
20 Q. Okay. And in this Samsung is -- there had been
21    correspondence in which Samsung had indicated
22    that unless notified in advance of July 10th by
23    Wang that it didn't need to pay the -- make the
24    withholding it was going to do so, correct?

Page 95

1  A. Correct.
2  Q. And it's indicating it had not received any
3     notification from Wang to that effect and was
4     therefore -- had withheld the taxes and paid them
5     to the Korean tax office on July 10th, correct?
6  A. Correct. Correct.
7  Q. And in fact, there wasn't any notification from
8     Wang to Samsung about the requirements of
9     withholding taxes, correct? You had sought a
10    ruling from the National Tax Administration in
11    the expectation that you could then send some
12    notice to Samsung and GoldStar that it didn't
13    need to withhold taxes but you never got such a
14    ruling, correct?
15 A. Correct. Correct.
16 Q. And so there was no notice. Wang didn't have
17    then the ability to send a notice indicating that
18    they had gotten some formal or informal ruling
19    from the Korean Tax Administration; is that
20    right?
21 A. I believe so.
22 Q. Okay.
23        (SIMM Withholding Tax marked Exhibit
24    No. 19.)

Page 96

1         (GoldStar document marked Exhibit No.
2     20.)
3  Q. I'm showing you two separate documents, 19 and
4     20, exhibits which appear to be summaries of
5     amounts paid in royalty and amounts withheld with
6     respect to both Samsung and GoldStar. The
7     Samsung agreement bears Bates stamp GW 701 and
8     the GoldStar's GW 983. Can you identify each as
9     such?
10 A. Yes.
11 Q. Now, these were documents created at some point
12    by Wang --
13 A. Correct.
14 Q. -- either as part of a Competent Authority
15    proceeding or after the Competent Authority
16    proceeding in order to determine what amounts
17    were purported to be due?
18 A. Correct.
19 Q. Okay. Actually, it's 10/18/95 on it?
20 A. Yes.
21 Q. Right around the time of the Competent Authority
22    proceeding?
23 A. Yes.
24 Q. We'll try to do this in a summary way. With

Page 97

1     respect to Samsung, this reflects the total
2     number of payments made by Samsung under the
3     royalty agreements, correct?
4  A. Correct.
5  Q. And in each instance it shows that a certain
6     amount of taxes were withheld?
7  A. Correct.
8  Q. Okay. And there's no dispute, I take it, that
9     those amounts in Korean won were sent by Samsung
10    to the Korean National Tax Service. No dispute
11    in this case?
12 A. Correct. Right.
13 Q. And that the total, this would be the total
14    number of won, that had been forwarded to the
15    Korean tax service by Samsung, that number of won
16    was in fact returned to Samsung, right?
17 A. I believe so, Bob.
18 Q. And that in turn, that amount of won was
19    converted by Samsung into US dollars?
20 A. Correct.
21 Q. At the date -- about the date it received it from
22    the National Tax Service, correct? Somewhere in
23    that time?
24 A. With some lag time.

Page 98

1  Q. At the then current exchange rate?
2  A. Correct.
3  Q. And then that total amount of US dollars were
4     forwarded to Wang by Samsung as its refund?
5  A. Correct.
6  Q. Okay. And with respect to GoldStar -- so this
7     indicates that the last payment by Samsung was in
8     1995. Is that correct?
9  A. Correct.
10 Q. And that's your understanding? That was the --
11 A. To the best of my knowledge.
12 Q. You don't have any reason to --
13 A. No, no.
14 Q. And also with respect to GoldStar, same -- my
15    same questions would apply.
16 A. Correct, Bob.
17 Q. That is, you have no reason to believe -- with
18    respect to each of the royalty payments made
19    there was a certain amount withheld --
20 A. Correct.
21 Q. -- and those dollars were forwarded by GoldStar
22    to -- in won to the Korean government, correct?
23 A. Correct.
24 Q. Korean government sent that money back at the end

Page 99

1     of the conclusion of the Competent Authority
2     proceeding to GoldStar in won?
3  A. Correct.
4  Q. GoldStar then converted those -- that won into US
5     dollars at the then current exchange rate,
6     correct?
7  A. Correct.
8  Q. And forwarded that total amount in US dollars to
9     Wang?
10 A. Correct.
11 Q. Okay. And just so it's clear for the record,
12    GoldStar by this point in time had changed its
13    name to LG Semicon Company?
14 A. Correct.
15 Q. And Wang was aware of that?
16 A. Correct.
17       MR. SHERMAN: We're actually going to
18    head towards Hyundai. Do you want to stop or do
19    you want to keep going for a little while?
20       MR. HARVELL: You're not going to
21    finish before lunch, I take it?
22       (Off the record.)
23       (9/18/90 letter marked Exhibit No. 21.)
24 Q. I'm showing you what's been marked as Exhibit No.

Page 100

1     21, which is a letter of September 18, 1990 to
2     Hyundai, H Y U N D A I, Electronics Industries
3     Company Limited from -- no. From Hyundai to
4     Michael Shanahan. And it's from MJ Yoon,
5     Y O O N, at Hyundai to Michael Shanahan. GW 929.
6     Can you identify it as such?
7  A. Yes.
8  Q. Okay. This is the first correspondence with
9     Hyundai that we have seen. Are you aware of
10    anything earlier?
11 A. No, I'm not.
12 Q. There must be something earlier because this is a
13    response to a letter from Wang but we don't have
14    it. You don't have it.
15       Okay. Fair enough.
16 A. Could not find it.
17 Q. No problem. Okay. In this Hyundai is indicating
18    that it's received a notice of infringement from
19    Wang and is studying the issue in essence,
20    correct?
21 A. Yes.
22 Q. And we presume this -- I take it that this notice
23    of infringement was --
24 A. No, it is.

Page 101

1  Q. -- with respect to the -- do you recognize these
2     as the SIMMs patents?
3  A. Yes.
4  Q. The '605, '513 and the '892 patents?
5  A. To the best of my knowledge, yes.
6  Q. Okay.
7        (SIMM Technology Patent License
8     Agreement marked Exhibit No. 22.)
9  Q. And this is Exhibit 22. It's a multi-page
10    document, GW 458 through 486. And it is
11    identified as the license -- SIMM Technology
12    Patent License Agreement between Wang and Hyundai
13    Electric. Electronics Industry Company Limited.
14    Can you identify it as such?
15 A. Yes.
16 Q. It's the executed copy, is it not?
17 A. Yes.
18 Q. Do you have any understanding of what, if
19    anything, happened between the time of Exhibit
20    No. 21, which was 1990, and June of 1993?
21 A. I do not.
22 Q. Okay. In any event, the license agreement wasn't
23    signed until then?
24 A. Correct.

PAOLILLO-9/28/05

Page 102

1  Q. Now, do you have any understanding about the
2     negotiation of this agreement?
3  A. No, I do not.
4  Q. Have you made any inquiry about the negotiation
5     of this agreement?
6  A. No, I have not.
7  Q. Do you have an understanding that in certain
8     respects the Hyundai agreement differs from the
9     Samsung and GoldStar agreements in its language?
10 A. It is --
11 Q. Well --
12 A. From my standpoint, the structure is different.
13    The paragraph's different. I've gone through it
14    but not substantially so --
15 Q. Not substantially different?
16 A. Yeah.
17 Q. Do you understand it -- now I mean testifying on
18    behalf of Wang, GetronicsWang -- to be in
19    substance the same?
20 A. That's my understanding, yes.
21 Q. Okay. Give me one second.
22    If you turn to page 475 and paragraph
23    6.10 --
24 A. Mm-hmm.

Page 103

1  Q. -- this is the counterpart, if you will, to the
2     provision in the Samsung and GoldStar agreement
3     about the withholding of taxes, correct?
4  A. Correct.
5  Q. This one says that "all taxes imposed as a result
6     of the existence or performance of this agreement
7     shall be borne and paid by the party required to
8     do so by applicable law."
9         Do you see that?
10 A. Yes.
11 Q. If you turn back to the Wang agreement,
12    Wang-Samsung agreement, it actually says that
13    they'll be paid by Wang. You can look back if
14    you want.
15 A. Okay.
16 Q. So that the language is a little different.
17 A. Okay.
18 Q. Do you have any understanding as to the reason
19    for difference in the language?
20 A. I do not.
21 Q. Notwithstanding that, do you understand these two
22    provisions to be, have the same -- to be the same
23    substantively?
24 A. I believe the intent of them to be.

Page 104

1  Q. Have you ever inquired as to anyone as to why
2     there is a difference in the language?
3  A. No, I have not.
4  Q. If you turn to 6.10, which we had already looked
5     at a bit, but --
6  A. Yes.
7  Q. This -- if you go on in 6.10 --
8         MR. HARVELL: Give us a minute.
9  A. Sorry about that. Okay.
10 Q. We looked at it earlier. It says, "Licensee
11    shall withhold from payments to Wang under this
12    agreement the amount of any national taxes levied
13    on licensee's payments hereunder by the Korean
14    government consistent with any Korea/United
15    States double taxation treaty."
16        That's not any of the language that we
17    saw in the earlier Samsung. Do you have any
18    understanding as to why that's --
19 A. I do not know why.
20 Q. Have you ever asked anybody?
21 A. I have not.
22 Q. Did you have an understanding that the Hyundai
23    agreement was indeed approved by the Korean
24    government? Let me give this to you so we don't

Page 105

1     have any mistake about it.
2  A. Okay.
3         (8/11/93 letter marked Exhibit No. 23.)
4  Q. It's a letter of August 11, '93 to Maggie
5     Mellonakos from DS Chung at Hyundai Electronics
6     Industries. Mr. Chung is informing Wang that the
7     Korean government has approved the license
8     agreement on August 6, 1993.
9  A. Correct.
10 Q. And as a result of that, that becomes the
11    effective date of the agreement?
12 A. Correct.
13 Q. Now, Wang was aware, was it not, that with
14    respect to payments made by Hyundai under the
15    license agreement that in each instance a certain
16    amount was withheld on Wang's behalf and paid to
17    the Korean Taxing Authority as withholding tax?
18 A. Wang was aware that there was withholding tax --
19    there was an amount withheld from that amount and
20    paid over to the Korean government.
21 Q. Each time?
22 A. Each time, yes.
23        (8/20/93 letter marked Exhibit No. 24.)
24 Q. This is a letter of August 20, 1993 from Michael

27 (Pages 102 to 105)

KACZYNSKI REPORTING

Page 114

1   bankruptcy?
2   A. It was -- we went into bankruptcy August 19,
3     1992. We came out of bankruptcy on December -- I
4     would like to say 17th, 1993.
5   Q. I see. I thought it was a longer period than
6     that. Okay. And was it Chapter 11?
7   A. Yes, it was.
8   Q. Okay. Now, at some point Wang made a decision to
9     initiate a request for Competent Authority
10    assistance to the United States, correct?
11  A. Correct.
12  Q. Were you involved in any of the Competent
13    Authority proceedings until -- before it was
14    concluded?
15  A. My only involvement with the -- I was not
16    involved with the original filing of the
17    Competent Authority, Bob. I was involved, of
18    course, once the Competent Authority had
19    concluded but prior to that, I was not involved.
20    I was aware that there was a Competent Authority
21    ruling in effect. Especially as people started
22    to leave the department, responsibilities started
23    to shift so I was very much aware of what was
24    going on from that standpoint.

Page 115

1   Q. Had you been involved in any -- have you ever
2     been involved in any Competent Authority request
3     for assistance other than in this instance?
4   A. Never.
5   Q. You understand, I take it, that Competent
6     Authority is not -- it's not a formal proceeding,
7     correct?
8   A. I understand. Yes.
9   Q. You understand it's a negotiation?
10  A. I understand.
11  Q. And I'll refer to it as a diplomatic negotiation.
12    Is that fair?
13  A. I would say yes. Yes.
14  Q. I take it that negotiation occurs between certain
15    of the members of the taxing authority of the
16    United States. In this instance, it's the
17    Internal Revenue Service, correct?
18  A. Correct.
19  Q. And counterparts of the -- in this instance the
20    Korean government?
21  A. Korean tax department, yes. NTA.
22  Q. The NTA. National Tax Administration?
23  A. Yes.
24  Q. Okay. Do you have any understanding as to

Page 116

1     whether or not the IRS, Internal Revenue Service,
2     is intended to be the advocate for the United
3     States company?
4   A. My understanding is it's more of a review of the
5     treaty between the two companies, countries, and
6     based on the interpretation, based on the Korean
7     side versus the US side of those two treaties. I
8     don't believe the IRS is the real advocate other
9     than to make sure the treaty that has been signed
10    between Korea and the United States is fulfilled
11    properly and that there's no double taxation or
12    double jeopardy.
13  Q. I'm just trying to mark this in time a bit.
14        (10/24/95 handwritten note marked
15    Exhibit No. 27.)
16  Q. Exhibit 27 is a half a page of handwritten notes
17    with a date of 10/24/1995. This -- first of all,
18    do you recognize anybody's handwriting here?
19  A. I do not, Bob.
20  Q. Okay. Do you understand that this is a note
21    somebody took about a potential Competent
22    Authority request for assistance? This says six
23    months to do Competent Authority.
24  A. Yeah. They are mentioning that, along with some

Page 117

1     other issues, I believe, up above.
2   Q. Well, the other issues are -- I guess maybe we'll
3     be forced to speculate, but it would appear that
4     certain companies were -- there was an inquiry
5     made about the availability of certain companies
6     to assist in this Competent Authority proceeding.
7     That may be the case and it may not.
8   A. Yeah. I'm not sure.
9   Q. I know you told me who Stephen Waystack is and
10    who Jim Boudreau is. Who is Pat DiLuca?
11  A. Pat is -- she is -- her role is -- she is in the
12    cash -- cash management group. They handle all
13    the cash receipts as they come in. And she is
14    really just a clerk, Pat, and she takes checks as
15    they come in and she makes sure they get -- if
16    any monies come in, they get appropriated
17    properly, proper costs and proper accounts.
18  Q. I got you. Okay. I think we'll get a little
19    further with that one. That's October, 1995,
20    correct?
21  A. Yeah.
22  Q. Okay.
23        (12/19/95 E-mail marked Exhibit No.
24    28.)

### Page 150

```
 1    the royalty, right?
 2  A. Yes.
 3  Q. 803,987. The amount withheld in US dollars,
 4    correct?
 5  A. Correct.
 6  Q. The exchange rate. And -- which shows it being
 7    different at the two times of payment. One time
 8    in August of '93 and the other in March of '95?
 9  A. Correct.
10  Q. Right? And what the total withheld in won was,
11    right?
12  A. Correct.
13  Q. So he's basically telling you that the
14    calculation by the NTS is just different than the
15    one you've provided?
16  A. I understand what he's doing, yes.
17  Q. I know you don't agree. That's very clear
18    because we have documents which show that. And
19    here it is, by the way. Okay. I'm not trying to
20    trick you. I know you don't agree.
21        (1/3/02 letter marked Exhibit No. 39.)
22  Q. I show you Exhibit 39, which is a one-page
23    letter, your letter to Mr. Chung, January 3,
24    2002, bearing Bates stamp number HYN 72. And you
```

### Page 151

```
 1    can identify it as such?
 2  A. Yes.
 3  Q. You received it at the time?
 4  A. Yes.
 5  Q. It should be 2003, shouldn't it?
 6  A. Yes.
 7  Q. No. Yes. January 3, 2003. I'm sorry. You're
 8    absolutely right. Hadn't gotten there yet.
 9    Hadn't changed the date electronically?
10  A. Yes.
11  Q. But this is in direct response to the letter we
12    just saw of December 30th?
13  A. Yes, yes.
14  Q. And you are indicating to Mr. Chung that you
15    basically are contesting the -- his position of
16    the amount that will be refunded will be
17    different because of the currency rate
18    fluctuation, correct?
19  A. Correct.
20  Q. In essence?
21  A. Yes.
22  Q. You say in the paragraph that begins "Relative to
23    the amount to be refunded," you reference
24    paragraph 6.4 of the SIMM license. And then you
```

### Page 152

```
 1    say, "Since the royalty, original royalty payment
 2    was made in US dollars and the tax withheld was
 3    in US dollars, then one can reasonably expect the
 4    tax refunded will be in US dollars at its value
 5    at the time of the original royalty payment."
 6        What was the basis for you to say you
 7    could expect that? "One could reasonably expect
 8    that." In other words, let me be more precise in
 9    my question. Is that your -- is that based
10    exclusively on your interpretation of section
11    6.4?
12  A. Yes.
13  Q. Okay. And no other source?
14  A. No other source.
15  Q. Okay.
16        (1/14/02 letter mark Exhibit No. 40.)
17  Q. I show you what's been marked Exhibit 40, a
18    letter from Mr. Chung to you, January 14, 2002.
19    This should be December -- January of 2003 as
20    well, correct?
21  A. Correct.
22  Q. Okay. And this is a response to your letter we
23    just looked at, Exhibit 39 of January 3, 2003,
24    correct?
```

### Page 153

```
 1  A. Correct.
 2  Q. Mr. Chung responds that, quote, We paid our
 3    royalty in United States dollars after
 4    withholding Korean taxes as required under
 5    section 6.4 and 6.1 of the SIMM license. Thanks
 6    to the agreement between US IRS and Korean NTS,
 7    however, you are now to receive those taxes
 8    withheld by Korean NTS. Since we serve only as a
 9    conduit for the refund of those taxes to Wang, we
10    will refund just as much as our NTS does to us.
11        Now, you understood ultimately that
12    that is what happened; that is to say, that Hynix
13    refunded to Wang everything that the NTS refunded
14    to Hynix on Wang's behalf?
15  A. Correct. We understood that. They refunded back
16    to us everything that they had originally
17    withheld from the Wang payment to the NTS back to
18    us.
19  Q. Okay. And I take it you understood that the NTS
20    didn't pay any interest to Hynix on those
21    payments?
22  A. That's my understanding based on these letters
23    back from the various --
24  Q. And you have no reason to --
```