# EXHIBIT E



EXHIBIT

22

S40  9/28/05

## SIMM TECHNOLOGY PATENT LICENSE AGREEMENT

Agreement dated as of June ___21___, 1993 (hereinafter "Date of this Agreement") by and between Wang Laboratories, Inc., a corporation under the laws of the Commonwealth of Massachusetts and having a principal place of business at One Industrial Avenue, Lowell, Massachusetts 01851 (hereinafter "WANG"), and Hyundai Electronics Industries Co., Ltd., a corporation under the laws of the Republic of Korea, and having a principal place of business at 66 Chuckseon-Dong, Chongro-Ku, Seoul, Korea, (hereinafter "LICENSEE").

WANG is the owner of, and has the right to license, certain United States patents and it desires to grant licenses and other rights with respect to such patents.

LICENSEE acknowledges that by letter dated as of July 25, 1990, WANG advised LICENSEE of its need for a license under such patents. LICENSEE desires to acquire a license and other rights under such patents.

NOW, THEREFORE, for and in consideration of the premises and covenants contained herein, WANG and LICENSEE agree as follows:

GW0000000458

Section 1.  Definitions

1.1     "SIMM" shall mean a single in-line memory module.

1.2     "Licensed Products" shall mean SIMMs which have a Type Number and which are covered by one or more claims of either or both of the Licensed Patents.

1.3     "Licensed Patents" shall mean the United States Letters Patent owned by WANG and identified as Patent Numbers 4,656,605 issued April 7, 1987 and 4,727,513 issued February 23, 1988.

1.4     "Type Number" shall mean any combination of numbers, letters or words utilized by LICENSEE to identify a particular type or model of SIMM.

1.5     "Licensee's Selling Price" shall mean the bona fide gross selling price, after prompt payment discounts (not to exceed 2%) and quantity discounts actually allowed, at which LICENSEE or its sublicensed Subsidiaries sell a Licensed Product to other than its affiliate.  If said gross selling price includes the following items, they may be deducted only if separately stated:  packing, transportation and insurance charges;  import, export excise, sales and value added taxes; custom  duties;  and  commissions.    If  LICENSEE  or  its

2

GW0000000459

sublicensed Subsidiaries so sell Licensed Products at more than one such price, Licensee's Selling Price with respect to each such Licensed Product of that Type Number shall mean the total revenue at such bona fide gross selling prices, adjusted as aforesaid for such sales of said Licensed Product, in the relevant semi-annual accounting period divided by the number of said Licensed Products of that Type Number sold in said period. If LICENSEE or its sublicensed Subsidiaries do not separately sell such Licensed Products, but incorporate them in apparatus which is not itself a Licensed Product, Licensee's Selling Price shall be deemed to be the Manufacturing Cost for each such Licensed Product of that Type Number in the relevant semi-annual accounting period multiplied by two (2). Licensed Products which are not sold by LICENSEE or its sublicensed Subsidiaries during the relevant accounting period, but which are otherwise transferred shall be deemed to have been sold for purposes of the computation of royalties in accordance with Section 5 hereof.

1.6     "Manufacturing Cost" shall mean LICENSEE's or its sublicensed Subsidiaries' total cost of direct materials, direct and indirect factory labor and factory overhead determined by LICENSEE in accordance with sound accounting principles.

3

GW0000000460

1.7    "Subsidiary" shall mean any corporation, company or other entity more than fifty percent (50%) of whose outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) are, now or hereafter, owned or controlled, directly or indirectly, by LICENSEE, but such corporation, company or other entity shall be deemed to be a Subsidiary only so long as such ownership or control exists.


Section 2.    License

2.1    WANG grants to LICENSEE a royalty bearing, nonexclusive license under the Licensed Patents:

2.1.1    to make, use, sell and/or otherwise transfer Licensed Products; and

2.1.2    to have made Licensed Products by another manufacturer for the use, sale or other transfer only by LICENSEE; provided, that prior written authorization to manufacture such Licensed Products under this Agreement has been given to said other manufacturer by LICENSEE.


2.2    No license or immunity is granted by WANG to LICENSEE either directly or by implication, estoppel or otherwise:

2.2.1 other than under the Licensed Patents;

2.2.2 with respect to any other apparatus which is not a Licensed Product even though such Licensed Product

4

GW0000000461

is incorporated into such apparatus;  or

2.2.3 to parties acquiring any items from LICENSEE for the combination of such acquired item with any other item, including other items provided by LICENSEE, or for the use of any such combination.


Section 3.    <u>Extension of License to Subsidiaries</u>

3.1    The license granted herein includes the right of LICENSEE to sublicense its Subsidiaries, direct or indirect. Each Subsidiary so sublicensed shall be bound by the terms and conditions of this Agreement as if it was named herein in the place of LICENSEE, provided that LICENSEE shall pay and account to WANG in respect of the exercise by any Subsidiary of any sublicense granted to it hereunder.  Any sublicense granted to a Subsidiary shall terminate on the date such Subsidiary ceases to be a Subsidiary.  Upon written request from WANG, LICENSEE shall promptly advise WANG in writing of those of its Subsidiaries which have been sublicensed under this Agreement.  At the time of the signing of this Agreement, Hyundai Electronics of American (hereinafter "HEA") is a Subsidiary of LICENSEE.


Section 4.    <u>Release</u>

4.1    Effective upon the receipt and acceptance by WANG of the payment provided for in Section 5.2 and the report required by Section 6.2, WANG irrevocably releases LICENSEE

5

GW0000000462

and its customers, mediate and immediate, from any and all claims of infringement of the Licensed Patents, which claims have been made or which might be made at any time, with respect to any item manufactured, used, sold or otherwise transferred by or for LICENSEE before the date of this Agreement, to the extent that such item would have been licensed hereunder had it been manufactured, used, sold or otherwise transferred after the date of this Agreement.

Section 5. <u>Payments and Royalties</u>

5.1      Within twelve (12) days of the Effective Date of this Agreement, LICENSEE shall pay to WANG, based on an invoice from Wang, a one time administrative licensing fee of fifty thousand dollars ($50,000), which payment shall be non-refundable and not creditable against royalties payable under any other provision of this Section 5.  The foregoing fee shall be paid by wire transfer pursuant to instructions from WANG to LICENSEE.

5.2.1     As consideration for the release granted to LICENSEE herein, LICENSEE shall pay to Wang seven hundred fifty thousand United States Dollars ($750,000).  The seven hundred fifty thousand ($750,000) shall be paid to WANG within twelve (12) days of the Effective Date of this Agreement.  The foregoing payments shall be made by wire transfer pursuant to WANG's instructions to LICENSEE.  LICENSEE shall provide to

6

WANG the report required by Section 6.2 of this Agreement within twelve (12) days of the Effective Date of this Agreement.

5.2.2    The payment provided for in Section 5.2 above includes:

an amount for LICENSEE's and its Subsidiaries' past infringement for direct and indirect sales (as defined in Section 5.3 of this Agreement) of memory modules in countries in which there was any Licensed Patent from July 25, 1990 through December 31, 1992, for memory modules which would have been Licensed Products upon which royalties would have accrued pursuant to Section 6.1 of this Agreement had such memory modules been made, used, sold or otherwise transferred subsequent to January 1, 1993 pursuant to the licenses and rights granted herein; and

a pre-paid running royalty for LICENSEE's and its Subsidiaries' direct and indirect manufacture, use, sale or other transfer of Licensed Products in a country where there is a Licensed Patent during the period from January 1, 1993 through December 31, 1994 under the licenses and rights granted herein and upon which royalties have accrued according to Section 6.3 of this Agreement.

7

GW0000000464

5.2.3    In the event that LICENSEE's and its Subsidiaries' cumulative direct and indirect sales in terms of LICENSEE's selling price of Licensed Product in countries in which there is any Licensed Patent during the period from January 1, 1993 through December 31, 1994 exceed twenty million two hundred thousand United Stated dollars ($20,200,000), LICENSEE shall pay Wang an additional royalty of three percent (3%) of the direct and indirect sales that exceed $20,200,000.    The foreign factor (defined in Section 5.3) applicable to LICENSEE's indirect sales shall be five percent (5%).    Wang shall provide LICENSEE an invoice for any such additional royalty upon receipt of LICENSEE's report for the semi-annual accounting period ending on December 31, 1994.    LICENSEE shall pay to Wang any such additional royalty within sixty days of December 31, 1994.

5.2.4    In the event that LICENSEE's direct and indirect sales of Licensed Product for the period from January 1, 1993 through December 31, 1994 are equal to or less than twenty million two hundred thousand United States dollars ($20,200,000), Wang shall not be required to refund any amount to LICENSEE nor shall LICENSEE be obligated to make any additional payment to Wang.

5.2.5    In the event, that the United States Court of Appeals for the Federal Circuit, the United States Supreme

8

GW0000000465

Court or a United States District court hold that "3 pack" SIMMs infringe one or both of the Licensed Patents, then, after the foregoing holding becomes final without further right of appeal by any party (the "HOLDING") and within sixty days of the HOLDING, LICENSE shall recalculate the royalty on its direct and indirect (as defined in Section 5.3) sales of Licensed Products, including sales of both "classic" and 3 pack SIMMs,

(1)   upon which royalties would have accrued pursuant to Section 6.1 of this Agreement, for the period from July 25, 1990 through December 31, 1992 at a rate of 4% and pay WANG within said sixty (60) days the royalty on such revenue that is in excess of the royalty payable on $4,800,000 at 4%; and

(2)(a)   upon which royalties would have accrued pursuant to Section 6.3 of this Agreement for the period from January 1, 1993 through December 31, 1994, when the HOLDING date is on or after January 1, 1995, at a rate of 3% and pay WANG within sixty (60) days of January 1, 1995 the royalty on such revenue that is in excess of the royalty payable on $20,200,000 at 3%, or

(2)(b)   upon which royalties would have accrued pursuant to Section 6.3 of this Agreement when the HOLDING date is between January 1, 1993 and January 1, 1995, at a rate of 3% and pay WANG, within sixty (60)

9

GW0000000466

days of the HOLDING date, the royalty on revenue accrued from January 1, 1993 through the HOLDING DATE that is in excess of the royalty payable on $20,200,000 times 0.04167 times the number of full months from January 1, 1993 to and including the month of the HOLDING;

plus,

(2)(c)    upon which royalties have accrued pursuant to Section 6.3 of this Agreement during the period from the HOLDING date through December 31,1994 at a rate of 3% and pay WANG, within sixty (60) days of January 1, 1995, the royalty on revenue accrued from the HOLDING date through December 31, 1994 that is in excess of $20,200,000 times 0.04167 times the number of full months from the HOLDING date  to January 1, 1995.


5.3       On or after January 1, 1995, LICENSEE shall pay to WANG a running royalty of three percent (3%) of LICENSEE's Selling Price, as hereinafter provided, in respect of each Licensed Product manufactured, used, sold or otherwise transferred directly or indirectly in a country where there is a Licensed Patent by LICENSEE and its sublicensed Subsidiaries (including HEA) under the licenses and rights granted herein and upon which royalties have accrued according to Section 6.3 of this Agreement.  LICENSEE shall also pay the above three percent (3%) royalty on a percent (calculated as of January 1, 1995) of all Licensed Products, except those Licensed Products

10

GW0000000467

upon which royalty is payable pursuant to the preceding sentence, which Licensed Products are made, used, sold or otherwise transferred in any country where there is not an issued Licensed Patent. (This percentage, which is hereinafter defined as the "Foreign Factor", is used for administrative convenience based on activity, including manufacture, use and sales, of LICENSEE and its Subsidiaries which result in Licensed Products being indirectly imported into a country where there is an issued Licensed Patent, the "indirect sales"). "Foreign Factor" means $AxP + BxQ + CxR$ divided by the sum of $A + B + C$ multiplied by 100. A, B and C are LICENSEE's revenue for a twelve month period in three regions of the world: A is Europe; B is Japan and Australia and the South East Asia countries between those two countries including, but not limited to, Korea, Hong Kong, Singapore and Malaysia; and C is all other regions of the World except the United States. P, Q and R are percentages of the total number of ISA and EISA personal computers exported from A, B, and C, respectively, to the United States over the twelve month period.

5.4     Notwithstanding the provisions of Section 5.3 of this Agreement, LICENSEE has the option, exercisable after it has paid to Wang the $50,000 set forth in Section 5.1 and the $750,000 set forth is Section 5.2.1 above within any semi-annual accounting period beginning with the accounting period

11

GW0000000468

that commences on April 1, 1994, of electing to convert the royalty rate of three percent (3%) as set forth in such Section 5.3 to a royalty rate of two and three quarters percent (2¾%) by LICENSEE making a one time payment to Wang of six hundred thousand United States dollars ($600,000). Such option shall be deemed exercised by LICENSEE upon the making of such one time payment. The royalty rate of two and three quarters percent (2¾%) shall be effective for the remainder of that accounting period and all subsequent accounting periods.

5.5     No royalties shall be paid by LICENSEE in respect of a Licensed Product manufactured by LICENSEE or a sublicensed Subsidiary for any other party that is licensed by WANG to have such Licensed Product manufactured for it under the Licensed Patents, provided said other party has given prior authorization to LICENSEE or such Subsidiary to manufacture such Licensed Product under said other party's name.

5.6     No royalties shall be payable under this Agreement by LICENSEE for Licensed Products acquired by LICENSEE or a sublicensed Subsidiary from a third party that is licensed by WANG under the Licensed Patents pursuant to a license agreement that provides for the payment of running royalties and under which agreement such third party has paid such royalties. No royalties shall be payable under this Agreement for Licensed Products acquired by LICENSEE or a Sublicensed

12

GW0000000469

Subsidiary from the Hewlett Packard Corporation or from the International Business Machine Corporation.

Section 6. <u>Accruals, Records and Reports</u>

6.1      For all memory modules made, used, sold or otherwise transferred during the period from July 25, 1990 through December 31, 1992 which would have been Licensed Products had such activity occurred after December 31, 1992, the past infringement portion of the Section 5.2 payment shall be deemed to have accrued if such memory modules were first sold or otherwise transferred or first used, by or for LICENSEE, during such period.

6.2      Together with the payments required by Sections 5.1 and 5.2 and within twelve (12) days of the Effective Date, LICENSEE shall furnish a report certified by an officer of LICENSEE covering the period from July 25, 1990 through December 31, 1992 setting forth the same type of information as required by Section 6.6 for a regular semi-annual accounting period as defined in Section 6.5. Within thirty (30) days following receipt of such report and the payment required by Section 5.2, WANG will advise LICENSEE in writing if it accepts such reports and payment. If Wang accepts such report and payment the release of Section 3.1 shall be effective. If WANG does not accept such report and payment, the release of Section 3.1 shall be of no effect and WANG

13

GW0000000470

shall specify its reasons for nonacceptance including the amount of any deficiency in the amount of the payment. If prompt payment is not made by LICENSEE of such deficiency, the report and payment will be, at WANG's option, subject to the audit provisions of Section 6.8 and the interest provision of Section 6.9.

6.3    Beginning on January 1, 1993, royalties shall accrue when Licensed Products with respect to which royalty payments are required by Section 5.2 or Section 5.3 of this Agreement, as the case may be, are first sold or otherwise transferred, or first used, by or for LICENSEE or its sublicensed Subsidiaries in a country where there is an issued Licensed Patent, unless such first sale, transfer or use first occurs in a country where there is not an issued Licensed Patent in which event royalties shall accrue on such Licensed Products when first made by LICENSEE or such sublicensed Subsidiaries. No royalties shall accrue with respect to Licensed Products for a second or subsequent use, sale or other transfer thereof.

6.4    LICENSEE shall pay all royalties and other payments due hereunder in United States dollars. All royalties for an accounting period or other payments computed in other currencies shall be converted into United States dollars at the exchange rate for bank transfers from such currency to

14

GW0000000471

United States dollars as quoted by the head office of the Korean Foreign Exchange Bank at the close of banking on the day preceding the Effective Date of the Agreement for the payments required by Section 5.1 and 5.2 and on the last day of such accounting period (or the first business day thereafter if such last day shall be a non-business day) for the royalty payments required by Section 5.3.

6.5     A semi-annual accounting period shall end on the last day of each June and December during the term of this Agreement.  The first accounting period will end on June 30, 1993 and cover the period from January 1, 1993 through June 30, 1993.  Within twelve (12) days after the end of each such period (including the first) LICENSEE shall furnish to WANG a written report containing the information specified in Section 6.6.  In response thereto, for the accounting period ending on June 30, 1995, WANG shall issue to LICENSEE an invoice for the amount specified in such report as the royalties due and payable by LICENSEE and upon receipt thereof, LICENSEE shall pay to WANG within such sixty (60) day period, all unpaid royalties accrued hereunder to the end of each such period.

6.6     LICENSEE's semi-annual report shall be certified by an officer of LICENSEE and shall contain the following information:

6.6.1 identification by Type Number, quantity and

15

GW0000000472

description of each Licensed Product upon which royalty has accrued pursuant to Section 6.3;

6.6.2 identification of Licensee's Selling Price for each Type Number of Licensed Product; the amount of royalties due for each Type Number of Licensed Product; and the aggregate amount of all royalties due;

6.6.3 identification by Type Number, quantity and description of each Licensed Product which LICENSEE has delivered during such semi-annual accounting period to a third party and which are exempt from royalty in accordance with Section 5.5 and the name of such third party, or which are exempt from royalty in accordance with Section 5.6 and the name of such third party; and

6.6.4 in the event that any of the Sections 6.6.1 through 6.6.3 do not apply, LICENSEE shall so state as to each such Section.

In the event no royalties are due, LICENSEE's report shall so state and the reason therefor.

6.7    Upon written request by WANG and in any event at least once each year during the term of this Agreement with the report provided by LICENSEE for the semi-annual accounting period ending in June, LICENSEE will promptly provide to WANG a copy of each publicly available sales manual or brochure relevant to each Licensed Product identified by WANG or sold or distributed by LICENSEE or its Subsidiaries. Upon written

16

GW0000000473

request by WANG, LICENSEE will sell under its standard terms
and conditions and promptly deliver to WANG any Licensed
Product which is offered for sale by LICENSEE identified by
WANG in its request.

6.8      LICENSEE, for itself and its sublicensed
Subsidiaries, shall keep records in sufficient detail to
permit the determination of royalties payable hereunder and at
the request and expense of WANG (except as provided in the
last sentence of this Section 6.8) will permit an independent
auditor selected by WANG or a WANG internal auditor, or any
other person acceptable to WANG and LICENSEE, to examine,
during ordinary business hours once in each calendar year,
such records and other materials as may be required by the
auditor to verify or determine royalties paid or payable under
this Agreement.    Such auditor or other person shall be
instructed to report to WANG only the amount of royalties due
and payable.    If no request for examination of such records
and materials for a particular semi-annual accounting period
has been made by WANG within six (6) years after the end of
said period, the right to examine such records and materials
for said period, and the obligation to keep such records and
materials for said period, shall terminate.    If royalties are
found by such independent auditor or other person to have been
understated, LICENSEE shall pay the understated amount
together with interest in accordance with Section 6.9 and

17

GW0000000474

shall reimburse WANG for its costs and expenses associated with the performance of the audit; provided, however, LICENSEE shall not be obligated to pay such costs and expenses if the amount of such understatement is less than three percent (3%) of the amount reported by LICENSEE and subject to such audit. If the amount subject to such audit is overstated by more than three percent (3%) WANG shall repay to LICENSEE the amount in excess of three percent (3%) of the amount subject to such audit.

6.9     In the event that any payment to be made pursuant to Section 5 is made in whole or in part after the date by which payment is due, such late payment shall be increased to include a late payment charge at the rate of one and one-half percent 1 1/2%) of the payment amount for each calendar month or part thereof (or, if such rate exceeds the maximum legal rate in the jurisdiction where a claim is asserted, the interest rate shall be reduced to the highest rate permitted by applicable law) during the period the amount due remains unpaid.

6.10     All taxes imposed as a result of the existence or performance of this Agreement shall be borne and paid by the party required to do so by applicable law.  LICENSEE shall withhold from payments to WANG under this Agreement the amount of any national taxes levied on LICENSEE's payments hereunder

18

GW0000000475

by the Korean government consistent with any Korea/United States double taxation treaty. LICENSEE shall effect payment to the appropriate tax authorities of said government of the taxes so withheld, and shall transmit to WANG official receipts issued by said tax authorities or such other evidence as is reasonably available to support a claim for income tax credit by WANG in respect of any taxes so withheld and paid.

Section 7. <u>Warranties and Liability</u>

7.1     WANG represents and warrants that it has the full right and power to grant the licenses and release granted to LICENSEE pursuant to this Agreement. LICENSEE represents and warrants that it, its Subsidiaries and their directors and officers, are not and have not directly or indirectly made, used or sold SIMMs in the United States under any other name without being licensed by WANG.

7.2     Nothing contained in this Agreement shall be construed as:

7.2.1 a warranty or representation by WANG as to the validity or scope of the Licensed Patents;  or

7.2.2 a warranty or representation by WANG that any manufacture, use, sale or other transfer of any product does not or will not infringe patents, copyrights, industrial design rights or other proprietary rights

19

GW0000000476

owned or controlled by third parties.  WANG shall not be liable to LICENSEE or its sublicensed Subsidiaries either directly or as an indemnitor of LICENSEE, such Subsidiaries or their customers as a consequence of any alleged infringement of any such patents, copyrights, industrial design rights or other proprietary rights owned or controlled by third parties.  For WANG's information purposes, LICENSEE shall endeavor to advise WANG in writing of any pending or future claims with respect to any such property rights asserted against it or its Subsidiaries by any third party which relates to Licensed Products.

7.3     WANG makes no other warranty or representation, express or implied, including any warranty or representation as to the results obtained or to be obtained by Licensed Products or the use thereof, and including but not limited to, any WARRANTY OF MERCHANTABILITY or any warranty of fitness for a particular purpose with respect to any Licensed Product or the use thereof.

7.4     In no event shall WANG have any responsibility in contract, tort or otherwise, arising out of or in any way connected with this Agreement, to pay or return to LICENSEE royalties paid hereunder by LICENSEE to WANG, except as specifically set forth herein.

20

GW0000000477

Section 8. <u>Term and Termination</u>

8.1      Unless terminated earlier under a provision of this Section 8, the license granted to LICENSEE under this Agreement shall extend from January 1, 1993 to the date of expiration of the last to expire of the Licensed Patents. Unless terminated earlier under a provision of this Section 8, the term of this Agreement shall extend from the Effective Date of this Agreement to the date of termination or completion of performance of all licenses, rights and obligations hereunder.

8.2      LICENSEE may terminate the licenses granted herein with respect to either or both Licensed Patents at any time upon ninety (90) days written notice to WANG.

8.3      Upon breach or default by Licensee of any provision in this Agreement, including but not limited to, failure to make any report, make any payment or pay any royalties or interest due, or permit the inspection of its or a sublicensed Subsidiary's books and records, as hereinabove required, WANG may terminate the licenses granted to LICENSEE under this Agreement and/or this Agreement at any time upon thirty (30) days written notice to LICENSEE identifying such breach or

21

GW0000000478

default; _provided, however_, that if LICENSEE satisfactorily remedies such breach or default within the thirty (30) days notice period, then the licenses granted herein by WANG to LICENSEE shall not terminate.

8.4    In the event this Agreement or the license granted hereunder shall be terminated pursuant to this Section 8, the corresponding sublicense granted to Subsidiaries of LICENSEE pursuant to Section 3 shall likewise terminate, but no notice need be given by WANG to such sublicensed Subsidiaries.

8.5    No termination pursuant to this Section 8, or Sections 3.1 or 10.10 shall relieve LICENSEE of any obligations or liability accrued hereunder prior to such termination, or rescind or give rise to any right to rescind anything done by LICENSEE or any payments made or other consideration given to WANG prior to the time such termination becomes effective, and such termination shall not affect in any manner any rights of either party arising under this Agreement prior to such termination.

Section 9. Notices and Communications

9.1    Notices, reports and communications hereunder shall be deemed to have been sufficiently given if in writing and sent by facsimile transmission and confirmed in writing by

22

GW0000000479

courier to the other party at the address given below within ten (10) days following such facsimile transmission. Until further notice, all notices shall be addressed as follows:

9.1.1  If from WANG to LICENSEE;

D. S. Chung
Senior Manager of the
Patent Department
Hyundai Electronics Co., Ltd.
66 Chuckseon-Dong, Chongro-Ku
Seoul, Korea

9.1.2  If from LICENSEE to WANG;

General Counsel
Wang Laboratories, Inc.
One Industrial Avenue
Lowell, Massachusetts  01851

Either party may change such address by written notice to the other party.

Section 10. <u>Miscellaneous Provisions</u>

10.1    <u>Assignment</u>.

LICENSEE shall not assign this Agreement or the license and rights granted hereunder, in whole or in part, without the prior written consent of WANG. WANG may assign this Agreement without the written consent of LICENSEE, provided that the assignee expressly assumes all of WANG's obligations under this Agreement by a writing delivered to LICENSEE.

10.2    <u>Agency</u>.

WANG and LICENSEE stipulate that neither party shall be

23

construed as acting as an agent or representative of the other party in any dealings which the first party may have with any other person, firm or corporation and that neither party has power to act for or legally bind the other party in any transaction.

10.3    Applicable Law.

This Agreement shall be interpreted and the rights and liabilities of the parties determined in accordance with the laws of the Commonwealth of Massachusetts.

10.4    Costs and Attorney's Fee.

In the event it is necessary for WANG to commence legal proceedings to enforce this Agreement, or to collect amounts due hereunder, WANG will be entitled to recover from LICENSEE its costs of suit and collection, including attorney's fees, unless such proceedings involve the representation or warranty made by WANG in Section 8.1 of this Agreement, in which event LICENSEE shall be entitled to recover from WANG its attorney's fees.

10.5    Other Property.

Nothing contained in this Agreement shall be construed as conferring any rights by implication, estoppel or otherwise, to or under know-how, copyrights or mask work or similar rights, or with respect to computer programs under any form of

24

statutory protection now existing or hereafter enacted, wherein the copying of a program is a requisite for infringement under such form.

10.6    Enforcement.

WANG shall not have any obligation hereunder to institute any action or suit against third parties for infringement of any Licensed Patents or to defend any action or suit brought by a third party which challenges or concerns the validity of any Licensed Patents.  In addition, LICENSEE shall not have any right to institute any action or suit against third parties for infringement of any Licensed Patents.

10.7    Entire Agreement.

This Agreement constitutes the complete and exclusive statement of the agreement between WANG and LICENSEE with respect to the subject matter indicated above, and supersedes all prior proposals and understandings, oral or written, relating to the subject matter of this Agreement.  There are no understandings, representations or warranties of any kind, oral or written, express or implied, with respect to the subject matter indicated above, except as expressly set forth herein.  Failure by either party to enforce any provision of this Agreement shall not be deemed a waiver of that provision or of any other provision of this Agreement.  Any claim of waiver of any right, obligation, term or condition of this

25

GW0000000482

Agreement and any claim that any provision of this Agreement has been modified or amended shall be null and void unless such waiver, modification or amendment is made in writing and signed by authorized representatives of both LICENSEE and WANG.

10.8    This Agreement shall be effective (herein the "Effective Date of this Agreement") as of the later to occur of:

10.8.1    The Date of this Agreement; or

10.8.2    The date on which all necessary Korean government approvals are obtained.

If the approvals referred to in Section 10.8.2 are required in order for LICENSEE to perform its obligations under this Agreement, and all such approvals are not obtained within sixty (60) days of the signing of this Agreement by WANG, this Agreement shall be void, <u>ab initio</u>.

10.9    <u>Headings</u>.

The headings of the several Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

10.10    <u>Severability</u>.

If any Section of this Agreement is found by competent

26

GW0000000483

authority to be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such Section in every other respect and the remainder of this Agreement shall continue in effect so long as the Agreement still expresses the intent of the parties. If the intent of the parties cannot be preserved, this Agreement shall be either renegotiated or terminated.

10.11    FACSIMILE SIGNATURES

The parties agree that this Agreement may be executed by one party signing and dating two originals of the Agreement in the place provided at the end and transmitting by facsimile one signed Agreement to the other party and by the other party signing and dating the facsimile copy in the place provided at the end and transmitting by facsimile the facsimile copy back to the first party. The first party, upon receipt of the signed facsimile copy, shall deliver by courier the two original Agreements to the second party for signing and dating to conform to the facsimile copy and shall deliver by courier one of the signed and dated originals of the Agreement to the first party. The Agreement shall be deemed to be made as of the date that the first party receives from the second party its signed and dated copy of the facsimile copy of the Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this

GW0000000484

Agreement to be duly signed as of the date first above written.

For Hyundai Electronics          For Wang Laboratories, Inc.
    Industries Co., Ltd.

_____ 6/21/93        _____ 6/21/93
Signature        Date           Signature        Date

MUN-BAE CHONG                    Richard L. Buckingham
_____                _____
Typed Name                      Typed Name

VICE PRESIDENT                   Vice President and
_____                Treasurer
Title                           _____
                                Title

28

GW0000000485

Agreement to be duly signed as of the date first above written.

For Hyundai Electronics        For Wang Laboratories, Inc.
     Industries Co., Ltd.

_____ 6/21/93        _____ 6/21/93
Signature        Date          Signature          Date

MUN-BAG CHUNG                   Richard L. Buckingham
_____        _____
Typed Name                     Typed Name

VICE PRESIDENT                  Vice President and
_____        Treasurer
Title                          _____
                               Title


Commonwealth of Massachusetts
Middlesex, SS.

    Before me on June 21, 1993, the above-named Richard L. Buckingham, Vice President and Treasurer, being personally known to me did appear and subscribe his name to the foregoing and affirmed that the same was his free act and deed.

                               _____
                               Notary Public
                               My Commission Expires: 9/14/95



28

GWO000000486