UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GETRONICSWANG CO., LLC,<br>    Plaintiff,<br><br>v.<br><br>HYNIX SEMICONDUCTOR, INC., and<br>SAMSUNG ELECTRONICS CO., LTD.,<br>    Defendants. | Civil Action No. 04-12382 (RCL) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendants Hynix Semiconductor, Inc. ("Hynix") and Samsung Electronics Co., Ltd. ("Samsung") submit this memorandum in opposition to plaintiff GetronicsWang Co., LLC's ("Wang's") motion for summary judgment, which was filed simultaneously with the defendants' own motion for summary judgment. In their motion and supporting papers,[1] the defendants demonstrated that judgment should enter for them because:

- Wang's claims depend on the defendants having improperly withheld tax amounts from royalty payments, but Wang has no competent evidence to support a finding that the withholding was wrong.

---

[1] The defendants incorporate by reference into this opposition their memorandum of law, statement of undisputed facts, and the affidavits of K.H. Min, Sungrak Son, and Bruce S. Barnett filed in support of their motion.
 In this memorandum: Plaintiff's Memorandum of Law in Support of Its Motion for Summary Judgment [document 26] is referred to as "Wang's Brief"; Plaintiff's Concise Statement of Material Undisputed Facts in Support of Its Motion for Summary Judgment [document 29] is referred to as "Wang's Facts"; the Memorandum of Law in Support of Defendants' Motion for Summary Judgment [document 31] is referred to as "Defendants' Brief"; and Hynix Semiconductor, Inc. and Samsung Electronics Co., Ltd.'s Local Rule 56.1 Statement of Undisputed Facts [document 32] is referred to as "Defendants' Facts."

- Even if it could show improper withholding, the claims are time-barred. And,

- In light of the contracts' failure to address a tax refund, it is unfair and unreasonable to require the defendants to make up the difference in Dollar value between the amount withheld and the amount refunded.

The arguments Wang makes in favor of its motion, and the evidence it submits to support them, reinforce each of these arguments by demonstrating that all of Wang's claims are inextricably bound to the allegation that the tax payments were royalties that were due in 1992-1997. If the royalties were due between 1992-1997, plaintiff's claims are time-barred. If the royalties were not due in 1992-1997, then the plaintiff does not have — indeed never had —any claim against the defendants.

The parties submissions also demonstrate that there is no genuine dispute about a material issue of fact that would prevent the entry of summary judgment. Rather, the cross-motions present to the Court undisputed facts to which the application of heartland legal principles must result in the Court granting the defendants' motion for summary judgment on all of plaintiff's claims.

I. **Plaintiff's Contention that the Withheld Amounts Were Required To Be Paid at the Time of the Royalty Payments Confirms That Its Claims Are Barred by the Statute of Limitations.**

    A. **The Royalty Payment Claim and associated interest claims are time-barred.**

In supporting its motion for summary judgment, Wang acknowledges — indeed embraces — the predicates for the defendants' argument that Wang's claims are time-barred. Wang asserts that the full amount of the gross royalty calculated by the Korean companies was due at the time of the royalty payments, that the tax payments were improperly withheld, and that

~BOST1:405895.v4

the License Agreements[2] were thus breached at various points from 1992 to 1997 coinciding with the payments of royalties net of taxes.[3] This overarching theme — that the defendants failed to pay royalties when they were due — pervades Wang's summary judgment papers:

- "Wang protested the [tax] deductions, informing Samsung and Goldstar that the royalties were not Korean source income …" (Wang's Facts ¶ 20.)
- "Wang therefore informed Samsung and Goldstar that the royalties were not subject to the Korean Corporation Tax." (Wang's Facts ¶ 20.)
- "[T]he … aggregate royalties accrued" "[f]rom 1990 to 1997". (Wang's Br. at 2.)
- "Defendants did not pay the royalties in full,…." (Wang's Br. at 2.)
- "Defendants made partial royalty payments when the royalties accrued…." (Wang's Br. at 4.)
- "Defendants have breached the license agreements … by failing to pay royalties as they accrued…." (Wang's Br. at 4.)
- "When Defendants made their initial royalty payments, …. Defendants did not pay the full amounts due…." (Wang's Br. at 6.)
- "In so doing, Defendants breached the plain terms of the license agreements calling for royalties to be paid when the royalties accrued." (Wang's Br. at 6.)

---

[2] Capitalized terms not defined herein have the meaning given to them in the Defendants' Brief.

[3] For purposes of the cross-motions for summary judgment generally, the defendants do not accept as true the assertions that the withholding amounts were due in 1992-1997, that they were improperly withheld, and that the defendants breached by not paying them to Wang. Indeed, the defendants argue that they performed exactly as required by the Agreements and that the plaintiff can prove no breach. However, in this Part I (and in Parts II and III.A of the Defendants' Brief) the defendants assume *arguendo* that plaintiff could prove such facts to demonstrate that, on the basis of those facts, Wang's claims are time-barred.

- "[I]t is clear that Defendants breached their license agreements because Defendants improperly deducted from the royalty payments taxes that were not due or levied by the NTS." (Wang's Br. at 13.)

- "Defendants' payment to the NTS without the Korean authorities levying the funds contravenes the plain meaning of the license agreements." (Wang's Br. at 14.)

- In light of the Hyundai Motor case, "[e]ven under a relaxed definition of 'levy,' Defendants' withholding was improper." (Wang's Br. at 14.)

- "Defendants' deducting 16.25% [sic] from their initial royalty payments was unjustified …." (Wang's Br. at 15.)

- "Defendants cannot credibly claim that the 16.25% [sic] they withheld was not due to Wang, because they withheld the 16.25% from the accrued royalties and paid that amount to the NTS. The fact that Defendants withheld and paid those funds to the NTS is evidence that they considered the 16.25% otherwise due to Wang at the time." (Wang's Br. at 18-19, n. 13.)

Given the centrality of those allegations to Wang's theory, its summary judgment brief is remarkable for not addressing or even mentioning the obvious statute of limitations hurdle it must surmount. The statute of limitations is clearly the elephant in the room that plaintiff refuses to acknowledge. If the royalties accrued in the early to mid-1990s, they were due in the early to mid-1990s, at the end of the six-month accrual period in which they arose. If they were due then and not paid at the end of the accounting period, the defendants breached the Agreements, Wang was injured at that time, and Wang's claim accrued. "Under Massachusetts law, an action for breach of contract generally accrues at the time of breach, thereby triggering the statute of

4

limitations for purposes of determining whether a claim is time-barred." Saenger Organization, Inc. v. Nationwide Ins. Licensing Assocs., Inc., 119 F.3d 55, 64 (1st Cir. 1997). Wang thus asserts causes of action that accrued from 1992-1997. The time allowed for bringing those claims expired no later than 2003 — six years after the last of the royalty payments made by the defendants and long before Wang commenced this action.[4]

It is equally remarkable that Wang presses its claim for contractual interest on the amounts withheld from the date of the royalty payments until the date of payment of the tax refund. Wang bases this claim on the so-called late payment provisions of the Agreements. By the terms of the Agreements, interest only accrues "[i]n the event that any payment … is made after the date by which payment is due."[5] (E.g., Samsung Agreement § 2.12 (emphasis added).) In its memorandum, Wang points to these provisions, which provide for interest on "late payments," and then concludes that it is entitled to interest from the date the defendants failed to pay all the amounts it says were due — 1992-1997. (Wang's Br. at 18.) Plaintiff appears to be undaunted by the statute of limitations, which is again crowding the room without acknowledgment.[6] If the payments have been late since that time, the amounts were due then and the statute of limitations bars the claim.

---

[4] Wang has no basis for tolling the statute of limitations: "Under the Massachusetts discovery rule, the running of the statute of limitations is delayed while 'the facts,' as distinguished from the 'legal theory for the cause of action,' remain '*inherently unknowable*' to the injured party." Saenger Organization, Inc., 119 F.3d at 65 (alteration in original, internal quotation omitted). The plaintiff bears the burden of presenting facts sufficient to take the case outside the statute of limitations, see id., and Wang has made no effort to do so here. Indeed, it cannot, as it was at all times aware of all material facts relating to the withholding.

[5] Because there are no other provisions in the Agreements which could serve as a basis for the pre-refund interest claim, plaintiff is driven to use the "late payment" provision. That provision, however, necessarily results in the claim being time-barred.

[6] That plaintiff attempts to assert the claim for pre-refund interest despite the fact that it is clearly time-barred is not surprising given that it constitutes $2.2 million of its total claim of $2.9 million. However, the size of the interest claim does not make it any less time-barred.

**B.     The Exchange Rate Claim is either time-barred or does not exist.**

While Wang makes no effort to directly address the statute of limitations, its concern with the problem is evident by the lengths to which it goes to construct a breach at the time of the tax refund in 2002-2003. Its "Exchange Rate Claim" is premised on the allegation that the defendants, in remitting to Wang what they received from NTS in 2002-2003, paid too little money. Wang measures the shortfall as the difference between the Dollar value of the withholding (at the time it was withheld) and the Dollar value of the refund (at the time it was refunded). The perceived obligation to pay this shortfall must have accrued at one of two times: when the royalty payments were made or when the refund was transmitted. Wang's position is that it was the former — "In 2002-2003, Defendants purported to rectify their earlier partial payments." (Wang's Br. at 7) — but on that theory, the claim is time-barred for the reasons set forth above. On the other hand, if the obligation to pay arose at the time of the refund, there is no Exchange Rate Claim.

While Wang states that the shortfall obligation arose at the time of the royalty payments (1992-1997), Wang simultaneously nods to the obvious statute of limitations problem inherent in this approach by concocting an alleged breach at the time of the refund (2002-2003). Doing so is no small feat, as it is clear that the Agreements do not address the unanticipated circumstance of Wang receiving a refund of taxes previously withheld. According to Wang, the breach that occurred in 2002-2003 was the defendants' use of the currency exchange rate in effect at the time of the refund rather than the exchange rate at the time the royalty payments were due.[7] It thus

---

[7] Wang also contends the defendants breached the requirement that "[a]ll sums payable to WANG pursuant to th[e] Agreement[s] shall be paid in United States Dollars." It says that by remitting the Dollars into which they exchanged the refunded Won received from NTS, the defendants "effectively

*(footnote continued to next page)*

turns to the only possible hook in the contract on which to hang that claim — the accrual-period exchange rate designation in the U.S. Dollar Payment Provision.[8]

On examination, Wang musters nothing in support of this position beyond the mere assertion that the accrual-period exchange rate applied to the tax refund: "Effectuating the plain meaning of the license agreements requires applying the currency rate for 1990-1997, the period during with the royalties accrued, to <u>all</u> payments made by Defendants." (Wang's Br. at 9 (emphasis added).) But asserting it does not make it so. In fact, the language on which Wang bases its "plain meaning" argument plainly does not address the tax refund:

> In the event royalties accrue in a currency other than United States Dollars, those royalties shall be converted to United States Dollars at the rate for which United States Dollars were publicly traded in exchange for the other currency by Korea Foreign Exchange Bank, on the last day of the Semi-Annual Period during which the royalties accrued.

(<u>E.g.</u>, Samsung Agreement § 2.11.) This exchange rate provision applies at a specific time (the end of each six-month accrual period) to a specific amount (any royalties that accrued during that time in a non-U.S. Dollar currency). The defendants agree that this provision allocates the risk of exchange rate fluctuation during the six-month accrual period.[9] It is also undisputed that this exchange rate was properly used to convert any

---

*(footnote continued from previous page)*
made late royalty payments in Won." (Wang's Br. at 8.) But Wang does not contend that the defendants tendered even a single payment in a currency other than U.S. Dollars, and it is undisputed that they never did.

[8] Because Wang is attempting to recapture the Dollar value of the amount withheld at the time of the withholding, it must find a way to contend that the accrual-period exchange rate applies to the refund.

[9] If the foreign currency appreciates against the Dollar during the six-month period, Wang enjoys a gain and the Korean company absorbs the risk. Wang has taken the risk of the foreign currency depreciating, which would result in it receiving fewer Dollars than if the exchange had been made on the day of the accrual. Defendants also agree that this exchange rate designation, <u>as far as it goes</u>, is within the parties' contracting power and would be enforceable in court if defendants attempted to compute gross royalties at the end of each six-month period by applying some other rate to foreign-denominated accrued royalties.

*(footnote continued to next page)*

such accrued royalties to U.S. Dollars at the appropriate time — when the gross royalties were computed at the conclusion of each six-month period.  But there is no basis in the contract or the law for applying that allocation of risk to an unanticipated refund of tax payments received five to ten years after each of the royalty payments.  Viewing each of the Agreements as a whole, the exchange rate designation is intended to be used only in the computation of pre-tax gross royalties.  Once that task is accomplished at the end of the accrual period, the designated exchange rate drops away and plays no role.

      Moreover, Wang's very reliance on the exchange rate designation of the U. S. Dollar Payment Provision puts it right back behind the bar of the statute of limitations, for Wang cannot cherry pick the accrual-period exchange rate while leaving behind the inconvenient but inseparable other language of the provision, which provides that the exchange rate is only applicable to royalty amounts that accrued in the prior six months.  Under this provision, accrual must precede the date of the designated exchange rate.  Thus, the only way Wang can reach back to claim the accrual-period exchange rate is to concede that the royalties had accrued even earlier.  If they accrued prior to the date of the exchange rate Wang seeks to apply, they were due and a claim to recover them is time-barred.

---

*(footnote continued from previous page)*
This is as far as the numerous cases cited by plaintiff carries its argument.  No cited case addresses a factual situation similar to the one before the Court and none indicates that where parties to a contract designate the date for an exchange rate for one purpose, it is the proper exchange rate for all purposes.

~BOST1:405895.v4

**II.     Wang Must — But Cannot — Prove That Taxes Were Improperly Withheld.**

   **A. Wang's claims depend on improper withholding.**

Another remarkable feature of Wang's brief is the contention that it need not prove the tax payments were improperly withheld to succeed on its motion for summary judgment. (Wang Br. at 13.) As plaintiff, Wang must prove a breach. Absent improper withholding, there is no Royalty Payment Claim. It is undisputed that: a) the defendants withheld amounts from the gross royalty computation to pay taxes to NTS on Wang's behalf; b) the defendants converted every Dollar withheld to Won and paid it to NTS; and c) each of the contracts required defendants to withhold taxes levied by NTS. In light of these facts, the only way the defendants' withholding and payment of net royalties to Wang could constitute a breach is if the taxes were improperly withheld.

There can also be no Exchange Rate Claim if the defendants properly withheld the taxes. As seen in Part I.B., the exchange rate provision Wang relies on applies to royalties that accrued over the prior 6 months, as products incorporating the SIMMS technology are sold. Under no circumstances — and certainly not if taxes were properly withheld — can the tax refund be appropriately considered "accrued royalties." It is a tax refund and there is no basis for Wang to pull the accrual-period exchange rate out of the sky to manufacture a claim where none exists.

   **B.     Wang has no evidence to support a reasonable conclusion that the withholding was improper.**

It is clear Wang has not carried its burden to present admissible evidence from which a finder of fact reasonably could conclude that the taxes were not required to be paid. It must at least set forth evidence to create a genuine dispute to defeat the defendants' motion for summary judgment, as " a nonmoving party can fend off a motion for summary judgment only by setting forth specific facts sufficient to demonstrate that every essential element of its claim or defense

9

is at least trial worthy." Saenger Organization, Inc., 119 F.3d at 65-66 (internal quotation and alteration omitted). To prevail on its motion, Wang faces the more arduous task of establishing that no reasonable jury could fail to find that the taxes were improperly withheld. See id. It falls far short of both standards.

Wang's primary argument for improper withholding is that "levy" means something other than "assess" and, because the Agreements used the former term, the Korean companies were not empowered to withhold the tax amounts — even if NTS required the taxes to be paid — until NTS took legal action to seize them.

This argument fails for at least two reasons: First, the premise that there is a distinction with a difference in the definitions of levy and assess is false. Dictionaries provide "strong evidence" of the meaning of terms used in a contract, Okmyansky v. Herbalife International of America, Inc., 415 F.3d 154, 160-61 (1st Cir. 2005), and Black's Law Dictionary equates the terms, defining levy as "[t]o impose or assess (a fine or a tax) by legal authority <levy a tax on gasoline>." Black's Law Dictionary (7th ed. 1999) at 919. See also Merriam-Webster's Collegiate Dictionary (10th ed. 2001) at 668 (defining levy as "to impose or collect by legal authority <~ a tax>").

More significantly, Wang's construction of "levy" as used by the Agreements makes no sense in light of the undisputed features of the Korean tax system, as identified by the defendants' expert, Dong Soo Kim. (Defendants' Facts ¶¶ 21-26.) Wang's interpretation requires the Korean companies to accept civil and possibly criminal penalties for failing to withhold, while forcing NTS to pursue them in court to recover the payments. The levy-as-seizure view also makes no commercial sense for Wang, as it is undisputed that the net royalty

10

payments could not be wired out of the country until the government certified that the taxes had been paid. (Id.)

Wang's subsidiary arguments, based on the Hyundai Motor Co. case and the resolution of the Competent Authority Proceeding, also fall far short of the mark. As an initial matter, Wang presents no evidence in support of its characterization of Hyundai Motor Co. and no evidence that the case applies (or that NTS considered it to apply) to payments under the Agreements. The lone paragraph of Wang's Facts (#13) addressing the substance of the case does not cite any evidence. Moreover, Wang ignores the substantial undisputed evidence presented by the defendants in support of their motion, including Mr. Kim's expert testimony that NTS continued to require payment of taxes on royalties in situations similar to those under the Agreements (Kim Report at 5[10]) and the unsuccessful efforts of the parties — including Wang itself — in 1992 to get NTS to state that Hyundai Motor Co. applied to the Agreements or that withholding was not required (Defendants' Facts ¶¶ 43-51).

In a final effort to make a case that NTS did not levy the taxes between 1992 and 1997, Wang cites a portion of an internal IRS memorandum which states that, in the Competent Authority Proceeding, the two governments agreed that "none of the royalties will be considered as Korean sourced." (Wang's Facts ¶ 26 (quoting Dunahoo memorandum) (emphasis added).) As an initial matter, if the IRS memorandum is to be considered evidence on whether NTS had levied the taxes in 1992-1997, the question is decided against Wang. In the paragraph immediately preceding the one Wang chooses to quote, the IRS states, "Since the Korean tax authorities considered all royalties as 100% sourced in Korea, all payments were subjected to

---

[10] Attached as Exhibit F the Barnett Affidavit

withholding taxes." (Barnett Aft. Ex. AA p. 2 (emphasis added).) But the larger point is that the Competent Authority Proceeding was a negotiated, diplomatic proceeding, not a judicial or even administrative determination of whether the taxes were properly withheld or properly required to be withheld. See Defendants' Facts ¶¶ 27-28, 54.[11]

## CONCLUSION

For all of the foregoing reasons, Hynix and Samsung ask that the Court deny plaintiff's motion for motion for summary judgment and grant their cross-motion for summary judgment.

HYNIX SEMICONDUCTOR, INC. and
SAMSUNG ELECTRONICS CO., LTD.,

By their attorneys,

/s/ Robert P. Sherman
Robert P. Sherman (BBO #458540)
Bruce S. Barnett (BBO #647666)
DLA Piper Rudnick Gray Cary US LLP
One International Place
Boston, MA 02110
617-406-6000

Dated: February 3, 2006

---

[11] To the extent Wang's description of a competent authority proceeding as "an administrative procedure … [to] determine which of the two (or more) [governments] is the 'competent authority' to levy the tax" suggests differently, it must be noted that Wang cites no evidence in support of its characterization. Moreover, the U.S.-Korea tax treaty is consistent with Mr. Kim's interpretation: "The Competent authorities of the Contracting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising as to the application of this Convention. In particular, [they] may agree — …(c) to the same determination of the source of particular items of income." Tax Treaty Art. 27(2) (found at Exhibit H to the Harris Affidavit).

~BOST1:405895.v4